**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada  M9L 1T9 | ) <br> ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) <br> )    Case No. |
| v. | ) <br> ) <br> ) |
| FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857 | ) <br> ) <br> ) <br> ) |
| MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C.  20201 | ) <br> ) <br> ) <br> ) <br> ) |
| and | ) <br> ) |
| ANDREW VON ESCHENBACH<br>Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD  20857 | ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) |

**APOTEX INC.'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Pursuant to Rule 65(a) and (b) of the Federal Rules of Civil Procedure and LCvR 65.1, Apotex Inc. ("Apotex") hereby respectfully moves for a temporary restraining order and/or preliminary injunction against the Food and Drug Administration ("FDA"); Michael O. Leavitt, Secretary of Health and Human Services; and Andrew von Eschenbach, Commissioner of Food and Drugs (collectively, the "Federal Defendants") as follows:

(a) requiring FDA to set aside its June 28, 2007 administrative decision converting final approval of Apotex's Abbreviated New Drug Application ("ANDA") No. 76-048 for omeprazole capsules 10 mg and 20 mg to a tentative approval;

(b) requiring FDA to immediately reinstate final approval of Apotex's ANDA No. 76-048 for omeprazole capsules 10 mg and 20 mg; and

(c) enjoining FDA from rescinding or otherwise converting final approval of Apotex's ANDA No. 76-048 for omeprazole capsules 10 mg and 20 mg to a tentative approval.

In the event the Court denies such relief, Apotex respectfully moves for emergency relief pending appellate review. Specifically, in the event the Court denies Apotex's request for emergency injunctive relief, Apotex respectfully requests that FDA's decision converting final approval of Apotex's ANDA No. 76-048 to a tentative approval be stayed pending review by, and appeal of this matter to, the United States Court of Appeals for the D.C. Circuit, in order to prevent further devastating and irreparable harm to Apotex.

The grounds for this motion are fully set forth in the accompanying brief in support of Apotex's motion, the Declaration of Tammy L. McIntire and the Declaration of Arthur Y. Tsien, filed contemporaneously herewith.

Pursuant to LCvR 65.1(a), Apotex certifies that in advance of this filing, Apotex informed the Federal Defendants of its intent to seek a temporary restraining order and/or preliminary injunction in this matter, as well as the time of the making of the application, and has provided the Federal Defendants with copies of this motion and all supporting papers, including the proposed order. The Federal Defendants have declined to consent to entry of the requested

temporary restraining order and/or preliminary injunction, and consultation pursuant to LCvR 7(m) has failed to narrow the areas of disagreement.

Dated:  July 2, 2007.                          Respectfully submitted,

APOTEX INC.

By:    /s/Arthur Y. Tsien
             Arthur Y. Tsien, D.C. Bar No. 411579
             Kathryn E. Balmford, D.C. Bar No. 482279
             OLSSON, FRANK AND WEEDA, P.C.
             1400 16th Street, N.W., Suite 400
             Washington, D.C. 20036-2220
             (202) 789-1212
             (202) 234-3550 (facsimile)

Of Counsel:
William A. Rakoczy, D.C. Bar No. 489082
Amy D. Brody, D.C. Bar No. 478100
Natalie G. Mitchell
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada  M9L 1T9<br><br>     Plaintiff,<br><br>     v.<br><br>FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C.  20201<br><br>     and<br><br>ANDREW VON ESCHENBACH<br>Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>     Defendants. | Case No. |

## MEMORANDUM OF LAW IN SUPPORT OF APOTEX INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

William A. Rakoczy, D.C. Bar No. 489082
Amy D. Brody, D.C. Bar No. 478100
Natalie G. Mitchell
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301

Arthur Y. Tsien, D.C. Bar No. 411579
Kathryn E. Balmford, D.C. Bar No. 482279
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212

Dated:  July 2, 2007

*Counsel for Apotex Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 3

I.     Statutory Background. ............................................................................... 3

       A.     Brand Drugs – NDAs And Patent Listing Requirements. ...................... 3

       B.     Generic Drugs – ANDAs And Patent Certifications. ........................... 4

       C.     Pediatric Exclusivity. ............................................................... 5

II.    Factual Background. ................................................................................ 6

       A.     The Reference-Listed Drug And Orange Book Patents. ......................... 6

       B.     Apotex's ANDA No. 76-048 For Omeprazole Delayed-Release Capsules
              10 mg And 20 mg. ..................................................................... 7

       C.     The New York District Court Judgment. ......................................... 8

       D.     FDA's Unlawful Decision Revoking And Converting Apotex's Final
              Approval To A Tentative Approval. ................................................ 9

ARGUMENT ................................................................................................... 11

I.     Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its
       Claims. ................................................................................................ 12

       A.     Apotex's ANDA Is Not Subject To Astra's Pediatric Exclusivity And
              Therefore FDA Has No Lawful Basis For Revoking The Longstanding
              Final Approval Of Apotex's ANDA. .............................................. 13

              1.     Under The Agency's Own Binding Precedent, Pediatric
                     Exclusivity Simply Does Not Apply To An ANDA, Like Apotex's
                     Omeprazole ANDA Here, That Is Already Finally Approved Prior
                     To Patent Expiration. ...................................................... 13

              2.     FDA's Decision Violates The Plain Language Of The Relevant
                     Statutes. ...................................................................... 16

              3.     FDA's Decision Is Not Entitled To Any Deference From This
                     Court. ........................................................................ 17

i

      B.     FDA Was Not Bound By, And Should Not Have Blindly Deferred To, The New York Court's Judgment. ............................................................................... 19

           1.     FDA Alone Has The Statutory Authority To Determine Whether An NDA-Holder Has Pediatric Exclusivity. ............................................. 20

           2.     The New York Court's Construction Of The Pediatric Exclusivity Statute Does Not Trump That Of FDA. ..................................................... 21

      C.     In The Alternative, This Court Should Vacate FDA's Decision Pending Judicial Review Of FDA's Response To Apotex's Submission To The Agency. ............................................................................................................. 24

II.    The Harm To Apotex Is Substantial And Irreparable. ...................................... 26

III.   The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate Injunctive Relief. ............................................................................................... 27

IV.   An Injunction Would Further The Public Interest. ........................................... 28

CONCLUSION .............................................................................................................. 28

# TABLE OF AUTHORITIES

## Federal Cases

\* *Am. Bioscience, Inc. v. Thompson*,
   243 F.3d 579 (D.C. Cir. 2001) ........................................................................ 25

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ...................................................................... 24

*Barnhart v. Walton*,
   535 U.S. 212 (2002) ........................................................................................ 18

*Blackman v. District of Columbia*,
   277 F. Supp. 2d 71 (D.D.C. 2003) .................................................................. 11

*Bracco Diagnostics, Inc. v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) ....................................................................... 15

*Bush-Quayle '92 Primary Comm. v. FEC*,
   104 F.3d 448 (D.C. Cir. 1997) ................................................................... 15, 19

\* *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ................................................................................ 16, 17, 18

*Columbia Broad. Sys. v/ FCC*,
   454 F.2d 1018 (D.C. Cir. 1971) ................................................................. 14, 19

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
   300 F. Supp. 2d 32 (D.D.C. 2004) .................................................................. 15

*In re Barr Labs.*,
   930 F.2d 72 (D.C. Cir. 1991) ............................................................................ 3

*Ind. Mich. Power Co. v. Dep't of Energy*,
   88 F.3d 1272 (D.C. Cir. 1996) ........................................................................ 17

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996) ........................................................................ 15

*INS v. Cardoza-Fonseca*,
   80 U.S. 421 (1987) .......................................................................................... 19

*Malcomb v. Island Creek Coal Co.*,
   15 F.3d 364 (4th Cir. 1994) ............................................................................ 19

\* *Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ........................................................... 11, 16, 28

*\*Authorities upon which
Apotex chiefly relies are
marked with asterisks.*

iii

\* *Mylan Labs., Inc. v. Leavitt,*
    484 F. Supp. 2d 109 (D.D.C. 2007) ............................................................. 6, 14, 20

\* *Mylan Labs., Inc. v. Thompson,*
    332 F. Supp. 2d 106 (D.D.C.) ..................................................................... 20, 24

\* *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005).............................................................................. 21, 22, 23

*Omar v. Harvey,*
    416 F. Supp. 2d 19 (D.D.C. 2006) .................................................................. 11

*Pfizer, Inc. v. Mylan Labs., Inc.,*
    No. 02cv1628, 2006 WL 2990398 (W.D. Pa. Oct. 18, 2006) ............................. 5, 8

*Raymen v. United Senior Ass'n,*
    No. 05-486(RBW), 2005 WL 607916 (D.D.C. Mar. 16, 2005) ............................. 11

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998) ..................................................................... 25

*Teva Pharms. USA, Inc. v. FDA,*
    182 F.3d 1003 (D.C. Cir. 1999) ............................................................. 4, 27, 28

\* *Teva Pharms. USA, Inc. v. FDA,*
    441 F.3d 1 (D.C. Cir. 2006) ................................................................. 21, 22, 24

*Transactive Corp. v. United States,*
    91 F.3d 232 (D.C. Cir. 1996) ........................................................................ 15

*United States v. Mead,*
    533 U.S. 218 (2001).................................................................................... 18

## Federal Statutes

21 U.S.C. § 355(b)(1) .......................................................................................... 3, 4

21 U.S.C. § 355(c)(2)............................................................................................... 4

21 U.S.C. § 355(j)(2)(A)........................................................................................... 4

21 U.S.C. § 355(j)(2)(A)(vii)..................................................................................... 4

21 U.S.C. § 355(j)(2)(B)........................................................................................... 4

\* 21 U.S.C. § 355(j)(5)(B)(iii)................................................................................ 5, 17

\* 21 U.S.C. § 355a ............................................................................................. 6, 14

21 U.S.C. § 355a(c)(2)(A) ................................................................................ 14

\* 21 U.S.C. § 355a(c)(2)(B)............................................................................ 14, 16

\* 21 U.S.C. § 355a(d) ....................................................................................... 20

\* 21 U.S.C. § 355a(f) ........................................................................................ 20

35 U.S.C. § 271(e)(2)(A) .................................................................................. 4

\* 35 U.S.C. § 271(e)(4)(A) ............................................................................ 5, 17

5 U.S.C. § 705 ................................................................................................ 24

5 U.S.C. § 706(2) ........................................................................................... 12

## Federal Regulations

21 C.F.R. § 314.53(e)....................................................................................... 4

## Other Authorities

FDA, *Guidance for Industry: Qualifying for Pediatric Exclusivity Under
Section 505A of the Federal Food, Drug, and Cosmetic Act* (Sept. 1999).............................. 20

Apotex respectfully submits this brief in support of its motion for a temporary restraining order and/or preliminary injunction:  (a) requiring FDA to set aside its June 28, 2007 administrative decision converting the final approval of Apotex's Abbreviated New Drug Application ("ANDA") No. 76-048 for 10 mg and 20 mg omeprazole capsules to a tentative approval; (b) requiring FDA to immediately reinstate Apotex's final approval; and (c) enjoining FDA from further revoking or otherwise converting Apotex's final approval.  In the event the Court denies such relief, Apotex respectfully moves for a stay of the effects of FDA's decision pending appeal of this matter to, and review by, the D.C. Circuit, in order to prevent further irreparable harm to Apotex.

## **<u>INTRODUCTION</u>**

FDA has unlawfully revoked the final approval of Apotex's generic omeprazole capsules.  FDA's decision ignores and violates the Agency's own precedent and constitutes a complete abdication of the Agency's statutory authority and obligation.  The Court therefore should—indeed must—set aside that decision as arbitrary, capricious and contrary to law under the Administrative Procedures Act ("APA"), and enjoin the revocation of Apotex's lawful final approval.

At issue here is the prescription anti-ulcer medication omeprazole, which AstraZeneca ("Astra") first marketed under the brand-name Prilosec<sup>®</sup>.  Apotex has lawfully marketed lower-priced generic omeprazole to American consumers for ***over 3 years*** pursuant to an approval granted by FDA in 2003.  To obtain that approval, Apotex filed an ANDA for generic omeprazole in December 2000 challenging Astra's Prilosec<sup>®</sup> patents.  In response, Astra sued Apotex and triggered an automatic 30-month stay of FDA approval of Apotex's ANDA. After that stay expired, FDA granted final approval of Apotex's ANDA on October 6, 2003. When Astra deliberately chose not to seek a preliminary injunction, Apotex began commercially

1

marketing its generic product shortly thereafter, **and continued to do so after Astra's patents naturally expired on April 20, 2007**. Prior to patent expiration, no ruling on infringement or validity had occurred, and as FDA itself concedes, no exclusivity of any kind existed that would affect Apotex's final approval. The expiration of Astra's patents should have put an end to any possible impediment to Apotex's approval–as of that date, there was no possible exclusivity period.

But in an unprecedented administrative decision issued on June 28, 2007, well after patent expiration, FDA stripped Apotex of the lawful final approval that it has enjoyed for over 3 years. FDA based this cursory two-page letter decision solely on a order **entered well after patent expiration** by the district court hearing the patent action that purports to reset the effective date of Apotex's approval to the expiration of Astra's supposed "pediatric exclusivity" on October 20, 2007. Simply put, however, there is no such exclusivity against Apotex. FDA itself conclusively determined in another matter just two months ago that pediatric exclusivity does not exist or apply to ANDAs that are already finally approved before patent expiration. The Agency therefore had no lawful basis or authority to rescind or convert Apotex's final approval.

Nor was FDA bound by the patent court's order in any event, but rather was obligated to engage in independent and reasoned agency decision-making on an issue that Congress delegated and entrusted solely to FDA, not the district court. No reasoning or analysis of any kind occurred here, let alone that required by statute. Far from it in fact—FDA completely abdicated its statutory obligation to determine the existence of pediatric exclusivity in the first instance. Such *ad hoc* decision-making, which is bereft of any reasoning at all, is entitled to no deference from this Court.

As a result, Apotex has a strong likelihood of success on the merits of its claim that FDA's decision is arbitrary, capricious and contrary to law under the APA. At the very least, Apotex has demonstrated that an injunction immediately reinstating final approval of Apotex's ANDA until the merits of the parties' positions can be fully briefed and heard (both by this Court and the D.C. Circuit, if necessary) should be issued. This is particularly true in light of the fact that Apotex is suffering, and will continue to suffer, irreparable harm to its business and reputation absent the requested injunctive relief; FDA on the other hand, will not suffer any harm if the requested relief is granted. And, of course, the public plainly benefits from full generic competition as it has experienced and come to expect over the last three years. This Court should, therefore, enter an order awarding Apotex with the immediate injunctive relief sought herein.

## **BACKGROUND**

### I.    **Statutory Background.**

This action arises in connection with the 1984 Hatch-Waxman Amendments, which amended the Federal Food, Drug, and Cosmetic Act ("FFDCA") and the patent laws "to get generic drugs into the hands of patients at reasonable prices—fast." *In re Barr Labs*., 930 F.2d 72, 76 (D.C. Cir. 1991).

### A.    **Brand Drugs – NDAs And Patent Listing Requirements.**

A company that seeks to sell a new drug must file with FDA a New Drug Application ("NDA"). The applicant must include in its NDA, *inter alia*, technical data on the composition of the drug, the means for manufacturing it, clinical trial results establishing its safety and effectiveness, and labeling describing the use for which approval is requested. *See* 21 U.S.C. § 355(b)(1). The applicant also must submit information to FDA with respect to any patent that "claims the drug for which the application was submitted or which claims a method of

using such drug . . . ."  21 U.S.C. § 355(c)(2); *see also id.* § 355(b)(1).  FDA publishes all such

patent information in the "Orange Book."  *See* 21 C.F.R. § 314.53(e).

### B.     Generic Drugs – ANDAs And Patent Certifications.

Before 1984, a company seeking to market a generic version of an FDA-approved

NDA drug had to complete expensive and time-consuming safety and efficacy studies on the

drug, even though the NDA-holder already had established the drug's safety and efficacy.  In

1984, Congress simplified the procedure for obtaining approval of generic drugs with the Hatch-

Waxman Amendments to the FFDCA.   Under Hatch-Waxman, "an abbreviated new drug

application process allows applicants . . . to proceed more quickly to the marketplace."  *Teva*

*Pharms. USA, Inc. v. FDA*, 182 F.3d 1003, 1004 (D.C. Cir. 1999).

An ANDA applicant must establish that its generic drug product is bioequivalent

to the NDA drug.  *See* 21 U.S.C. § 355(j)(2)(A).  The ANDA also must include a "certification"

to any properly-listed Orange Book patent.   *See* 21 U.S.C. § 355(j)(2)(A)(vii).   The statute

provides for the following four certification options:  (I) that there is no patent information; (II)

that the listed patent has expired, a so-called "paragraph II certification"; (III) that the ANDA

applicant will not market its generic drug until after expiration of the listed patent, a so-called

"paragraph III certification"; or (IV) that the listed patent is invalid and/or will not be infringed

by the proposed drug, a so-called "paragraph IV certification."  *Id.*

With certain exceptions not applicable here, an ANDA applicant seeking FDA

approval to market its generic drug prior to the expiration of the Orange Book-listed patent must

submit a paragraph IV certification and notify the patentee and NDA-holder of the factual and

legal bases for that certification.  *See* 21 U.S.C. § 355(j)(2)(B).  The submission of an ANDA

with a paragraph IV certification constitutes a technical act of infringement under 35 U.S.C.

§ 271(e)(2)(A), thereby vesting the district courts with subject matter jurisdiction to adjudicate

whether the proposed generic drug infringes the subject patent before the drug has actually been marketed.

If the patentee or NDA-holder does not bring suit against the ANDA applicant within 45 days of receiving the notice letter, the statute mandates that FDA "shall" approve the ANDA immediately, once FDA's approval requirements have been satisfied.  *See* 21 U.S.C. § 355(j)(5)(B)(iii).  If, however, the brand company brings suit within 45-days, FDA "shall" approve the ANDA immediately upon expiration of the 30-month stay referenced in the statute. *See id.*

Before expiration of the 30-month stay, if the district court hearing the patent infringement suit decides that the patent is valid and infringed, the court may enter an order stating that the effective date of approval of the ANDA shall be a date that is not earlier than expiration of the patent.   *See* 35 U.S.C. § 271(e)(4)(A); *see also* 21 U.S.C. § 355(j)(5)(B)(iii) (noting that § 271(e)(4)(A) relief applies only where the district court decides that the patent is infringed "before the expiration of such [30-month] period").  But the court has no jurisdiction or authority to enter such an order ***after the patent expires***.  *See Pfizer, Inc. v. Mylan Labs., Inc.*, No. 02cv1628, 2006 WL 2990398, at *3 (W.D. Pa. Oct. 18, 2006) (dismissing § 271(e)(2)(A) claims against ANDA-filer after patent expiration for lack of subject matter jurisdiction, even though pediatric exclusivity still had not, to the extent applicable, expired). FDA, moreover, may not revoke and/or convert the effective final approval of an ANDA after expiration of the relevant patent.

### C.    Pediatric Exclusivity.

In certain circumstances, if an NDA-holder conducts clinical studies in the pediatric population at FDA's request, FDA may award an additional six-month period of so-called marketing exclusivity, commonly known as "pediatric exclusivity."   *See* 21 U.S.C.

§ 355a.  This six-month period of exclusivity granted under Section 355a does *not* extend the term of any relevant patent, but rather merely attaches six months to the end of any other exclusivities already in existence.  Application of Section 355a delays the period during which FDA may approve certain pending ANDAs.

More pertinent here, the six-month period of pediatric exclusivity granted by Section 355a does ***not*** apply to or otherwise delay ANDAs with paragraph IV certifications that are already finally approved, and for which there had been no court decision of infringement or validity, as of the date of patent expiration.  FDA reached this conclusion in an April 18, 2007 decision letter in a matter involving generic versions of the drug Norvasc® (amlodipine).  (*See* Tsien Decl.[1] Ex. A, 4/18/07 FDA Letter to Amlodipine Besylate ANDA Applicants, at 5 n.4 (citing 21 U.S.C. § 355a(c)(2)(A)-(B) (concluding that ANDAs that stand finally approved at the time the final blocking patent expires are "not blocked by [a brand manufacturer's] pediatric exclusivity . . . under the literal terms of the [pediatric exclusivity] statute")).  FDA's decision was upheld by Judge Urbina of this Court.  *Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109 (D.D.C. 2007), *appeal pending*, No. 07-5156 (D.C. Cir.).

## II.    Factual Background.

### A.    The Reference-Listed Drug And Orange Book Patents.

The reference-listed drug upon which Apotex based its ANDA is Astra's Prilosec® (omeprazole) delayed-release capsules.    FDA first approved Prilosec® on September 14, 1989, pursuant to NDA No. 19-810.  This product is used for, among other things, the treatment of gastroesophageal reflux disease.  Astra submitted information on several patents for listing in the Orange Book in connection with Prilosec®, of which two are relevant here:  (a)

---

[1]  References to "Tsien Decl." are to the Declaration of Arthur Y. Tsien, submitted contemporaneously herewith.

U.S. Patent No. 4,786,505 ("the '505 patent"); and (b) U.S. Patent No. 4,853,230 ("the '230 patent"). **The '505 and '230 patents both expired on April 20, 2007**. FDA also has awarded Astra a period of pediatric exclusivity in connection with Prilosec® that, **to the extent applicable**, expires on October 20, 2007.

### B.     Apotex's ANDA No. 76-048 For Omeprazole Delayed-Release Capsules 10 mg And 20 mg.

On December 5, 2000, Apotex submitted ANDA No. 76-048 for generic omeprazole delayed-release capsules in, among others, 10 mg and 20 mg strengths. Apotex's ANDA contains paragraph IV certifications to, among others, the listed '505 and '230 patents. As required by statute and regulation, Apotex duly notified Astra of its ANDA and paragraph IV certifications, together with the legal and factual bases for those certifications. In response to the filing and notice of Apotex's paragraph IV ANDA, Astra sued Apotex for alleged infringement of the '505 and '230 patents under 35 U.S.C. § 271(e)(2)(A) in the United States District Court for the Southern District of New York ("the New York Court"). The only 30-month stay arising out of the New York action expired years ago in 2003.

On October 6, 2003, FDA granted final approval of Apotex's ANDA 76-048 for the 10 mg and 20 mg products, finding that these generic products are safe and effective for use in accordance with the approved labeling. Apotex commercially launched its 10 mg and 20 mg generic products soon thereafter, and has been providing its lower-priced generic version of this important medicine to consumers since that time. At no time prior to patent expiration did Astra attempt to challenge Apotex's final effective approval or otherwise attempt to preclude the commercial marketing of Apotex's competing generic products. In fact, Astra made the calculated decision not to seek any type of preliminary injunctive relief. Several other generic

companies, including Mylan, Lek and Impax, also commercially launched and have been marketing competing generic omeprazole products for years as well.

On April 20, 2007, the '505 and '230 patents-in-suit naturally expired before any adjudication of infringement or validity by the New York Court. Because Apotex's ANDA was finally approved *years* before the patents expired and any ruling on infringement or validity, it was not subject to any pediatric exclusivity. In fact, as of the day the patents expired on April 20, 2007, FDA concedes that there was no pediatric exclusivity delaying, blocking or otherwise affecting Apotex's lawfully granted final approval.

**C.    The New York District Court Judgment.**

The expiration of the '505 and '230 patents should have divested the New York Court of any jurisdiction to enter an order under § 271(e)(4)(A). *See Pfizer*, 2006 WL 2990398. Nevertheless, on June 14, 2007, despite the expiration of the patents, the New York Court entered judgment against Apotex and others under § 271(e)(2)(A). Under that judgment, the New York Court concluded that Apotex's omeprazole products infringe certain claims of the '505 and '230 patents. Despite the expiration of the '505 and '230 patents, the New York Court also entered an order stating that "[p]ursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of approval for the aforementioned products and related ANDAs shall be not earlier than October 20, 2007, ***the date on which the six-month period of exclusivity under 21 U.S.C. § 355a(b)(2)(B) expires***." (*See* Tsien Decl. Ex. B, 6/14/07 Order ¶ 3 (emphasis added)). As noted above, however, there was no pediatric exclusivity as to Apotex, because its ANDA was approved years before patent expiration and because there was no ruling on infringement before patent expiration. FDA, in fact, had previously agreed. The New York Court nonetheless erroneously assumed—and based its order solely on the erroneous determination—that such exclusivity exists as to Apotex, when it clearly does not. As such, Apotex hoped that FDA

would simply follow the law, indeed its own precedent, and set the record straight: Apotex's approval could not be delayed or revoked on an exclusivity that does not exist. After all, the question of whether Astra is entitled to such pediatric exclusivity is vested solely in FDA. As it turns out, however, FDA, as noted below, would completely abdicate that responsibility, ignore its own binding precedent, and blindly defer to the New York Court's erroneous order.

Meanwhile, Apotex duly appealed the New York Court's judgment to the United States Court of Appeals for the Federal Circuit. That appeal is pending. Apotex requested that the Federal Circuit stay that portion of the judgment purporting to reset the effective date of Apotex's approval to the expiration of Astra's pediatric exclusivity. The Federal Circuit denied that motion, also erroneously assuming that Astra was entitled to pediatric exclusivity. While Apotex asked FDA to weigh in and set the record straight, it refused to do so. Apotex recently filed an emergency motion to reconsider the Federal Circuit's denial of Apotex's motion to stay. That motion remains pending.

**D.    FDA's Unlawful Decision Revoking And Converting Apotex's Final Approval To A Tentative Approval.**

On June 15, 2007, Astra requested that FDA immediately revoke final approval of Apotex's ANDA until at least October 20, 2007, the date on which Astra's purported pediatric exclusivity expires. (*See* Tsien Decl. Ex. C, 6/15/07 Letter from Astra to FDA). Astra conveniently omitted that Apotex already had final approval; that such approval had been lawfully granted years before patent expiration or any infringement ruling; and that it was not entitled to such exclusivity as against Apotex.

On June 21, 2007, Apotex submitted a six-page letter to FDA with comments and legal arguments detailing the reasons why FDA should not, and indeed could not, lawfully

revoke and/or convert the status of Apotex's final effective approval.[2] (*See* Tsien Decl. Ex. D, 6/21/07 Apotex Letter to FDA). Apotex fully explained why, under the Agency's own precedent in the amlodipine matter, there could be no pediatric exclusivity against Apotex, and thus no basis to rescind Apotex's longstanding and lawful final approval. On June 28, 2007, Apotex also requested that FDA refrain from taking any action until the Federal Circuit decides Apotex's emergency motion to reconsider, and until FDA could solicit comments and input from interested parties and the industry, just as the Agency had done in the amlodipine matter.

Nevertheless, on June 28, 2007, in a cursory two-page letter decision that included no legal analysis or support, FDA revoked and converted Apotex's final approval to a tentative approval until the expiration of Astra's purported pediatric exclusivity on October 20, 2007. (*See* Tsien Decl. Ex. E, 6/28/07 FDA Letter Ruling). FDA's decision does not address, and indeed ignores, the comments submitted by Apotex, as well as prior Agency precedent on the application of pediatric exclusivity. In fact, the decision is devoid of any reasoning or analysis of any kind on whether Astra is, in fact, entitled to such exclusivity against Apotex. Rather, FDA simply defers and considers itself bound by the New York Court's erroneous assumption and determination that Astra is entitled to pediatric exclusivity. Indeed, FDA merely states in a footnote that Prilosec® "is subject to periods . . . of pediatric exclusivity"—without any explanation as to how such exclusivity could possibly apply to an ANDA lawfully approved years before patent expiration and any ruling on infringement. (*Id.* at 1 n.1). The *only* "explanation" in FDA's letter was that the Agency's action was being taken "in light of [the New York Court] order." (*Id.* at 1).

---

[2] Apotex's 6/21/07 Letter to FDA was submitted jointly with Impax Laboratories, Inc.

## **ARGUMENT**

Courts must weigh four factors in deciding whether to grant a preliminary injunction or temporary restraining order: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of harm to other parties if relief is granted; and (4) the public interest. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Raymen v. United Senior Ass'n*, No. 05-486(RBW), 2005 WL 607916, at *2 (D.D.C. Mar. 16, 2005) (granting temporary restraining order). The movant "need not prevail on each factor in order to receive injunctive relief." *Raymen*, 2005 WL 607916, at *2. "Rather . . . the factors must be viewed as a continuum, with more of one factor compensating for less of another. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Blackman v. District of Columbia*, 277 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (internal quotations and citation omitted) (granting preliminary injunction).

"[I]ssuing an injunction may be justified 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'" *Raymen*, 2005 WL 607916, at *2 (quoting *Blackman*, 277 F. Supp. 2d at 78). Moreover, "[i]n cases that raise questions 'going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground . . . for more deliberative investigation,' . . . courts should eschew an 'exaggeratedly refined analysis of the merits at an early stage in the litigation.'" *Omar v. Harvey*, 416 F. Supp. 2d 19, 22 (D.D.C. 2006) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

Apotex satisfies this standard here. *First*, Apotex has a strong likelihood of prevailing on the merits because there is no pediatric exclusivity applicable to Apotex's ANDA. For this reason alone, FDA had no lawful basis to revoke or convert Apotex's final approval.

*Second*, the unlawful withdrawal of Apotex's final approval already has caused devastating and irreparable harm by forcing Apotex to stop selling a safe and effective product that has been on the market for over three years. *Third*, FDA has no stake in this litigation, and therefore will suffer no harm from an injunction. Nor will Astra or any other third-parties. The balance of harms thus tips decidedly in favor of granting injunctive relief. *And fourth*, the public will benefit from an order that allows for both faithful application of the laws and fuller generic competition, as Congress intended. Consequently, this Court should enter an order granting Apotex the injunctive relief sought herein.

## I.    Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its Claims.

Under the APA, the Court must set aside FDA's decision because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Here, FDA has revoked or converted Apotex's final approval solely on the basis of a court order that purports to reset the effective date of approval of Apotex's ANDA to the expiration of Astra's pediatric exclusivity on October 20, 2007. FDA's decision therefore rests and depends solely on the existence of pediatric exclusivity against Apotex. ***But there is no such pediatric exclusivity here to enforce against Apotex's ANDA.*** To the contrary, under FDA's own binding precedent and the plain language of the statute, pediatric exclusivity simply does not apply to Apotex's ANDA that was approved *years* before patent expiration and any ruling on infringement or validity. Nothing in the statute, FDA regulations or other Agency precedent permits FDA to revive that exclusivity out of thin air after expiration of the relevant patents. For this reason alone, FDA's decision is contrary to law.

Nor was FDA required to defer to a court order that erroneously assumes the existence of pediatric exclusivity. FDA, and FDA alone, is vested with the exclusive statutory authority to determine the existence of pediatric exclusivity. FDA was therefore required to

bring its expertise and experience to bear in determining, in the first instance, whether Astra is even entitled to pediatric exclusivity against Apotex—it clearly is not. FDA was not remotely bound by the New York Court's order and erroneous assumption to the contrary. FDA's complete abdication of its statutory mandate and blind deference to the New York Court's order is arbitrary and capricious for this reason as well.

A. **Apotex's ANDA Is Not Subject To Astra's Pediatric Exclusivity And Therefore FDA Has No Lawful Basis For Revoking The Longstanding Final Approval Of Apotex's ANDA.**

FDA granted Apotex final approval *years* before the '505 and '230 patents expired on April 20, 2007, and before any ruling on infringement or validity. In fact, no such ruling occurred until *well after patent expiration*. Based on this lawful final approval, Apotex rightfully began commercially marketing of its generic omeprazole products in or about November 2003. Now, after Apotex has been marketing and selling its generic omeprazole products for well over three years, FDA has stripped Apotex of its final approval until the expiration of Astra's pediatric exclusivity. FDA's revocation of Apotex's final approval is erroneous and unlawful because it is based solely on a pediatric exclusivity period that simply does not exist as to Apotex.

1. **Under The Agency's Own Binding Precedent, Pediatric Exclusivity Simply Does Not Apply To An ANDA, Like Apotex's Omeprazole ANDA Here, That Is Already Finally Approved Prior To Patent Expiration.**

In a previous matter involving the drug amlodipine besylate, FDA conclusively determined that a finally-approved ANDA (like Apotex's ANDA here) "is not blocked by [an NDA-holder's] pediatric exclusivity . . . under the literal terms of the [pediatric exclusivity] statute," and that the "ANDA's approval cannot be delayed." (Tsien Decl. Ex. A, Amlodipine

13

Decision, at 5 n.4 (citing 21 U.S.C. § 355a(c)(2)(A)-(B))). FDA must apply the same rule to Apotex here.

More specifically, in the amlodipine besylate matter, Mylan filed its ANDA in May 2002, which included a paragraph IV certification to Pfizer's listed '909 and '303 patents. (Tsien Decl. Ex. A, Amlodipine Decision at 4). Pfizer, however, did not bring a patent infringement suit within 45 days of receiving notice of Mylan's paragraph IV certification. (*Id.*). Consequently, Pfizer's untimely lawsuit did not result in the 30-month stay of ANDA approval provided for under 21 U.S.C. § 355(j)(5)(B)(iii). (*Id.*). Mylan's ANDA received final approval in October 2005, well before the '909 patent expired in July 2006 and the '303 patent expired in March 2007. (*Id.* at 4-5). ***Thus, FDA concluded that under the plain language of 21 U.S.C. § 355a, pediatric exclusivity did not apply to Mylan's ANDA***. This court (Urbina, J.) deferred to that decision. *See Mylan*, 484 F. Supp. 2d at 121-22.

So here, Apotex's ANDA was finally approved *years* before the patents expired and before any ruling on infringement and validity. Accordingly, just as Mylan's ANDA was not subject to Pfizer's pediatric exclusivity, Apotex's ANDA is not subject to Astra's pediatric exclusivity either. Absent such exclusivity, FDA had no basis or lawful authority to rescind or convert Apotex's final approval.

FDA has not articulated any reason, much less a legitimate one, for departing from the amlodipine precedent in this case. "[W]hen an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law." *Columbia Broad. Sys. v/ FCC*, 454 F.2d 1018, 1026 (D.C. Cir. 1971). FDA has not done so here. As such, and for this reason alone, FDA's revocation of Apotex's final approval is arbitrary, capricious and

contrary to law.  *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) (stating that an agency must afford similar treatment to comparable cases); *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 300 F. Supp. 2d 32, 42 (D.D.C. 2004) (finding HHS's denial of coverage was arbitrary and capricious due to agency's inconsistent treatment of similarly situated parties); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997) (granting injunctive relief based on FDA's disparate treatment of one product as a device and another product as a drug); *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (stating that should an agency change its course, it "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored") (quoting *Greater Boston Tel. Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (finding Treasury acted arbitrarily in not conforming its electronic benefits transfer policies to its existing regulations or offering a 'reasoned analysis' for the difference).

The fact of the matter is that there is no reason to depart from the amlodipine precedent here in any case, especially where Apotex was lawfully approved years before the patents expired, ***and where the infringement ruling and order on which FDA purportedly based its decision occurred well after patent expiration***.  This is key and bears repeating—as of the date that the relevant patents expired, no one (not FDA or Astra) disputes that ***no pediatric exclusivity existed***, and that Apotex's final approval was perfectly lawful.  In other words, any claim to pediatric exclusivity was effectively extinguished as of patent expiration.  FDA's cursory decision essentially assumes, without any supporting authority or analysis, that the infringement ruling rendered well after patent expiration somehow magically revived or reinstated such pediatric exclusivity.  But nothing in the controlling statute, FDA regulations or

Agency precedent suggests, much less compels, this absurd result and Agency hocus pocus. To hold otherwise simply defies logic and common sense, and would, by fiat, effectively revive a pediatric exclusivity that no longer exists and extend the life of admittedly expired patents.

### 2.    FDA's Decision Violates The Plain Language Of The Relevant Statutes.

While it is impossible to discern from the 2-page decision exactly on what statutory authority FDA purported to base its decision, that decision certainly cannot be squared with the plain language of the pediatric exclusivity statute either. The relevant provision states that,

> [I]f the drug is the subject of a listed patent for which a certification has been submitted under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 355 of this title, and in the patent infringement litigation resulting from the certification the court determines that the patent is valid and would be infringed, *the period during which an application may not be approved under* section 355(c)(3) or *section 355(j)([5])(B)* of this title *shall be extended by a period of six months after the date the patent expires* (including any patent extensions).

21 U.S.C. § 355a(c)(2)(B) (emphasis added). As FDA rightly recognized in the Amlodipine Decision, the unambiguous terms of the statute apply only to an ANDA that has not yet been approved. Indeed, this provision in its face is limited to ANDAs that have not received a final effective approval.

Here, by contrast, Apotex's ANDA was finally approved *years* before the New York Court made any finding that Apotex infringed the patents or that the expired patents were valid. FDA's decision therefore contravenes the plain language of the pediatric exclusivity statute as well. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (holding that an agency "must give effect to the unambiguously expressed intent of Congress"); *see also Mova*, 140 F.3d at 1068 (finding that, although FDA has the power to

interpret the FFDCA, it "does not thereby obtain a license to rewrite the statute"); *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (rejecting agency's "treatment of th[e] statute" because it "is not an interpretation but a rewrite" and "destroys the *quid pro quo* created by Congress").

Even when read in junction with the rest of Hatch-Waxman, this provision does not authorize FDA to revive a pediatric exclusivity that no longer exists and revoke a lawful final approval. Indeed, even the language of § 271(e)(4)(A), on which the New York Court's Order was purportedly based, is limited on its face to approvals that are not yet effective. *See* 35 U.S.C. § 271(e)(4)(A) ("the court shall order ***the effective date*** of any approval of the drug . . . *to be* a date which is not earlier than the date of the expiration of the patent" (emphasis added)).[3] The statute speaks in terms of future approvals "to be" granted. More importantly, however, it refers to the date of patent expiration, not the expiration of pediatric exclusivity. Nothing in either of the relevant statutes authorizes FDA to revive a pediatric exclusivity that no longer exists as to Apotex in order to revoke a lawful approval granted well before, and effective at the time of, patent expiration.

### 3.    FDA's Decision Is Not Entitled To Any Deference From This Court.

Furthermore, FDA's decision is contrary to the plain language of the pediatric exclusivity provision of the FFDCA. But even beyond, FDA's decision is not entitled to any deference from this Court, even if examined under *Chevron* Step II. *See Chevron*, 467 U.S. at 843-44. The degree of *Chevron* deference afforded an Agency decision by a reviewing court

---

[3] The literal language of Hatch-Waxman also provides that § 271(e)(4)(A) relief is only available when the infringement ruling occurs before expiration of the 30-month stay. *See* 21 U.S.C. § 355(j)(5)(B)(iii) (noting that § 271(e)(4)(A) relief applies only where the district court decides that the patent is infringed "before the expiration of such [30-month] period"). In any case, nothing suggests that an infringement ruling that occurs well after patent expiration should have any effect on lawfully granted approvals.

always depends in significant part on the interpretive method used by the agency, as well as the care, consistency and manner in which the administrative decision was reached. *See Barnhart v. Walton*, 535 U.S. 212, 222 (2002); *United States v. Mead*, 533 U.S. 218, 229-35 (2001). In this case, however, there was no deliberative process or reasoned agency decision-making at all, let alone anything to which a court could reasonably defer under *Chevron*.

In this regard, the Agency's conduct in the amlodipine matter is instructive, and speaks volumes about the Agency's outrageous conduct here. In amlodipine, FDA solicited comments and input on a variety of detailed questions and issues from all interested parties and the industry as a whole before acting. FDA even set up a special docket for such comments. FDA then considered all such submissions and comments in a detailed 14-page letter decision, which addressed each and every issue and question in a thorough and deliberative fashion.

Here, in contrast, FDA failed to respond at all to Apotex's and Impax's detailed submission (or Astra's for that matter). FDA did not address a single issue or argument, but rather issued a cursory 2-page letter with no meaningful explanation of any kind for the basis of its decision (to the extent there is any), much less any care or formality. Indeed, FDA relegates the issue of pediatric exclusivity to a footnote with no explanation. In short, FDA impermissibly abdicated its role in determining the applicability of pediatric exclusivity, and failed to provide any meaningful explanation of the basis for its decision. In these circumstances, FDA's cursory letter decision is entitled to no deference and cannot possibly withstand judicial review. *See Barnhart*, 535 U.S. at 222 (degree of deference afforded by reviewing court depends in significant part upon the interpretive method used by the agency); *Chevron*, 467 U.S. at 845 (deference afforded if review of agency decision supports conclusion that it was "a reasonable policy choice for the agency to make"); *Mead,* 533 U.S. at 229-35 (holding that *Chevron*

deference was denied due to lack of care, consistency and authority in administrative decision); *see also Bush-Quayle '92 Primary Comm.*, 104 F.3d at 453 (refusing *Chevron* deference when agency inconsistently interprets the statute and fails to explain its departure from prior precedent); *Columbia Broad. Sys.*, 454 F.2d at 1026 (finding that "when an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law").[4]

**B.      FDA Was Not Bound By, And Should Not Have Blindly Deferred To, The New York Court's Judgment.**

The New York Court erroneously assumed—and based its order solely on the premise—that Astra is entitled to pediatric exclusivity against Apotex. FDA blindly deferred to, and felt bound by, that order and erroneous assumption, even though there is no such exclusivity against Apotex under the Agency's own binding precedent from amlodipine. This, too, was arbitrary and capricious because FDA is not even remotely bound by the New York Court's order—especially not on the crucial question of whether there is pediatric exclusivity against Apotex. On this crucial issue, FDA alone was obligated to bring its expertise and experience to bear. It was not permitted to abdicate that responsibility.

---

[4] This, of course, is especially true where, as here, FDA's decision so clearly conflicts with the Agency's prior amlodipine precedent. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (citation omitted); *Malcomb v. Island Creek Coal Co.*, 15 F.3d 364, 369 (4th Cir. 1994) ("When the agency's varying interpretations of a regulation have not been the result of the agency making considered changes in its policy, but rather of the agency simply acting inconsistently without explanation, however, 'the case for judicial deference is less compelling.'") (citation omitted)).

1.    **FDA Alone Has The Statutory Authority To Determine Whether An NDA-Holder Has Pediatric Exclusivity.**

As an initial matter, only FDA has the statutory authority to determine whether an NDA-holder is entitled to pediatric exclusivity. *See Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d 106, 118 (D.D.C.), *aff'd* 389 F.3d 1272 (D.C. Cir. 2004) (holding that "issues relating to the ANDA's approval and the applicability of the pediatric exclusivity provisions" are "subject areas that have clearly been entrusted to the FDA by Congress"); *see also* 21 U.S.C. § 355a(d) (granting FDA authority to determine whether pediatric studies submitted by the NDA-holder are sufficient); *id*. § 355a(f) (requiring FDA to "publish a notice of any determination that the requirements of subsection (d) of this section have been met and that submissions and approvals under subsection (b)(2) or (j) of section 355 of this title for a drug will be subject to the provisions of this section"); *see also generally* FDA, *Guidance for Industry: Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act* (Sept. 1999) (setting forth FDA's standards for determining whether a brand manufacturer is entitled to pediatric exclusivity).

Courts routinely recognize the deference owed to FDA under *Chevron* to determine when pediatric exclusivity is applicable. *See, e.g., Mylan*, 332 F. Supp. 2d at 118 (deferring to FDA's determination that Mylan was barred by Alza's pediatric exclusivity for Duragesic®); *see also Mylan*, 484 F. Supp. 2d at 121-22 (deferring to FDA's determination that Teva was barred by Pfizer's pediatric exclusivity for Norvasc® but Apotex was not).

It is therefore FDA, and not the New York Court, that is vested with the authority to decide whether pediatric exclusivity applies to Apotex's ANDA. FDA's decision to blindly defer to the New York Court's erroneous assumption and determination in this regard was arbitrary and capricious to say the least. FDA's decision does not even attempt to justify or

explain how pediatric exclusivity could possibly effect Apotex's lawful approval.  The Agency's absurd footnote, which merely assumes the existence of such exclusivity, does not, and cannot, pass muster in view of FDA's statutory mandate.

> ## 2.    The New York Court's Construction Of The Pediatric Exclusivity Statute Does Not Trump That Of FDA.

The New York Court's misguided interpretation of 21 U.S.C. § 355a(c)(2)(B) does not, and indeed cannot, override FDA's own precedent, as established by the Amlodipine Decision, that pediatric exclusivity does not apply to ANDAs with final approval.  As such, FDA must adhere to its own interpretation of the pediatric exclusivity statute rather than the interpretation and conclusion of the New York Court.  Indeed, FDA was obligated to bring its own expertise and experience to bear on this issue, and was not obligated under any circumstances to blindly accept the New York Court's opinion on this issue.

As an initial matter, the New York Court actually made no explicit determination of the existence of pediatric exclusivity as to Apotex, but merely erroneously assumed that to be the case.  But even if the New York Court had engaged in a detailed statutory construction (it clearly didn't), as a general matter, a court's construction of a statute does not trump that of an administrative agency.  As the Supreme Court recently recognized, "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference **only** if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (emphasis added); *see also Teva Pharms. USA, Inc. v. FDA ("Pravastatin")*, 441 F.3d 1, 4-5 (D.C. Cir. 2006) (quoting *Brand X*).  Thus, where a prior judicial determination purports to interpret or apply an ambiguous statute, an administrative agency lawfully may "choose a different construction, since the agency remains

the authoritative interpreter (within the limits of reason) of such statutes." *Brand X*, 545 U.S. at 983; *see also Pravastatin*, 441 F.3d at 4 ("In a suit challenging agency action, it is not for the court to choose between competing meanings of an ambiguous statute when the agency charged with its administration has not weighed in first." (internal quotation marks and citations omitted)).

As such, prior judicial determinations, such as the New York Court's judgment, do not bind an administrative agency otherwise entitled to *Chevron* deference, and such determinations cannot substitute for reasoned agency decision-making once the issue is submitted to the Agency. *See, e.g.*, *Pravastatin*, 441 F.3d at 4-5. For example, in *Pravastatin*, the D.C. Circuit held that "FDA mistakenly thought itself bound by [its] decisions in *Teva I* and *Teva II*," and therefore vacated the Agency's decision as arbitrary and capricious. *Id.* at 5. The court remanded the case to the Agency with instructions to "bring its experience and expertise to bear in light of competing interests at stake and make a reasonable policy choice" notwithstanding the D.C. Circuit's prior interpretation of the Hatch-Waxman Act. *Id.* at 4-5 (citations and quotations omitted). In other words, the Agency was not bound by the D.C. Circuit's construction, and its decision was arbitrary and capricious precisely because FDA blindly accepted the court's construction, rather than engaging in its own reasoned decision-making on the matter in the first instance.

Similarly, in *Brand X*, the Supreme Court upheld an agency interpretation of a statute, despite a court's interpretation to the contrary. *Brand X* involved a challenge to FCC's administrative decision to classify high-speed internet access ("broadband") as an "information service" rather than a "telecommunications service" under the Telecommunications Act of 1996. Several parties challenged that determination on the ground that FCC's interpretation was

foreclosed by a prior Ninth Circuit decision holding that broadband was best considered to be a "telecommunications service"—a conclusion the court had reached despite the fact that it "was not reviewing an administrative proceeding and the [FCC] was not a party." *Brand X*, 545 U.S. at 978-80. When the petitioners' consolidated challenges to FCC's decision were assigned to the Ninth Circuit, that court agreed that its prior interpretation trumped the agency's contrary conclusion and vacated FCC's interpretation as contrary to law. *Id*. at 982.

The Supreme Court reversed, holding that "allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute . . . would allow a court's interpretation to override an agency's," in direct contravention of "*Chevron*'s premise . . . that it is for agencies, not courts, to fill statutory gaps." *Brand X*, 545 U.S. at 982. As a result, the Court held, "only a judicial precedent holding that a statute unambiguously forecloses the agency's interpretation . . . displaces a conflicting agency construction," *id*. at 982-83, such that "[b]efore a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction," *id*. at 985. Because the Ninth Circuit's prior decision was not expressly based on the unambiguous text of the Telecommunications Act, the Court gave FCC's contrary application of the statute full *Chevron* deference and dismissed the petitioners' challenge to FCC's administrative decision.

The same principle applies here. As in *Brand X*, the New York Court in this case concluded that Astra was entitled to pediatric exclusivity despite the fact that (1) it was not reviewing an administrative proceeding; (2) FDA was not a party to the case; (3) the patents-in-suit had expired; (4) Apotex's ANDA received final approval and was on the market for years prior to the expiration of the patents-in-suit; (5) FDA has never awarded, and indeed could not

award, Astra pediatric exclusivity against Apotex; and (6) the court did not solicit FDA's views. Moreover, the New York Court did not even purport to base its assertion that Astra is entitled to pediatric exclusivity on the text (much less the unambiguous text) of the relevant statutory provisions at all.

In sum, in these circumstances, just as FCC was not bound to effectuate the Ninth Circuit's determination that broadband is a "telecommunications service," and just as FDA was not bound by prior D.C. Circuit cases to treat the stipulated dismissal at issue in the *Pravastatin* case as a triggering court decision, FDA was not remotely bound by the New York Court's erroneous determination—reached without the benefit of FDA's views, and in direct conflict with the FDA's recent decision on this very subject—that Astra is entitled to pediatric exclusivity against Apotex. To the contrary, Astra's eligibility for pediatric exclusivity is a matter that has "clearly been entrusted to the FDA by Congress." *Mylan*, 332 F. Supp. 2d at 118. FDA's blind deference to the district court's order on this issue clearly entrusted to the Agency alone by Congress is not reasoned agency decision-making, but rather the hallmark of arbitrary and capricious agency action. For that reason as well, FDA's decision must be vacated. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1086 (D.C. Cir. 2001) (vacating FDA decision to approve an ANDA due to FDA's failure to adequately explain its decision involving an Orange Book patent listing dispute).

C.    **In The Alternative, This Court Should Vacate FDA's Decision Pending Judicial Review Of FDA's Response To Apotex's Submission To The Agency.**

For the reasons discussed above, FDA's decision cannot stand. But even if this Court does not agree, this Court should nevertheless vacate FDA's decision under 5 U.S.C. § 705 pending the Agency's preparation of a complete response to the issues raised by Apotex in its June 21, 2007 submission to the Agency. *See Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579,

582 (D.C. Cir. 2001) (remanding matter where the agency's administrative record was not before the court).

Allowing this case to proceed on the basis of explanations and rationales offered by litigation counsel for FDA is no substitute for review of the Agency's own rationale. For example, in *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1325 (D.C. Cir. 1998), the D.C. Circuit recognized the difference between an FDA decision "letter [that] represents the considered views of the agency-decisionmaker herself, announced at the usual point in the agency's decision-making process (the end)" and "the views of litigation counsel trying to come up with an explanation after the fact." Here, as noted, FDA's June 28, 2007 decision letter is devoid of **any** considered views of the agency decisionmaker. Similarly, in *American Bioscience*, the D.C. Circuit rejected the district court's apparent reliance "on the parties' written or oral representations to discern the basis on which the FDA acted." *Am. Bioscience*, 243 F.3d at 582. The court went on to state, "[f]or all we know, the attorneys were merely speculating." *Id*.

In this case, of course, FDA did not respond to or address any of the issues raised by Apotex. In contrast, in the amlodipine matter, FDA solicited comments from all interested parties and the public before issuing a thorough decision analyzing all of the various issues and positions. The slipshod and conclusory letter decision revoking Apotex's approval here is a far cry from the deliberative and thoughtful process that FDA engaged in for amlodipine, and which Apotex deserves at a minimum here. The Court should not permit *post-hoc* rationalizations of FDA's litigation counsel to substitute for the deliberative and reasoned agency decision that Apotex is entitled to here.

## II.    The Harm To Apotex Is Substantial And Irreparable.

As an initial matter, the harm to Apotex could not be more substantial or imminent.  FDA cannot seriously argue otherwise.

Apotex is already suffering, and will continue to suffer, unquantifiable, intangible losses for omeprazole and other product lines as a result of FDA's action.  (McIntire Decl.[5] ¶¶ 6, 15-20).  For example, Apotex's generic omeprazole products have been on the market for 3 ½ years, during which time Apotex has built beneficial customer relations with pharmacy chains and distributors.  (*Id.* ¶ 16).  The removal of Apotex's generic omeprazole products will result in a loss of good will and damage to—if not termination of—the customer relations it has worked so hard to establish.  (*Id.* ¶ 19).  These losses, in turn, will adversely affect Apotex's sales opportunities across all of its product lines.  (*Id.* ¶¶ 17, 18).

Apotex's generic omeprazole is one of its top-selling products; during the 2007 fiscal year, Apotex was the market leader in providing generic omeprazole.  (McIntire Decl. ¶¶ 11-13, 19).  If Apotex is not permitted to reenter the market immediately, it will not regain the market position it has held for the past 3 years.  (*Id.* ¶ 19).  Indeed, Apotex will continue to suffer harm in the future as a result of FDA's unlawful decision.  (*See id.* ¶¶ 17-19).

Moreover, Apotex's inability to continue selling its generic omeprazole products more than likely will lead the public to incorrectly believe that there are quality or safety concerns with these products.  Such misperceptions will cause Apotex to suffer a loss in consumer confidence and severe damage to its reputation.  (McIntire Decl. ¶ 17).

The bottom line is that the harm here is not just about lost or reduced sales— though such losses are certainly substantial and unrecoverable.  FDA has suddenly pulled a safe

---

[5] References to "McIntire Decl." are to the Declaration of Tammy L. McIntire submitted contemporaneously herewith.

and effective product from the market that the public has come to expect from Apotex, and rely on, for over *3 years*. Indeed, the public now counts on Apotex as the market leader for generic omeprazole. FDA's unlawful decision has already caused enormous confusion in the marketplace. If not immediately reversed, that decision will destroy Apotex's reputation in the industry as a reliable and safe provider of lower-priced generic drugs. Such losses and harms are irreparable in every sense of the term and thus warrant emergency injunctive relief. *See Teva*, 182 F.3d at 1011 n.8. Apotex, therefore, has more than sufficiently satisfied its burden of establishing the existence of irreparable harm absent immediate injunctive relief.

### III.    The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate Injunctive Relief.

FDA admittedly has no commercial stake in the outcome of this dispute. Moreover, as a governmental agency, FDA's interests are aligned with the public's interest which, as discussed below, strongly favors injunctive relief. Yet, absent injunctive relief, Apotex stands to lose millions of dollars, goodwill with its customers, and other significant tangible and intangible benefits.

Moreover, Astra will not suffer any harm if the Court grants injunctive relief either. Even with Apotex's generic omeprazole products off the market, Astra will gain no additional market share. (McIntire Decl. ¶ 21). Rather, the removal of Apotex only means that other generic suppliers (which have been and still are marketing their generic omeprazole products), not Astra, will absorb Apotex's market share. (*Id.*). Furthermore, Astra had ample opportunity to move for a preliminary injunction against Apotex after FDA granted final approval of Apotex's ANDA. Astra made the calculated decision not to do so. Obviously, Astra believed it could be sufficiently compensated for any alleged infringement without removal of Apotex's ANDA products from the market.

Accordingly, the balance of harms tips decidedly in favor of granting Apotex's request for a temporary restraining order and/or preliminary injunction. *See Mova*, 140 F.3d at 1066.

## IV.    An Injunction Would Further The Public Interest.

The public interest is best served by granting the requested injunctive relief. First, the public's interest lies in the "faithful application of the laws," *Mova*, 140 F.3d at 1066, which, here, is served by requiring the Agency to apply the governing statute in a manner that is consistent with FDA's prior rulings and the controlling statutory language. Second, injunctive relief comports with the purpose of the statute, which seeks to expedite full generic competition and prevent the patentee from "manipulat[ing] the system in order to block or delay generic competition." *Teva*, 182 F.3d at 1009. Indeed, increased generic competition results in lower prices for consumers. (McIntire Decl. ¶ 23). Further, the profits Apotex gains from the sale of its generic omeprazole products benefits the public by fostering development and the introduction of new generic products into the market. (*Id.* ¶ 24). Thus, the public interest favors entry of the injunctive relief requested by Apotex here.

### CONCLUSION

Apotex has made the requisite showing for immediate injunctive relief. Simply put, FDA cannot ignore its own binding precedent holding that pediatric exclusivity does not apply to an ANDA—like Apotex's omeprazole ANDA here—that is finally approved before patent expiration and any ruling on infringement or validity. Nor can FDA blindly follow the New York Court's order and abandon its statutory obligation to independently engage in reasoned agency decision-making on the question of whether Astra is entitled to such exclusivity in the first place. Because Astra is not entitled to such exclusivity under FDA's own precedent, FDA had no lawful basis to revoke Apotex's final approval, and its decision must be set aside as

arbitrary, capricious and contrary to law.  Because Apotex has already suffered devastating and

irreparable harm, and because neither FDA nor any other interested party will suffer in the least,

the Court should enter an order setting aside the travesty of FDA's decision and requiring FDA

to immediately reinstate Apotex's final approval and refrain from further revoking and/or

converting that approval.

      In the event the Court denies such relief, Apotex respectfully moves for an

injunction allowing Apotex to maintain its final approval pending an appeal of this matter to the

D.C. Circuit, in order to prevent further devastating and irreparable harm to Apotex.  A proposed

order seeking such relief is submitted herewith.

Dated:  July 2, 2007.              Respectfully submitted,

                        APOTEX INC.

                   By:    /s/ Arthur Y. Tsien
                        Arthur Y. Tsien, D.C. Bar No. 411579
                        Kathryn E. Balmford, D.C. Bar No. 482279
                        OLSSON, FRANK AND WEEDA, P.C.
                        1400 16th Street, N.W., Suite 400
                        Washington, D.C. 20036-2220
                        (202) 789-1212
                        (202) 234-3550 (facsimile)

Of Counsel:
William A. Rakoczy, D.C. Bar No. 489082
Amy D. Brody, D.C. Bar No. 478100
Natalie G. Mitchell
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada M9L 1T9, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, Maryland 20857, | ) ) ) ) | |
| MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20204, and | ) ) ) ) ) | |
| ANDREW C. VON ESCHENBACH, M.D.<br>Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, Maryland 20857, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF ARTHUR Y. TSIEN

I, ARTHUR Y. TSIEN, declare as follows:

1.      I am a principal in the law firm of OLSSON, FRANK AND WEEDA, P.C.,
counsel for Apotex Inc. ("Apotex").

2.      I am a practicing attorney and member in good standing of the Bar of the District
of Columbia, and am admitted to practice before the United States District Court for the District
of Columbia and the United States Court of Appeals for the District of Columbia Circuit.

3.      I submit this Declaration in support of Apotex Inc.'s Motion for Temporary
Restraining Order and/or Preliminary Injunction.

4.     I have personal knowledge of the facts stated in this Declaration and am competent to testify as to the same.

5.     Attached hereto as Exhibit A is a true and correct copy of FDA's April 18, 2007 letter to ANDA Applicants for Amlodipine Besylate Tablets.

6.     Attached hereto as Exhibit B is a true and correct copy of the June 14, 2007 Judgment entered in *AstraZeneca AB v. Apotex Corp.*, 01 Civ. 9351 (BSJ) (S.D.N.Y.).

7.     Attached hereto as Exhibit C is a true and correct copy of the June 15, 2007 letter from AstraZeneca (Peter O. Safir) to FDA (Sheldon T. Bradshaw), without the enclosure.  The enclosure was a copy of the June 14, 2007 Judgment by the United States District Court for the Southern District of New York, which is submitted separately herewith as Exhibit B to my Declaration.

8.     Attached hereto as Exhibit D is a true and correct copy of the June 21, 2007 letter from Apotex (William A. Rakoczy) to FDA (Sheldon T. Bradshaw), with excerpts of the exhibits thereto.  To the extent any exhibit to the letter has been omitted, it is submitted separately herewith as a stand alone exhibit to my Declaration.

9.     Attached hereto as Exhibit E is a true and correct copy of the June 28, 2007 letter ruling by FDA (Gary J. Buehler) to Apotex.

10.     The foregoing facts are true and correct as I verify and believe.

Dated:  July 2, 2007.

I, ARTHUR Y. TSIEN, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.


_____/s/Arthur Y. Tsien_____
ARTHUR Y. TSIEN

*Apotex Inc. v. Food and Drug Administration et al.*, Case No. _____ (D.D.C.)

# EXHIBIT A
# to Tsien Declaration



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

April 18, 2007

Dear ANDA Applicant/Holder for Amlodipine Besylate Tablets:

This letter addresses issues related to the timing of potential approvals of abbreviated new drug applications (ANDAs) that reference Norvasc tablets. This letter construes the provisions of the Drug Price Competition and Patent Term Restoration Act of 1984 (known as the Hatch-Waxman Amendments or Hatch-Waxman), codified at 21 U.S.C. §§ 355, 360cc, and 35 U.S.C. §§ 156, 271, 282, and does not necessarily apply to changes made in the Medicare Modernization Act (MMA) of 2003.[1]

As you are aware, Pfizer Inc. (Pfizer) manufactures and markets Norvasc, a besylate salt of amlodipine, indicated for the treatment of hypertension and angina. Pfizer had listed two patents with FDA, asserting that they claim Norvasc and would be infringed by the marketing of generic versions of the product. The later of these patents, Patent No. 4,879,303 ('303 patent), expired on March 25, 2007, so that these patents, by themselves, no longer bar the marketing of generic versions of Pfizer's product. Several companies have submitted ANDAs for approval to market generic versions of Norvasc. Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (Mylan) filed the first ANDA to market a generic version of Norvasc and had challenged Pfizer's patents by submitting the first "paragraph IV certifications" to those patents with its application. FDA approved Mylan's ANDA in October 2005, and Mylan began marketing its product on March 23, 2007. On or about the same day, Pfizer began marketing a generic version of Norvasc.

Pfizer and Mylan now contend that the approvals of the other ANDAs for amlodipine besylate are blocked by Pfizer's "pediatric exclusivity" until September 25, 2007. Mylan contends, alternatively, that the approvals of its competitors' ANDAs are blocked by Mylan's "180-day marketing exclusivity" until September 19, 2007.[2] Resolution of whether pending ANDAs referencing Norvasc are blocked either by Pfizer's pediatric exclusivity or Mylan's 180-day exclusivity involves a number of legal issues, some of first impression for the agency. Part of the analysis requires FDA to determine the effect of a recent Federal Circuit decision in patent litigation between Pfizer and Apotex Inc. (Apotex), another ANDA applicant for amlodipine besylate who filed a paragraph IV certification after Mylan had submitted its certification. On March 22, 2007, the Federal Circuit ruled that the three claims in the '303 patent that Pfizer asserted that Apotex infringed were invalid as obvious. *Pfizer Inc. v. Apotex, Inc.*, No. 2006-1261, 2007 U.S. App. LEXIS 6623 (March 22, 2007) (the *Apotex* decision).

---

[1]  The 1984 Hatch-Waxman provisions govern most issues related to ANDA approval for amlodipine besylate tablets. Although certain provisions of Hatch-Waxman have been superseded by changes made in the MMA, the 180-day exclusivity provisions of the MMA apply only to applications for which the first ANDA with a paragraph IV certification was filed after December 3, 2003. Mylan's ANDA was filed before December 3, 2003, and hence is governed by the pre-MMA provisions with respect to 180-day exclusivity.

[2]  Mylan has claimed in its submissions to FDA that its 180-day exclusivity commenced on March 23, 2007 and would expire on September 23, 2007. See Petition for Stay of Action, Docket 2006P-0116 (March 26, 2007) (http://www.fda.gov/ohrms/dockets/dockets/07p0116/07p-0116-psa0001-01-vol1.pdf). However, 180 days after March 23 is September 19.

The questions presented by the pending applications and exclusivity claims include: (1) whether the *Apotex* decision is effective upon issuance of the opinion or upon issuance of the mandate, for purposes of determining the application of Pfizer's pediatric exclusivity; (2) upon the *Apotex* decision becoming effective, whether Pfizer's pediatric exclusivity bars approval of the Apotex ANDA; (3) upon the *Apotex* decision becoming effective, whether Pfizer's pediatric exclusivity bars approvals of the remaining ANDAs; and (4) whether Mylan's eligibility for 180-day exclusivity blocks approval of ANDAs after the expiration of Pfizer's patent. These questions are addressed in turn in the Discussion section below.

Regulatory Background

A.  Patent Listing and Certification

The Hatch-Waxman Amendments permit the submission of ANDAs for approval of generic versions of approved drug products. 21 U.S.C. § 355(j). Under the procedure established in Hatch-Waxman, NDA sponsors are required to list patents that protect their approved drug substances, drug products, or approved methods of use, 21 U.S.C. § 355(b)(1); FDA publishes those patents in FDA's "Approved Drug Products With Therapeutic Equivalence Evaluations" (the Orange Book); and ANDA applicants are required to certify whether their proposed drug products infringe those listed patents. 21 U.S.C. § 355(j)(2)(A)(vii). As to each patent listed in the Orange Book for the listed drug referenced, an ANDA applicant can certify that 1) such patent information has not been filed (paragraph I certification); 2) the patent has expired (paragraph II certification); 3) the date the patent will expire (paragraph III certification); or 4) the patent is invalid or not infringed by the drug product proposed in the ANDA (paragraph IV certification). *Id.*

In the case of paragraph I and paragraph II certifications, the patent does not serve as a barrier to ANDA approval. A paragraph I or paragraph II certification permits immediate effective approval of the ANDA. 21 U.S.C. § 355(j)(5)(B)(i). If an applicant files a paragraph III certification, approval may be made effective when the patent expires. 21 U.S.C. § 355(j)(5)(B)(ii).

If an applicant seeks to challenge a listed patent and to obtain approval before the patent expires, it must provide a paragraph IV certification certifying that "in the opinion of the applicant and to the best of his knowledge" the patent is "invalid or will not be infringed by the manufacture, use or sale of the [drug described in the ANDA]." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The applicant with a paragraph IV certification must notify the patent owner and NDA holder of its paragraph IV certification and of the basis of its belief that the patent is invalid or not infringed. 21 U.S.C. § 355(j)(2)(B). The filing of a paragraph IV certification "for a drug claimed in a patent or the use of which is claimed in a patent" is an act of infringement. 35 U.S.C. § 271(e)(2)(A). This enables the NDA holder and patent owner to sue the ANDA applicant. If the patent owner or NDA holder brings a patent infringement suit against the ANDA applicant within 45 days after receiving notice of the paragraph IV certification, the suit triggers an automatic stay of FDA approval for 30 months from the date the patent owner or NDA holder received notice of the certification ("30-month stay"). 21 U.S.C. § 355(j)(5)(B)(iii). If the patent owner or NDA holder does not bring suit within 45 days after it has received notice of the paragraph IV certification, the unexpired patent will not, by itself, bar FDA's approval of the ANDA, even if patent litigation is subsequently commenced outside the 45-day period and is ongoing at the time the requirements for approval are met. See *id.*

2

B. <u>180-Day Exclusivity</u>

To provide an incentive for ANDA applicants to be the first to challenge a listed patent and remove patent barriers to approval, Congress provided that:

> [I]f the [ANDA] contains a [paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection . . . [containing] such a certification, the application shall be made effective not earlier than one hundred eighty days after

> (I)  the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv)(2002).

Although this statutory provision is commonly characterized as granting "180-day exclusivity" to the first applicant to submit an ANDA containing a paragraph IV certification challenging a patent, the statute does not provide for that result directly. Instead, this end is accomplished by delaying the approval of subsequent ANDAs *containing a paragraph IV certification* until 180 days after the exclusivity period for the first ("previous") applicant has been triggered. If the first applicant's ANDA no longer contains a valid paragraph IV certification when it is ready for approval, the first applicant is not eligible for exclusivity. Similarly, when subsequent applicants' ANDAs do not contain paragraph IV certifications, their approval is not delayed under the plain language of this statutory provision.

C. <u>Pediatric Exclusivity</u>

The pediatric exclusivity statute, enacted as part of the Food and Drug Administration Modernization Act (FDAMA) and renewed in the Best Pharmaceuticals for Children Act (BPCA), provides an incentive for NDA sponsors to conduct pediatric studies that FDA has requested. Although this incentive for doing pediatric studies is commonly referred to as "pediatric exclusivity," a grant of pediatric exclusivity alone does not guarantee that an NDA will be free of generic competition while the exclusivity is in effect. Instead, as FDA has opined and the D.C. Circuit has affirmed, the applicability of *pediatric exclusivity* to prevent approval of a particular applicant's ANDA depends on the outcome of that applicant's patent challenges, if any. See *Mylan Labs., Inc.* v. *Thompson*, 332 F. Supp. 2d 106 (D.D.C. 2004), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004); *Ranbaxy Labs., Ltd.* v. *FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004). Specifically, the statute states that if the approved product has completed the pediatric exclusivity requirements and is subject to

> (i)  "a listed patent for which a [paragraph II] certification has been submitted . . . the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the patent expires;"
> (ii) "a listed patent for which a [paragraph III] certification has been submitted . . . the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the date the patent expires;"

3

(iii)        "a listed patent for which a [paragraph IV] certification has been submitted . . . , and in the patent infringement litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the date the patent expires."

21 U.S.C. § 355a(c)(2)(A)-(B).

Factual Background

On July 31, 1992, FDA approved Pfizer's new drug application (NDA) for amlodipine besylate tablets, which Pfizer began marketing later that year under the brand name Norvasc. Pfizer listed two patents with respect to Norvasc: Patent 4,572,909 ('909 patent), originally due to expire on July 31, 2006, and the '303 patent, originally due to expire on March 25, 2007. Pfizer conducted pediatric studies requested by FDA and, on November 27, 2001, FDA granted Pfizer pediatric exclusivity for Norvasc pursuant to 21 U.S.C. § 355a. Pediatric exclusivity, by delaying approval of ANDAs for six months after the expiration date for a patent, had the potential to block approvals of ANDAs referencing Norvasc until January 31, 2007, with respect to the '909 patent, and until September 25, 2007, with respect to the '303 patent. Because this period with respect to the '909 patent has expired, that patent is no longer relevant to the issues discussed in this letter.

In May 2002, Mylan filed an ANDA for amlodipine besylate, and was the first to file a paragraph IV certification to the '303 patent pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). Pfizer sued Mylan for patent infringement. *Pfizer Inc. v. Mylan Labs. Inc.*, No. 02-cv-1628 (W.D. Pa.). However, because Pfizer did not file its lawsuit within 45 days of receiving notice of Mylan's paragraph IV certification, the filing of the lawsuit did not result in the 30-month stay of approval pursuant to 21 U.S.C. § 355(j)(5)(B)(iii). In October 2005, FDA approved Mylan's ANDA.

In February 2007, the district court in the patent litigation between Mylan and Pfizer entered judgment for Pfizer that Mylan had infringed the '303 patent. *Pfizer Inc. v. Mylan Labs., Inc.*, No. 02-cv-1628, 2007 U.S. Dist. LEXIS 14417 (W.D. Pa. Feb. 27, 2007). On March 16, 2007, the district court amended the judgment and enjoined the approval of Mylan's ANDA until the '303 patent expired. *Id.*, 2007 U.S. Dist. LEXIS 18699 (Mar. 16, 2007).[3] Mylan appealed that judgment and sought a stay of the district court's injunction. The Federal Circuit granted the stay. *Pfizer Inc. v. Mylan Labs., Inc.*, No. 2007-1194 (Mar. 23, 2007). Mylan began marketing its product on March 23, 2007.

Apotex, Inc. (formerly Torpharm, Inc.) filed an ANDA for amlodipine besylate, which contained a paragraph IV certification to the '303 patent. On July 20, 2003, Pfizer sued Apotex for patent infringement. In January 2006, the district court held the patent was valid and infringed. *Pfizer, Inc. v. Apotex*, No. 03C 5289, 2006 U.S. Dist. LEXIS 95778 (N.D. Ill. January 29, 2006). The Federal Circuit reversed in the opinion noted above, finding that Apotex's amlodipine besylate

---

[3] When an NDA holder or patent owner sues the ANDA applicant and wins — that is, the court hearing the patent infringement litigation finds the patent valid and infringed — the Patent Code provides that "the court shall order the effective date of any approval of the drug * * * involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A).

tablets did not infringe claims 1-3 of the '303 patent because those claims were invalid for obviousness. See *Apotex* decision. The Federal Circuit did not address the validity of the remaining claims of the patent, presumably because those were not claims on which Pfizer had sued Apotex. On April 5, 2007, Pfizer filed a motion in the Federal Circuit, seeking a rehearing and/or rehearing en banc of the *Apotex* decision. This motion stayed issuance of the mandate pending its resolution under Rule 41(d)(1) of the Federal Rules of Appellate Procedure (FRAP).

At midnight on March 25, 2007, the '303 patent expired. Pfizer submitted a letter to FDA dated March 25, 2007, contending that approval of Apotex's ANDA was barred by Pfizer's pediatric exclusivity, at least until the Federal Circuit's mandate issues.

On March 26, 2007, Mylan submitted to FDA a Petition for Stay of Action requesting that the FDA refrain from taking any action to approve any ANDA for amlodipine besylate tables until Mylan's 180-day exclusivity expires. According to Mylan, the 180-day exclusivity for amlodipine besylate tablets had been triggered when it commenced marketing on March 23, and is due to expire on September 19, 2007. Also on March 26, Mylan sued FDA in the U.S. District Court for the District of Columbia, alleging that it was entitled to 180-day exclusivity as to the '303 patent and requesting that the court enjoin FDA from approving additional ANDAs for amlodipine until the merits of its claim for 180-day exclusivity could be heard. *Mylan Labs., Inc.* v. *Leavitt*, CA No. 07-579 (RMU)(D.D.C.).

FDA determined that it was unprepared to immediately resolve all of the legal questions raised by the pending applications and exclusivity claims, and would benefit from soliciting the views and legal arguments of the interested parties. FDA informed the court that it proposed to seek comments to be submitted by April 4, 2007, and to issue its determination by April 11, 2007. The court memorialized FDA's proposal, and enjoined FDA from implementing any ANDA approval decisions, once made, until 5:00 PM on April 13, 2007 to allow the court to review FDA's decisions. *Mylan Labs.*, CA No. 07-579 (RMU), Order (March 26, 2007). FDA subsequently moved the court for an extension of time, until April 18, 2007, to issue its determination, which the court granted.

By letter dated March 28, 2007, FDA requested comments on five specific questions from Pfizer and the ANDA applicants for amlodipine besylate tablets. FDA created a docket for collecting the comments and posting them on the internet, and posted its letter requesting comments to give other interested parties an opportunity to comment on the questions FDA raised. (http://www.fda.gov/ohrms/dockets/dockets/07n0123/07n0123.htm) Several parties expressed a range of opinions on the questions FDA posed. *See id.* After receiving and considering submissions from interested parties, FDA reaches the following conclusions.

Discussion

1.  For Purposes of Pediatric Exclusivity, the *Apotex* Decision Will Not be Effective until Issuance of the Mandate.

Under the language of the statute, pediatric exclusivity operates by delaying the approval of an ANDA for six months after a patent expires.[4] The operative subsection of the statute varies

---

[4]  In this case, Mylan's ANDA is not blocked by Pfizer's pediatric exclusivity because its ANDA was already approved in October 2005, and therefore, under the literal terms of the statute, the ANDA's approval cannot be delayed. 21 U.S.C. § 355a(c)(2)(A)-(B). One commenter maintained that FDA should have converted the approval status of Mylan's ANDA to tentative approval after Mylan lost its patent litigation in the district court. See Comments of Synthon Pharmaceuticals, Inc. at 4. However,

according to the certification submitted by the ANDA applicant. When the ANDA applicant, such as Apotex, submits a paragraph IV certification, "if . . . in the patent litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved . . . shall be extended by a period of six months after the date the patent expires . . . ." *See* 21 U.S.C. § 355a(c)(2)(B). As discussed in greater detail below, FDA has previously opined, and concludes below, that this provision means that pediatric exclusivity does *not* apply when the ANDA applicant prevails in its patent challenge -- that the court determines that the patent is *invalid* or would *not* be infringed, and that construction has been acknowledged as appropriate by a court. Accordingly, this provision governs the application of pediatric exclusivity, at least with respect to Apotex.

In determining the effect of the *Apotex* decision on Pfizer's pediatric exclusivity claim, the first issue that FDA must resolve is to ascertain the meaning of the phrase "the court determines" for purposes of the statutory provision quoted above. Specifically, FDA must decide whether the Federal Circuit "determined" invalidity when it issued its opinion or will not "determine" validity or infringement until the mandate issues. Because the Court of Appeal's opinion is not effective until the mandate issues, Pfizer argues that the Federal Circuit will not have determined invalidity until that time. Apotex and others have asserted that the March 22, 2007 date of the issuance of the Federal Circuit opinion is the operative date.

FDA finds that the operative phrase -- "the court determines" -- is ambiguous as to the action it describes. Congress could have been more precise in indicating the action by the court to which it was referring, as it has done in other statutes. Compare, e.g., 26 U.S.C. § 7481(a) (finality is determined "upon mandate" issued by Court of Appeals or Supreme Court) with 21 U.S.C. § 355(j)(5)(B)(iii)(I)(aa)-(bb) (approval "shall be made effective on the date on which the court enters judgment reflecting the decision; or the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed."). Instead, it chose a phrase that, as the comments submitted to FDA reflect, is susceptible to more than one interpretation. On the one hand, the use of the present tense in the word "determines" could suggest that the issuance of the opinion itself is sufficient. Indeed, one dictionary definition of "determine" is "to come to a decision . . . as the result of investigation or reasoning." Webster's Third New International Dictionary (2002) at 616 (definition 1.c). Under this view, a court "determines" validity and infringement when it issues an initial ruling to that effect.

On the other hand, the choice of the word "determines" suggests the fixing or settling of rights and obligations. The dictionary definitions of "determine" include: "to fix conclusively or authoritatively," "to settle a question or controversy about," "to settle or decide by choice of alternatives or possibilities." *Id.* (definitions 1.a, 1.b, and 1.d.). See also Webster's II New Riverside University Dictionary (1994) at 369 ("[t]o end or decide by final, esp. judicial action") (definition 1.b). Under this view, where an appellate court is reversing the district court's judgment below, the parties' rights and obligations continue to be governed by the district court determination until the appellate court issues its mandate effectuating its judgment.

The Federal Rules of Appellate Procedure provide some additional guidance regarding which should be the relevant time frame for determining generally when the Federal Circuit's decision is effective. The rules themselves do not conclusively resolve the issue: FRAP 36 states that a judgment is entered when it is noted on the docket, while FRAP 41(c) states that the mandate is

---

before FDA took such action, the Federal Circuit stayed the district court injunction in that litigation. After that stay, FDA had no basis to convert the approval status of Mylan's ANDA from approved to tentatively approved.

effective when issued. However, the 1998 advisory committee notes to FRAP 41(c) state that "[a] court of appeals judgment or order is not final until issuance of the mandate; at that time the parties' obligations become fixed." These notes have been cited with approval by courts, *Mercer v. Duke Univ.*, 401 F.3d 199, 212 n.7 (4th Cir. 2005); *Stewart Park & Reserve Coalition Inc. v. Slater*, 374 F. Supp. 2d 243, 248 n.5 (N.D.N.Y. 2005); *United States v. Swan*, 327 F. Supp. 2d 1068, 1071-72 (D. Neb. 2004), and no commenters have cited any authority to FDA that would indicate that the advisory committee notes do not state the current rule regarding finality of appellate court decisions.[5] Therefore, under these rules, until the mandate issues, the parties continued to be bound by the district court judgment.

In FDA's view, the phrase "the court determines" in section 355a(c)(2)(B), in the context of a federal court of appeals reversing a district court judgment, should be read as the date the mandate issues for several reasons. When the district court decides a patent issue, FDA applies that decision, unless it is stayed, in determining issues related to ANDA approval. The district court decision continues to control the rights of the parties until the appellate court mandate issues. Thus, the vital date under this scheme is when the rights of the parties become fixed by the decision of the court of appeals, that is, the date the mandate issues. This understanding of the phrase "the court determines" is further supported by the dictionary definitions of "determine" that use the terms "fixing" and "settling," and by the practice under the FRAP, as reflected in the advisory committee notes and as accepted by courts. Furthermore, as a matter of policy, FDA believes that the parties to paragraph IV litigation are best served by a rule that, consistent with the statutory language, errs on the side of greater finality. Such a rule reduces the possibility that an appellate court opinion will be relied on and then overturned (through an adverse opinion after rehearing or rehearing en banc) in very short order. Accordingly, FDA concludes that, in determining the applicability of pediatric exclusivity, this language requires FDA to await issuance of the mandate before giving effect to an appellate court opinion that would overturn a district court's ruling.

In this case, therefore, for purposes of determining the applicability of Pfizer's pediatric exclusivity, FDA will continue to be governed by the district court decision upholding the validity of the patent unless or until the mandate is issued, effectuating the appellate court's judgment.[6] As a result, all of the unapproved ANDAs are currently blocked by Pfizer's pediatric exclusivity. If the mandate does not issue before September 25, 2007, when the pediatric exclusivity expires, Pfizer and Mylan will have no additional competition during the interim period and thus will obtain the full benefit that could be derived under pediatric and 180-day marketing exclusivity. In that event, the remaining issues discussed in this letter will be moot. However, given the possibility that the mandate making the panel decision effective may issue before September 25, 2007, FDA will continue with its analysis.

---

[5] Several commenters have cited an FDA Guidance document issued in March 2000. See, e.g., Mylan Comments at 2; Pfizer comments at 2. FDA is not relying on this guidance document, however, because it relates to a different statutory provision, with different language, context, and purposes.

[6] In this case, the district court found patent validity and infringement and the appellate court opinion found invalidity. Under these circumstances, FDA here declines to give effect to the appellate court's judgment of invalidity until the mandate issues and the patent and pediatric exclusivity attached to the patent block ANDA approvals in the interim. We note, however, that the agency's position on this also suggests that, had the district court found invalidity and the appellate court reached the contrary conclusion of validity and infringement, the converse would also be true: In spite of the appellate court opinion finding validity and infringement, ANDAs could be approved (or could retain their approvals) and neither the patent itself nor pediatric exclusivity would attach to that patent to block such approvals unless and until the mandate issued.

2. Apotex will Cease to be Subject to Pfizer's Exclusivity if the Mandate Issues before September 25, 2007.

This is the first time that FDA has been called upon to determine whether an ANDA applicant is subject to the innovator's pediatric exclusivity when the ANDA applicant has received a *favorable* court decision in its paragraph IV litigation but has not yet obtained final approval when the patent expires. The pediatric exclusivity provisions address several scenarios in terms of the status of the ANDA applications, but there are several scenarios that they fail to address, including this one.

The statute provides that, where the ANDA applicant submits paragraph IV certification, "if . . . in the patent litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved . . . shall be extended by a period of six months after the date the patent expires . . . ." *See* 21 U.S.C. § 355a(c)(2)(B). Based on this language, FDA determines that the converse must also be true - if in paragraph IV litigation a court determines that a patent is *invalid* or *not infringed*, pediatric exclusivity will not bar approval of that applicant's ANDA. This is the implicit meaning and logical interpretation of subsection 355a(c)(2)(B); otherwise, the qualification in that provision regarding the victory for the patent holder in the patent litigation would make no sense and would be superfluous, at least as to any ANDA that did not receive final approval before the patent expired. In addition, this outcome is consistent with the goals of the 180-day exclusivity statute which encourages patent challenges to remove barriers to approval. As noted, FDA had previously opined that this was the logical interpretation of 355a(c)(2)(B), although FDA was not directly applying that interpretation at that time. See *Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d at 124 (D.D.C. 2004) ("As the FDA has correctly noted in its papers, § 355a(c)(2)(B) would apply 'where an ANDA applicant submits a paragraph IV certification, and prevails in the patent litigation.'")(dicta, citing Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and Summary Judgment and In Support of Cross Motion for Summary Judgment at 38 (July 8, 2004)), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004). FDA therefore concludes that, where an applicant has challenged a patent and has received a decision of invalidity or non-infringement, that applicant will not be subject to the NDA holder's pediatric exclusivity once that decision becomes effective.

FDA has previously been called upon to address other gaps in the pediatric exclusivity provisions. Specifically, the paragraph III and paragraph IV provisions are silent on the applicability of pediatric exclusivity to delay ANDA approvals where an ANDA applicant has a paragraph III or IV certification and has not received final approval at the time the patent expires. In determining the operation of the statute in those circumstances, FDA has relied on the broader certification scheme under Hatch-Waxman.

It has been FDA's longstanding view, that, when a patent expires before pending patent litigation is resolved, ANDA applicants who have not received final effective approval are required under Hatch-Waxman, to change their paragraph III and paragraph IV certifications to paragraph II certifications. Because, upon patent expiry, all ANDA applicants are presumed to have paragraph II certifications, the paragraph II provision of the pediatric exclusivity statute, 21 U.S.C. § 355a(c)(2)(A)(i), would control. The D.C. Circuit has upheld this approach in two recent decisions. See *Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d 106, 124 (D.D.C. 2004), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004); *Ranbaxy Labs., Ltd. v. FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004).

In considering these earlier determinations regarding the switch to paragraph II certifications with today's decision regarding the non-applicability of pediatric exclusivity to applicants who prevail in patent litigation, FDA determines as follows. When the '303 patent expired on March 25, 2007, all of the unapproved ANDAs were required to change (or deemed to have changed) to paragraph II certifications and became subject to Pfizer's pediatric exclusivity at that time. That is their status during the period before the mandate issues. However, FDA believes that the language of the statute manifests a clear Congressional intent that pediatric exclusivity not block the approval of an ANDA where the ANDA applicant has prevailed in the paragraph IV patent litigation and therefore creates an exception to the application of the Hatch-Waxman certification provisions. Thus, if and when the mandate finalizing the panel's March 22 decision issues in the *Apotex* case, Apotex's ANDA will not be blocked by Pfizer's pediatric exclusivity.

### 3. If the Mandate Issues Before the Expiration of Pediatric Exclusivity on September 25, 2007, ANDAs Other than Apotex May Not be Eligible for Immediate Approval.

Although Apotex is the only ANDA applicant to have obtained a favorable decision on the merits against Pfizer in the amlodipine besylate patent litigation, several commenters maintain that all or some of the other ANDAs should not be blocked by Pfizer's pediatric exclusivity because of the *Apotex* decision. Some maintain that, once the patent is declared invalid, it should be presumed delisted from the Orange Book. See Medco Comments at 7. That would mean that no ANDA applicants would be required to maintain their certifications to that patent, and pediatric exclusivity, by its literal terms, would not bar any approvals.

Others maintain that, once a patent is found invalid in litigation against one party, the patent owner is collaterally estopped from asserting infringement claims based on that patent against additional defendants. See, e.g. *Blonder-Tongue Labs., Inc.* v. *University of Ill. Found.*, 402 U.S. 313, 350 (1971). They argue that, applying collateral estoppel, all applicants who submitted paragraph IV certifications should be considered victorious in their individual patent litigation against Pfizer. At that point, they continue, the analysis applied to Apotex's ANDA should be applied to them as well so that their ANDAs would not be blocked by pediatric exclusivity. This would mean, according to at least one commenter, that ANDAs containing paragraph IV certifications at the time of patent expiration would be eligible for approval, while those containing paragraph III certifications would be blocked. See Teva Comments at 11-13.

Other commenters noted, however, that the *Apotex* decision addressed only claims 1-3 of an 11 claim patent. These commenters assert that the patent should stay listed in the Orange Book because some of the claims have not been declared invalid. See Mylan Comments at 1-2; Daiichi Sankyo Inc. Comments at 2. Nevertheless, another commenter maintains that there are no viable claims remaining for these products once claims 1-3 are declared invalid. See Caraco Pharmaceutical Labs, Ltd. at 3.

Patents are required to be listed in FDA's Orange Book if they claim the approved drug substance, approved drug product, or an approved method of use. 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53. If the remaining claims do not provide a basis on which to list the patent (i.e., do not claim the approved drug substance, drug product, or an approved method of use), the patent would no longer be eligible for listing in the Orange Book. In such a case, the patent must be withdrawn by Pfizer and any pediatric exclusivity that attached to the patent will no longer serve as a barrier to ANDA approval. If, on the other hand, one or more of the remaining claims claims the approved drug substance, approved drug product, or approved method of use, the patent can remain properly listed until the expiration of pediatric exclusivity. In such a case, the patent should remain in the Orange Book and the remaining unapproved ANDAs are potentially subject to Pfizer's pediatric exclusivity.

It is not clear to FDA, based on the current record, whether the remaining claims of the '303 patent would provide a valid basis to list the patent if claims 1-3 are invalid. Moreover, FDA has long maintained that its has neither the expertise nor the resources to resolve patent issues and does not make independent determinations of the merits or applicability of patent claims. 59 Fed. Reg. 50338, 50342-43, 50345, 50349, 50352 (1994). FDA's ministerial role in the listing process has been upheld. *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1348-49 (Fed. Cir. 2003); *aaiPharma, Inc. v. Thompson*, 296 F.3d 227, 243 (4th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003); *Alphapharm Pty Ltd. v. Thompson*, 330 F. Supp 2d 1, 7-8 (D.D.C. 2004).

Because FDA lacks both relevant information and expertise to resolve this issue based on the information before it, in the absence of further judicial or other action clarifying the status of the patent, FDA will assume the '303 patent remains validly listed. If one or more of the remaining claims qualified the patent for listing as of the time the patent expired, all of the remaining ANDAs who had paragraph III and paragraph IV certifications at the time of patent expiry are required to maintain their paragraph II certifications. As such, those ANDAs will be blocked by Pfizer's pediatric exclusivity.

### 4. Mylan's Eligibility for 180-day Exclusivity Does Not Extend Beyond the Expiration of the Patent.

Mylan asserts that regardless of the applicability of pediatric exclusivity, all of the remaining ANDAs are subject to Mylan's 180-day exclusivity, which, if viable, would expire on September 19, 2007. Most commenters assert that it is well settled that 180-day exclusivity does not extend beyond the expiration of the patent. See, e.g., Apotex Comments at 8; Teva Comments at 6-7. Although Mylan acknowledges FDA's longstanding position that 180-day exclusivity expires with the patent, Mylan urges FDA to change that position, at least in the circumstances here, where the 180-day exclusivity has been triggered and begun to run before the patent expires.

By the terms of the statute, when a listed patent expires, a paragraph IV certification is no longer accurate. In these circumstances, the statute and FDA's regulations require ANDA applicants to change from a paragraph IV certification stating that the patent "is invalid or will not be infringed" to a paragraph II certification stating "that such patent has expired." 21 U.S.C. § 355(j)(2)(A)(vii)(II),(IV); 21 C.F.R. § 314.94(a)(12)(viii)(C) ("an applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate"). In cases where an applicant neglects to amend its certification to a paragraph II certification after a patent expires, FDA will treat it as having done so. This approach was upheld in *Dr. Reddy's Laboratories, Inc. v. Thompson*, 302 F. Supp. 2d 340 (D.N.J. 2003) and *Ranbaxy Labs., Ltd. v. FDA*, 307 F. Supp. 2d 15 (D.D.C. 2004) *aff'd*, 2004 U.S. App. LEXIS 8311 (D.C. Cir. April 26, 2004).

As noted above, applications with paragraph II certifications are eligible for immediate effective approval; the patent ceases to be a barrier to that approval upon its expiration." 21 U.S.C. § 355(j)(2)(A)(ii); 21 U.S.C. § 355(j)(5)(B)(i)(where an applicant files a paragraph II certification, approval of the applicant's ANDA "may be made effective immediately"); 21 C.F.R. § 314.94(a)(12)(viii). Thus, consistent with the statutory language and purpose of 180-day exclusivity, FDA has consistently construed the statute to award 180-day exclusivity based upon paragraph IV certifications only to unexpired patents. See 59 Fed. Reg. 50338, 50348 (stating "a patent is deemed to be relevant [for exclusivity purposes] until the end of the term of the patent or applicable 180-day period, whichever occurs first"). Because only subsequent applicants with valid paragraph IV certifications are blocked by 180-day exclusivity, and

because paragraph IV certifications cease to be accurate once the patent expires, the patent and 180-day exclusivity based on a paragraph IV certification to that patent cease to prevent approval of subsequent ANDAs once the patent expires.[7]  See *Ranbaxy Labs., Ltd.* v. *Leavitt,* 469 F.3d 120, 126 (D.C. Cir. 2006)("[T]he first generic applicant may no longer retain exclusivity when the patent has expired.").

This plain language reading of the statute effectuates the statutory goals.  The 180-day exclusivity provisions were drafted to give ANDA applicants an incentive to be first to challenge a listed patent and remove that patent as a barrier to approval.  Once a listed patent expires and is no longer a barrier to ANDA approval, there is no longer a need to provide an incentive to challenge it in court.  Thus, an expired patent does not serve as the basis for a 180-day exclusivity award and 180-day exclusivity does not extend beyond the life of the patent.

Mylan has argued that 21 U.S.C. § 355a(k) compels the conclusion that 180-day exclusivity extends beyond the date the patent expires.  See Mylan comments at 7-8.  That section provides that:

> If [180-day exclusivity period] overlaps with a 6-month [pediatric exclusivity] period . . ., so that the applicant for approval of a drug under section 505(j) entitled to the 180-day period under that section loses a portion of the 180-day period to which the applicant is entitled for the drug, the 180-day period shall be extended from
> (1) the date on which the 180-day period would have expired by the number of days of overlap, if the 180-day period would, but for application of this subsection, expire after the 6-month exclusivity period; or
> (2) the date on which the 6-month exclusivity period expires, by the number of days of the overlap if the 180-day period would, but for application of this subsection, expire during the six-month exclusivity period.

21 U.S.C. § 355a(k).  On its face, this section is inapplicable here because Mylan is approved and is not subject to Pfizer's pediatric exclusivity and, thus, there is no 180-day exclusivity to restore.  No commenters appear to contend otherwise.

Instead, Mylan argues that, by providing, in circumstances not applicable here, that 180-day exclusivity will follow pediatric exclusivity, Congress must have been assuming that 180-day exclusivity survives patent expiration.  See Mylan comments at 7-8.  If Mylan were correct, then section 355a(k) would conflict with FDA's longstanding understanding of the Hatch-Waxman statutory provisions governing 180-day exclusivity, as discussed above, which FDA believes to be compelled by the plain language of the statute.  Thus, Mylan is essentially arguing that section 355a(k) repealed part of the Hatch-Waxman 180-day exclusivity provisions.

For one federal statute to repeal another:

---

[7] We note that if Mylan were correct and 180-day exclusivity continued to block approvals of ANDAs with paragraph IV certifications after the patent expired (essentially ignoring the automatic switch of the certifications to paragraph III), 180-day exclusivity would block ANDAs containing paragraph IV certification but not those containing paragraph III certifications under the plain language of 21 U.S.C § 355(j)(5)(B)(iv).  This would have the perverse effect of punishing applicants who took the risk of challenging a patent with a paragraph IV certification in order to remove a barrier to approval and to reward those applicants who sat back and waited for the patent to expire.  This result is clearly inconsistent with the intent and logic of Hatch-Waxman.  Thus, the fact that section 355(j)(5)(B)(iv) by its terms blocks only ANDAs containing paragraph IV certifications -- the only ANDA that can be approved before the expiration of an applicable patent -- indicates that Congress did not intend exclusivity to extend beyond patent expiration.

11

[T]he intention of the legislature to repeal must be clear and manifest. . . . In practical terms, this "cardinal rule" means that in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) (citations omitted). The "irreconcilable conflict" required is a conflict

in the sense that there is a positive repugnancy between [the two statutes] or that they cannot mutually coexist. It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem.

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (emphasis added). Here, there is no evidence that Congress ever affirmatively indicated that it intended to repeal or change the operation of the 180-day exclusivity provision in enacting section 355a(k).

Nor can Mylan show that the 180-day provisions in Hatch-Waxman and section 355a(k) are irreconcilable because it is possible to construe them in a way that they can mutually coexist. By its terms, section 355a(k) only addresses the curtailment of exclusivity to which the applicant is otherwise "entitled." As explained above, under Hatch-Waxman, the applicant is not entitled to exclusivity after the patent expires. That means, in reconciling the statutes, that the application of section 355a(k) is limited to the situation where there is more than one patent and the two exclusivity periods are each attached to different patents. Thus, one patent may expire, and pediatric exclusivity would start to run, but the ANDA applicant could still be eligible for 180-day exclusivity on a later patent that had not yet expired. If that 180-day exclusivity period were triggered by a court decision on the later patent, it would be running at the same time the ANDA was blocked from approval by the pediatric exclusivity on the earlier patent.

Indeed, the legislative history demonstrates that Congress intended to address this narrow situation by adding 21 U.S.C. § 355a(k) to restore the exclusivity to which the ANDA applicant was entitled but which otherwise would have been lost because the pediatric exclusivity on another patent blocked final effective approval:

The amendment gives the filer of an [ANDA] who challenges a patent *no more* and *no less* time to market his drug exclusively before subsequent [ANDAs] for the drug may be approved then it would have received but for the intervening period of pediatric exclusivity.
For example, the committee understands that there may be instances in which 2 patents on a drug are challenged in an [ANDA], and that, in subsequent litigation, a court holds the first patent to expire to be valid and infringed, and the second patent to expire to be invalid. If the section [355(b)(1), 21 U.S.C.] drug is granted a period of pediatric exclusivity with respect to the first patent, and if the court decision, which triggers the beginning of ANDA exclusivity, falls 60 days before that period of pediatric exclusivity begins (that is, 60 days before the first patent will expire), the ANDA exclusivity will overlap with the pediatric exclusivity for 120 days. In the absence of the pediatric exclusivity, the holder of the [ANDA] would enjoy at most 120 days to market its drug before a subsequent [ANDA] for the drug could be approved. But for the amendment, because of pediatric exclusivity, the holder of the [ANDA] would enjoy no ANDA exclusivity, because

the first 120 days of the pediatric exclusivity period would run over the last 120 days of its ANDA exclusivity period.

S. Rep. No. 107-79, at 6-7 (2001); see also *id.* at 14 ("[Section 9 of BPCA] specifies that, when the pediatric exclusivity period for a drug overlaps with a period of ANDA exclusivity for the drug, the period of ANDA exclusivity is extended by an amount necessary to ensure that the holder of ANDA exclusivity enjoys the same possibility of exclusive commercial marketing as that the holder would have enjoyed in the absence of pediatric exclusivity, no more and no less."). This language confirms both that Congress intended only the limited application of section 355a(k) and that this section can be construed consistently with the Hatch-Waxman exclusivity provisions. Thus, "[b]ecause the statutes are not irreconcilable and there is no convincing evidence that the later act was intended as a substitute, . . . . a repeal by implication did not occur." *United States v. Williams*, 216 F.3d 1099, 1102 (D.C. Cir. 2000).

Furthermore, the statute also does not distinguish, as Mylan proposes, between situations in which 180-day exclusivity has been awarded and triggered at the time of patent expiry and cases in which it has not. See Mylan Comments at 12-14. Although Mylan correctly notes that the obligation to update a patent certification only applies before the effective date of approval, *id.* at 14; Mylan's Petition for Stay at 3, and thus approved applications (such as Mylan's) have no continuing obligation to update their patent certifications, this does not mean that 180-day exclusivity for an approved application extends beyond the date the patent expires. On the contrary, if all of the remaining unapproved applications change to a paragraph II certification when the patent expires, as they are required to do, they will no longer be applications containing paragraph IV certifications that are blocked by the previous application containing a paragraph IV certification. This is the case regardless of whether Mylan's application, which has been approved, is also required to change its certification. As a result, because all unapproved applications must change to a paragraph II certification when the patent expires, and applications with paragraph II certifications are not blocked by 180-day exclusivity, for all intents and purposes, Mylan's 180-day exclusivity will terminate with the expiration of the patent regardless of the fact that Mylan itself is no longer obligated to change its certification upon patent expiry.

Conclusion

In sum, FDA has concluded:

- All of the unapproved ANDAs are currently blocked by Pfizer's pediatric exclusivity.
- If and when the mandate effectuating the panel's March 22 decision issues in the *Apotex* case, Apotex's ANDA will not be blocked by Pfizer's pediatric exclusivity.
- FDA cannot determine on the current record whether other ANDAs will continue to be blocked by pediatric exclusivity at that time.
- Mylan's 180-day marketing exclusivity terminated when the patent expired.

13

If you have any questions regarding this letter please contact Cecelia Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs at 240-276-9319

Sincerely,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration

cc:  Pfizer Inc.

*Apotex Inc. v. Food and Drug Administration et al.*, Case No. _____ (D.D.C.)

# EXHIBIT B
# to Tsien Declaration

06/14/2007 11:52 FAX 212 805 6191        HONORABLE BARBARA JONES                    Ø002/007

RECEIVED
JUN 1 4 2007
CAESAR, RIVISE, BERNSTEIN
COHEN & POKOTILOW, LTD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :   M-21-81 (BSJ)
In re OMEPRAZOLE PATENT LITIGATION  :   MDL Docket No. 1291
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
ASTRAZENECA AB, et al.,                 :
                                              :
              Plaintiffs,                    :   00 Civ 6749 (BSJ)
                                              :
       v.                                      :
                                              :
MYLAN LABORATORIES INC., et al.,   :
                                              :
              Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
ASTRAZENECA AB, et al.,                 :
                                              :
              Plaintiffs,                    :   03 Civ 6057 (BSJ)
                                              :
       v.                                      :
                                              :
LABORATORIOS DR. ESTEVE, S.A.,    :
et al.,                                          :
                                              :
              Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
ASTRAZENECA AB, et al.,                 :
                                              :
              Plaintiffs,                    :   00 Civ 4541 (BSJ)
                                              :   03 Civ 8719 (BSJ)
       v.                                      :
                                              :
LEK PHARMACEUTICAL AND CHEMICAL :
CO., D.D., et al.,                           :
                                              :
              Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
ASTRAZENECA AB, et al.,                 :
                                              :
              Plaintiffs,                    :   01 Civ 9351 (BSJ)
                                              :

v.                                      :
                                        :
APOTEX CORP., et al.,                   :
                                        :
          Defendants.                   :
----------------------------------x
                                        :
ASTRAZENECA AB, et al.,                 :
                                        :      00 Civ. 7597 (BSJ)
          Plaintiffs,                   :      01 Civ. 2998 (BSJ)
                                        :
v.                                      :
                                        :
IMPAX LABORATORIES, INC.,               :
                                        :      **Judgment**
          Defendant.                    :
----------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

     This matter having come to trial on the merits before the

undersigned Honorable Barbara S. Jones (without a jury), and the

Court having duly rendered its Opinion and Order dated May 31,

2007, it is hereby

     ORDERED, ADJUDGED and DECREED as follows:

### APOTEX

     1.   Defendants Apotex Corp., Apotex Inc., and TorPharm,

Inc. (collectively "Apotex") have failed to meet their burden of

proving that the asserted claims (claim 1, 5, 6, and 10) of U.S.

Patent No. 4,786,505 ("the '505 Patent") and asserted claims

(claims 1, 6, 7, and 13) of U.S. Patent No. 4,853,230 ("the '230

Patent" are invalid.

     2.   Apotex infringed claims 1, 5, 6, and 10 of the '505

Patent, and claims 1, 6, 7, and 13 of the '230 Patent by filing

Abbreviated New Drug Application ("ANDA") No. 76-048 with the Food and Drug Administration ("FDA") including a certification under 5)5(j)(2)(A)vii)(IV) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Apotex's omeprazole formulations sold, offered for sale, used and imported into the United States, described in ANDA No. 76-048, and which were the subject of the Court's May 31, 2007 Opinion and Order, literally infringe '505 Patent claims 1, 5, 6, and 10, and '230 Patent claims 1, 6, 7, and 13.

3.    Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of approval for the aforementioned products and related ANDAs shall be not earlier than October 20, 2007, the date on which the six-month period of pediatric exclusivity under 21 U.S.C. § 355a(b)(2)(B) expires.

## IMPAX

4.    Defendant Impax Laboratories, Inc. ("Impax") has failed to meet its burden of proving that the asserted claims (1, 5, 6, 8, and 10) of U.S. Patent No. 4,786,505 ("the '505 Patent" and the asserted claims (1, 6, 7, 10, and 13) of U.S. Patent No. 4,853,230 ("the '230 Patent") are invalid.

5.    Impax infringed claims 1, 5, 6, 8, and 10 of the '505 Patent, and claims 1, 6, 7, 10, and 13 of the '230 Patent by filing an Abbreviated New Drug Application ("ANDA") No. 75-785 with the Food and Drug Administration ("FDA") including a

certification under 505(j)(2)(A)vii)(IV) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Impax's omeprazole formulations sold, offered for sale, used and imported into the United States, described in ANDA No. 75-785, and which were the subject of the Court's May 31, 2007 Opinion and Order, literally infringe '505 Patent claims 1, 5, 6, 8, and 10, and '230 Patent claims 1, 6, 7, 10, and 13.

6.    Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of approval for the aforementioned products and related ANDAs shall be not earlier than October 20, 2007, the date on which the six-month period of pediatric exclusivity under 21 U.S.C. § 355a(b)(2)(B) expires.

## MYLAND AND ESTEVE

7.    Defendants Mylan Laboratories Inc., and Mylan Pharmaceuticals Inc. (collectively "Mylan"), and Esteve Quimica, S.A. and Laboratorios Dr. Esteve, S.A. (collectively "Esteve") have failed to meet their burden of proving that the asserted claims 1, 3, 4, 5, 6, 7, 10, 11, and 14) of U.S. Patent No. 4,786,505 ("the '505 Patent") and the asserted claims (1, 6, 7, 8, 9. 10, 13 and 15) of U.S. Patent No. 4,853,230 ("the '230 Patent" are invalid.

8.    The omeprazole formulation described in ANDA No. 75-876 of Defendants Mylan and Esteve, which was the subject of the Court's May 31, 2007 Opinion and Order, does not infringe the

asserted claims (1, 3, 4, 5, 6, 7, 10, 11, and 14) of the '505 Patent and the asserted claims (1, 6, 7, 8, 9, 12, 13, and 15) of the '230 Patent, either literally or under the doctrine of equivalents.

9.   Plaintiffs' allegations that Defendants Mylan and Esteve have willfully infringed the '505 and '230 Patents are dismissed as moot.

## LEK

10   The omeprazole formulations described in ANDA Nos. 75-757 and 76-515 of Defendants Lek Pharmaceuticals d.d. and Lek Services Inc. (collectively "Lek"), which were the subject of the Court's May 31, 2007 Opinion and Order do not infringe the asserted claims (1, 5, 7, 8, 9, and 10) of the '505 Patent and the asserted claims (1, 6, 8, 10, 11, and 13) of the '230 Patent, either literally or under the doctrine of equivalents.

## ALL PARTIES

11   The Parties reserve the right to assert remaining claims not the subject of the Court's previous orders and opinions, and to seek or oppose damages, enhanced damages, attorneys' fees and further relief.

12   There being no just reason for delay, pursuant to Federal Rule of Civil Procedure 54(b), the Clerk of Court shall enter final judgment for Astrazeneca, pursuant to paragraphs 1 through 11.

06/14/2007 11:53 FAX  212 805 6191          HONORABLE BARBARA JONES                      @007/007

SO ORDERED:

Barbara S. Jones
UNITED STATES DISTRICT JUDGE

Dated:     New York, New York
           June /4, 2007

*Apotex Inc. v. Food and Drug Administration et al.*, Case No. _____ (D.D.C.)

# EXHIBIT C
# to Tsien Declaration

# COVINGTON & BURLING LLP

1201 PENNSYLVANIA AVENUE NW    WASHINGTON
WASHINGTON, DC 20004-2401    NEW YORK
TEL 202.662.6000    SAN FRANCISCO
FAX 202.662.6291    LONDON
WWW.COV.COM    BRUSSELS

PETER O. SAFIR
TEL 202.662.5162
FAX 202.778.5160
PSAFIR@COV.COM

June 15, 2007

**BY FACSIMILE**

Sheldon T. Bradshaw, Esq., Chief Counsel
Food and Drug Administration
5600 Fishers Lane, Room 6-05
Rockville, Maryland 20857
301-827-3054 (f)

Re:    *In re Omeprazole Patent Litigation,* M-21-81 (BSJ); ANDA Nos. 76-048 and 75-785

Dear Mr. Bradshaw:

We represent AstraZeneca, Plaintiffs in the *In re Omeprazole Patent Litigation,* M-21-81 (BSJ). On June 14, 2008 the Court entered the attached Judgment ordering that the effective date of approval of ANDA Nos. 76-048 and 75-785 shall be not earlier than October 20, 2007, the date on which the six-month period of pediatric exclusivity under 21 U.S.C. § 355a(b)(2)(B) expires. (See Court Order at ¶¶ 3, 6). The pediatric exclusivities are measured from the April 20, 2007 expiration dates for the two patents-in-suit, U.S. Patent Nos. 4,786,505 and 4,853,230.

AstraZeneca respectfully requests that, pursuant to the Court's Judgment, the FDA immediately revoke the final approval of ANDA Nos. 76-048 (Apotex Corp. (Torpharm) and ANDA No. 75-785 (Impax Laboratories, Inc.) and return the status of the applications to tentatively approved through at least October 20, 2007, the date that the applicable pediatric exclusivities expire.

Respectfully submitted,

Peter O. Safir

COVINGTON & BURLING LLP

June 15, 2007
Page 2

Enclosure

cc:    Elizabeth Dickinson, Esq.,
       Office of the Chief Counsel
       5600 Fishers Lane, Room 6-05
       Rockville, Maryland 20857
       301-827-3054 (f)


       Gary Buehler, Director
       Office of Generic Drugs
       7500 Standish Place
       Rockville, MD 20855
       240-276-9327 (f)

       Errol B.Taylor, Esq. Counsel for Plaintiffs
       Milbank, Tweed, Hadley & McCloy LLP
       1 Chase Manhattan Plaza
       New York, NY 10005
       212-822-5545 (f)

       Robert S. Silver, Esq., Outside Counsel for Apotex
       Caesar, Rivise, Bernstein,
       Cohen and Pokotilow, Ltd.
       1635 Market Street
       11th Floor
       Philadelphia, PA 19103-2212
       215-751-1142 (f)

       Jeffrey J. Toney, Esq., Outside Counsel for Impax
       Sutherland, Asbill & Brennann LLP
       999 Peachtree Street, NE
       Atlanta, Georgia 30309-3996
       404-853-8806 (f)

*Apotex Inc. v. Food and Drug Administration et al.*, Case No. _____ (D.D.C.)

# EXHIBIT D
# to Tsien Declaration

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jay P. Lefkowitz
To Call Writer Directly:
212 446-4970
lefkowitz@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 21, 2007

**BY FACSIMILE AND E-MAIL**

Sheldon T. Bradshaw, Esq.
Chief Counsel
Food and Drug Administration
5600 Fishers Lane, Room 6-05
Rockville, MD 20857

RE:    *In re Omeprazole Patent Litigation*, M-21-81 (BSJ)
      ANDA Nos. 75-785 and 76-048

Dear Mr. Bradshaw:

On June 15, 2007, counsel for AstraZeneca requested that FDA "immediately revoke the final approval of ANDA No. 76-048 ... and ANDA No. 75-785 ... and return the status of the applications to tentatively approved through at least October 20, 2007, the date that the applicable pediatric exclusivities expire." Letter from P. Safir to S. Bradshaw [the "Safir Letter"], June 15, 2007, at 1 (attached as Exh. 1). On June 18, 2007, FDA requested that Apotex Inc. (the sponsor of ANDA No. 76-048) and Impax Laboratories, Inc. (the sponsor of ANDA No. 75-785) submit a written response to AstraZeneca's request. Apotex and Impax appreciate the opportunity to be heard on this matter, and respectfully submit the following joint response. For the reasons that follow, we believe that the Agency should determine that AstraZeneca is not eligible or entitled to pediatric exclusivity against Apotex or Impax, and thus that there is no basis for rescinding or converting those companies' longstanding final approvals.

As you are aware, the district court overseeing the omeprazole patent litigation, *In re Omeprazole Patent Litigation*, M-21-81 (BSJ), recently entered an order directing that "the effective date of approval for the [Apotex and Impax] ANDAs shall be not earlier than October 20, 2007, the date on which the six-month period of pediatric exclusivity under 21 U.S.C. § 355a(b)(2)(B) expires." *See* Judgment, *In re Omeprazole Patent Litigation*, M-21-81 (BSJ), June 15, 2007, at ¶¶ 3 & 6 (attached as Exh. 2). Apotex and Impax have appealed that judgment to the Federal Circuit, and each has moved the Federal Circuit to stay the district court's judgment pending appeal.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      San Francisco

Sheldon Bradshaw
June 21, 2007
Page 2

## KIRKLAND & ELLIS LLP

This matter raises particularly important issues regarding the Agency's authority to make and enforce pediatric exclusivity determinations, and Apotex and Impax thus request that the Agency take this opportunity to offer its own considered views on the matter of AstraZeneca's eligibility for pediatric exclusivity in this case. Given the magnitude of these issues, we hope that the Agency will express its views in response to this letter and, if necessary, directly to the Federal Circuit.

As set forth in greater detail below, we believe that the district court's judgment is based on an erroneous determination that AstraZeneca is entitled to a period of pediatric exclusivity for its Prilosec®-branded omeprazole drug products. *See, e.g.*, Order Denying Impax's Motion to Dismiss for Lack of Subject-Matter Jurisdiction [the "Order on Motion to Dismiss"], *In re Omeprazole Patent Litigation*, M-21-81 (BSJ), May 25, 2007, at 5 (attached as Exh. 3) ("AstraZeneca is entitled to a six-month period of pediatric exclusivity under 21 U.S.C. § 355a(c)(2)(B). This period of pediatric exclusivity is set to expire on October 20, 2007."); *id.* at 17-19 (holding that § 271(e)(4)(a) gives the court "power to enforce" the pediatric "period of … exclusivity"). Given that FDA is charged with the responsibility for administering and enforcing the pediatric exclusivity provisions of the Hatch-Waxman Act, we believe that the Agency is not only authorized, but obligated, to render its own reasoned view on that matter.

By law, FDA is vested with the exclusive statutory authority to determine whether a brand manufacturer is entitled to pediatric exclusivity, and courts thus routinely accord full *Chevron* deference to the Agency's determination of whether a brand manufacturer is entitled to pediatric exclusivity against a particular generic applicant.. *See, e.g.*, *Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d 106, 118 (D.D.C. 2004) (holding that "issues relating to the ANDA's approval and the applicability of the pediatric exclusivity provisions" are "subject areas that have clearly been entrusted to the FDA by Congress," and deferring to FDA's determination that Mylan was barred by Alza's pediatric exclusivity for Duragesic®), *aff'd* 389 F.3d 1272 (D.C. Cir. 2004); *see also Mylan Labs., Inc. v. Leavitt*, __ F. Supp. 2d __, 2007 WL 1241884, *8-*9 (D.D.C. April 30, 2007) (deferring to FDA's determination that Teva was barred by Pfizer's pediatric exclusivity for Norvasc® but Apotex was not); *see also* 21 U.S.C. § 355a(d) (granting FDA authority to determine whether pediatric studies submitted by a brand manufacturer are adequate); *id.* § 355a(f) (requiring FDA to "publish a notice of any determination that the requirements of subsection (d) of this section have been met and that submissions and approvals under subsection (b)(2) or (j) of section 355 of this title for a drug will be subject to the provisions of this section"); FDA, *Guidance for Industry: Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act* (Sept. 1999) (setting forth FDA's standards for determining whether a brand manufacturer is entitled to pediatric exclusivity).

In this case, however, the district court determined that AstraZeneca was entitled to pediatric exclusivity—and, thus, that the court could "enforce" that period of pediatric exclusivity under 35 U.S.C. § 271(e)(4)(a)—without the benefit of any input from the Agency. As a result, the district court was not able to defer to the Agency's views on this matter, and Apotex and Impax respectfully submit that it is incumbent on the Agency to set the record straight on this matter.

Sheldon Bradshaw
June 21, 2007                    KIRKLAND & ELLIS LLP
Page 3

As the district court and AstraZeneca have acknowledged, both of the patents at issue in the omeprazole litigation expired on April 20, 2007—long after FDA had granted final approval to those ANDAs, long after Apotex and Impax had acted on those lawful final approvals by commercially marketing drug products manufactured under their respective ANDAs, and prior to any finding that either of these two parties infringed the expired patents or that the expired patents were valid.    Given those circumstances, the district court's determination that AstraZeneca is entitled to pediatric exclusivity against Apotex and Impax is erroneous. Indeed, the Agency just recently held in the amlodipine besylate matter (FDA Docket No. 07-N-123) that a finally approved ANDA is "not blocked by [a brand manufacturer's] pediatric exclusivity ... under the literal terms of the [pediatric exclusivity] statute," and that the "ANDA's approval cannot be delayed."    Letter from G. Buehler to Amlodipine Besylate ANDA Applicants [the "Amlodipine Decision"], Apr. 19, 2007, at 5 n.4 (citing 21 U.S.C. § 355a(c)(2)(A)-(B)) (attached as Exh. 3). Thus, just as Mylan's ANDA for Norvasc®-equivalent amlodipine besylate tablets was not subject to Pfizer's pediatric exclusivity in that matter, neither Apotex's ANDA nor Impax's ANDA is barred by AstraZeneca's pediatric exclusivity in this case. In the Agency's words, the final approval of those ANDAs "cannot be delayed."  *Id.*

The district court's judgment in the *Omeprazole* litigation does not preclude the Agency from issuing its own determination regarding AstraZeneca's eligibility for pediatric exclusivity. Indeed, we respectfully submit, the Agency is compelled to do so. As the Supreme Court recently recognized, "a court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only* if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (emphasis added). Thus, where a prior judicial determination interprets or applies an ambiguous statute, an administrative agency lawfully may "choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." *Id.* at 983.

As a result, prior judicial pronouncements do not bind an administrative agency otherwise entitled to *Chevron* deference, and such determinations cannot substitute for reasoned agency decisionmaking once the issue is submitted to the Agency. *See, e.g., Teva Pharms. USA, Inc. v. FDA [Pravastatin]*, 441 F.3d 1, 4-5 (D.C. Cir. 2006) (holding that "FDA mistakenly thought itself bound by our decisions in *Teva I* and *Teva II*," vacating the Agency's decision as arbitrary and capricious, and remanding case to the Agency with instructions to "bring its experience and expertise to bear in light of competing interests at stake and make a reasonable policy choice" notwithstanding the D.C. Circuit's prior interpretation of the Hatch-Waxman Act) (citations and quotations omitted).

*Brand X* is particularly instructive. That case involved a challenge to FCC's administrative decision to classify high-speed internet access ("broadband") as an "information service" rather than a "telecommunications service" under the Telecommunications Act of 1996. Several parties challenged that determination on the ground that FCC's interpretation was foreclosed by a prior Ninth Circuit decision holding that broadband was best considered to be a "telecommunications service"—a conclusion the court had reached despite the fact that it "was

3

Sheldon Bradshaw
June 21, 2007
Page 4

**KIRKLAND & ELLIS LLP**

not reviewing an administrative proceeding and the [FCC] was not a party." *Id.* at 978-80. When the petitioners' consolidated challenges to FCC's decision were assigned to the Ninth Circuit, that court agreed that its prior interpretation trumped the agency's contrary conclusion and vacated FCC's interpretation as contrary to law. *Id.* at 982.

The Supreme Court reversed. It explained that "allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute ... would allow a court's interpretation to override an agency's," in direct contravention of "*Chevron*'s premise ... that it is for agencies, not courts, to fill statutory gaps." *Id.* As a result, the Court held, "only a judicial precedent holding that a statute unambiguously forecloses the agency's interpretation ... displaces a conflicting agency construction," *id.* at 982-83, such that "before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction." *Id.* at 985. Because the Ninth Circuit's prior decision was not expressly based on the unambiguous text of the Telecommunications Act, the Court gave FCC's contrary application of the statute full *Chevron* deference and dismissed the petitioners' challenge to FCC's administrative decision.

The same principle applies here. As in *Brand X,* the court in this case concluded that AstraZeneca was entitled to pediatric exclusivity despite the fact that it was not reviewing an administrative proceeding; despite the fact that the Agency was not a party to the case; despite the fact that the patents-in-suit had expired; despite the fact that Apotex and Impax had been approved and on the market for years; despite the fact that the Agency has never awarded, and indeed could not award, AstraZeneca pediatric exclusivity against Apotex or Impax; and without even soliciting the Agency's views. Moreover, the district court did not even purport to base its assertion that AstraZeneca is entitled to pediatric exclusivity on the text (much less the unambiguous text) of the relevant statutory provisions at all. Instead, it purported to base its decision on FDA's prior administrative determination in the fluconazole case—which it then expressly conceded to be distinguishable. *See* Order on Motion to Dismiss at 21-23 (discussing *Ranbaxy Labs. Ltd. v. FDA [Fluconazole]*, 307 F. Supp. 2d 15 (D.D.C. 2004)); *see also id.* at 25 ("Ranbaxy's ANDA is distinguishable from Impax's ANDA").

Thus, pursuant to *Brand X* and under the D.C. Circuit's decision in the *Pravastatin* case, the Agency is not remotely bound by the district court's determination that AstraZeneca is entitled to pediatric exclusivity. To the contrary, it is obligated to "bring its experience and expertise to bear" and render its own reasoned determination regarding AstraZeneca's eligibility for such exclusivity. *See Pravastatin,* 441 F.3d at 5.

Here, of course, there is no basis for awarding AstraZeneca pediatric exclusivity against Apotex or Impax. As the district court itself acknowledged, the *Fluconazole* case is distinguishable. In that case, FDA held that Ranbaxy's *then-tentatively approved* fluconazole ANDA was subject to pediatric exclusivity because Ranbaxy was required to convert its paragraph IV certification to a paragraph II certification upon patent expiration. *Ranbaxy,* 307 F. Supp. 2d at 18. Here, by contrast, both Apotex and Impax had *final approval for years* and actively were engaged in commercial marketing at the time the patents expired.

KIRKLAND & ELLIS LLP

As a result, neither Apotex nor Impax were required to update their respective patent certifications upon patent expiration. That is the conclusion FDA reached with respect to Mylan's ANDA in the amlodipine case, *see* Amlodipine Decision at 5 n.4—which the district court did not even cite, much less discuss—and it is the same conclusion that the district court eventually reached in this case. *See* Order on Motion to Dismiss at 23 ("Impax's ANDA did not automatically convert from a Paragraph IV to a Paragraph II certification.") (capitalization modified); *id.* at 25 ("Once an application is finally approved, the applicant is no longer under an obligation to amend its patent certification.") (citing 21 C.F.R. § 314.94(A)(12)(viii)(C)(i)).

Nor does the Agency's decision in the fentanyl patch matter require a different result. As the court acknowledged in this case, the district court's 271(e)(4)(a) order in that case issued well *before* patent expiration, *see* Order on Motion to Dismiss at 19—as did FDA's determination that Alza was entitled to a period of pediatric exclusivity for its fentanyl patch drug products. *See Mylan Labs., Inc. v. Thompson [Fentanyl Patch]*, 389 F.3d 1272, 1277 (D.C. Cir. 2004) (noting that the district court issued its 271(e)(4)(a) order on March 24, 2004, some four months prior to the patent's July 23, 2004 expiration, and that FDA determined that Alza was entitled to pediatric exclusivity on June 22, 2004, more than one month prior to the patent's expiration).

While the district court dismissed the significance of those facts, they are dispositive—not only because the Agency squarely held in the amlodipine matter that pediatric exclusivity does *not* apply to ANDAs that (like Apotex's and Impax's ANDAs) have final approval at the time of patent expiration, *see* Amlodipine Decision at 5 n.4, but because they call into question the jurisdiction of the district court to enter a 271(e)(4)(a) order in the first instance.[1] Nothing in the statute or the fentanyl patch matter suggests, much less compels the conclusion, that final approvals issued years ago can be rescinded or converted where the Agency determines that the brand manufacturer is not entitled to a period of pediatric exclusivity. To hold otherwise would, by fiat, replace non-existent pediatric exclusivity with an unlawful patent term extension.

Given *Brand X*'s holding that administrative agencies are free to interpret and apply statutes entrusted to their care independent of prior judicial determinations about the meaning and application of those statutes, and *Pravastatin*'s requirement that agencies are obligated to "bring [their] experience and expertise to bear" in these circumstances, Apotex and Impax respectfully submit that the Agency is obligated to address the district court's erroneous determination—reached without the benefit of the Agency's views, and in direct conflict with the Agency's recent decision on this very subject—that AstraZeneca is entitled to pediatric exclusivity against Apotex and Impax. This matter has "clearly been entrusted to the FDA by

---

[1]    At least one court has held that patent expiration divests the federal courts of subject matter jurisdiction to enter an effective order under 35 U.S.C. § 271(e)(4). *See Pfizer, Inc. v. Mylan Labs., Inc.*, 2006 WL 2990398 (W.D. Pa. Oct. 18, 2006) (dismissing § 271(e)(2)(A) claims against ANDA-filer after patent expiration for lack of subject matter jurisdiction, even though pediatric exclusivity still exists). Given the significance of these issues, FDA at least should stay its hand until the Federal Circuit can address the propriety of the district court's order on appeal.

Sheldon Bradshaw
June 21, 2007
Page 6                      KIRKLAND & ELLIS LLP

Congress," *Mylan*, 332 F. Supp. 2d at 118, and the Agency has both the authority and obligation to set the record straight by following its recent decision in the amlodipine matter—a decision that already has garnered substantial deference from the courts, *see Mylan*, __ F. Supp. 2d __, 2007 WL 1241884 at *8-*9, and which conclusively rejects the proposition that AstraZeneca is entitled to pediatric exclusivity in this case.

Accordingly, FDA should hold that AstraZeneca is not eligible or entitled to pediatric exclusivity against Apotex or Impax, and thus that there is no basis for rescinding or converting those companies' longstanding final approvals.

Respectfully submitted,

Jay V. Lefkowitz, P.C.                        William A. Rakoczy
KIRKLAND & ELLIS LLP                          RAKOCZY MOLINO MAZZOCHI SIWIK LLP
Citigroup Center                              6 West Hubbard Street
153 East 53rd Street                          Suite 500
New York, New York 10022                      Chicago, Illinois 60610
(212) 446-4970 (phone)                        (312) 222-6301 (phone)
(212) 446-4900 (fax)                          (312) 222-6321 (fax)

*Counsel for Impax Laboratories, Inc.*        *Counsel for Apotex Inc.*

cc:    Elizabeth Dickinson, Esq., *Office of the Chief Counsel*
       Gary Buehler, *Office of Generic Drugs*
       Peter Safir, Esq., *Covington & Burling LLP*
       Errol B. Taylor, Esq., *Milbank Tweed Hadley & McCloy LLP*
       Robert S. Silver, Esq., *Caeser, Rivise, Bernstein, Cohen and Pokotilow, Ltd.*
       Jeffrey J. Toney, Esq., *Sutherland, Asbill & Brennan LLP*

# Exhibit 1

# Intentionally Omitted — Exhibit 1:

June 15, 2007 letter from AstraZeneca (Peter O. Safir) to FDA (Sheldon T. Bradshaw)

# Exhibit 2

# Intentionally Omitted — Exhibit 2:

June 14, 2007 Judgment entered in *AstraZeneca AB v. Apotex Corp.*, 01 Civ. 9351 (BSJ) (S.D.N.Y.)

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
ASTRAZENECA AB, et al,            :
                     Plaintiffs, :
        vs.                       :         00 Civ. 7597(BSJ)
                                  :
IMPAX LABORATORIES, INC.          :         01 Civ. 2998(BSJ)
                     Defendants.  :
-------------------------------x
                                  :         M-21-81 (BSJ)
In re OMEPRAZOLE PATENT LITIGATION :        MDL Docket No. 1291
                                  :
                                  :         **Order**
-------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Presently before the Court is Impax Laboratories, Inc.'s

Motion to Dismiss for Lack of Subject Matter Jurisdiction

pursuant to Federal Rule of Civil Procedure 12(b)(1).  For the

reasons set forth below, Impax's motion is DENIED.

**Background**

This is a patent infringement action brought by Plaintiffs

AstraZeneca AB, Aktiebolaget Hässle, KBI-E Inc., KBI Inc., Astra

Pharmaceuticals, L.P., and AstraZeneca, LP (collectively

"Plaintiffs," "AstraZeneca," or "Astra") against Impax

Laboratories, Inc. ("Impax"), a manufacturer of generic

pharmaceutical products in the United States.  Astra alleges

infringement of U.S. Patent Numbers 4,786,505 and 4,853,230 (the

"'505 Patent" and the "'230 Patent," respectively), which cover

the Prilosec® formulation.

**A. Statutory Background**

Resolution of this matter requires the Court to analyze
three distinct statutory provisions; therefore, the Court will
provide a brief overview of the relevant provisions.  For a
detailed explanation, see Mylan Labs., Inc. v. Thompson, 389
F.3d 1272 (D.C. Cir. 2004); Barr Labs., Inc. v. Thompson, 238 F.
Supp. 2d 236 (D.D.C. 2002).

### 1. The Hatch-Waxman Amendments

21 U.S.C. § 355(j), a provision of the 1984 Hatch-Waxman
Amendments to the Federal Food, Drug, and Cosmetic Act ("FDCA"),
"creates an approval shortcut for applicants seeking to market
generic versions of approved drugs." Thompson, 389 F.3d at
1274-75  Section 355(j) permits a generic applicant to file an
abbreviated new drug application ("ANDA") with the U.S. Food and
Drug Administration ("FDA") certifying that the generic version
is bioequivalent to an approved drug, and thus avoid having to
conduct its own clinical trials.  Id. at 1275.  The ANDA must
include "a certification, that for each of the patents
applicable to the pioneer drug, the proposed generic drug would
not infringe the patent because (I) the patent information has
not been filed; (II) the patent has expired; (III) the patent
will expire on a stated date; or (IV) the patent is invalid or
will not be infringed by the manufacture, use or sale of the
drug for which the abbreviated application applicant seeks
approval." 21 U.S.C. § 355(j)(2)(A)(viii), cited in Mylan

2

Labs., Inc. v. Leavitt, No. 07-579, 2007 WL 1241884, at *2

(D.D.C. Apr. 30, 2007). These certifications are referred to as

Paragraphs I, II, III, and IV, respectively.

35 U.S.C. § 271(e)(2), a patent statute, also enacted in

the Hatch-Waxman Amendments, creates a cause of action for

patent infringement based solely upon the filing of an ANDA

containing a Paragraph IV certification. Eli Lilly & Co. v.

Medtron c, Inc., 496 U.S. 661, 676 (1990). Section 271(e)(4)

sets out the exclusive remedies available in a patent

infringement action under § 271(e)(2):

> For an act of infringement described in paragraph (2)-
> (A  the court shall order the effective date of any
> approval of the drug or veterinary biological product
> in the infringement to be a date which is not earlier
> than the date of expiration of the patent which has
> been infringed,
> (B  injunctive relief may be granted against an
> infringer to prevent the commercial manufacture, use,
> offer to sell, or sale within the United States or
> importation into the United States of an approved drug
> or veterinary biological product, and
> (C  damages or other monetary relief may be awarded
> against an infringer only if there has been commercial
> manufacture, use, offer to sell, or sale within the
> United States or importation into the United States of
> an approved drug or veterinary biological product.

35 U.S.C. § 271(e)(4).

## 2. The Period of Market Exclusivity

In 1997, in an effort to encourage the pediatric testing of

drugs, Congress passed the Food and Drug Administration

Modernization Act, Pub. L. No. 105-115, 111 Stat. 2296 (1997),

3

which grants manufacturers of drugs that agree to conduct pediatric studies, six months of market exclusivity for their products. Ass'n of Am. Physicians & Surgeons, Inc. v. U.S.F.D.A., 226 F. Supp. 2d 204, 206 (D.D.C. 2002). 21 U.S.C. § 355a, the "pediatric exclusivity" provision, authorizes a patent holder to receive a six-month period of market exclusivity beyond the patent's expiration date, if the patent holder "has satisfactorily conducted pediatric testing of its drug upon the FDA's request." Thompson, 389 F.3d at 1275. This provision serves as an incentive for a drug patent holder to conduct expensive and difficult pediatric studies of a drug that the FDA believes may have a beneficial pediatric use. Thompson, 389 F.3d at 1276; cf. Ass'n of Am. Physicians & Surgeons, 226 F. Supp. 2d at 206 (noting that "[b]ecause of the expense and difficulty in finding substantial pediatric populations to undergo tests, along with the ethical complications associated with testing new drugs on children, many drugs are tested for safety and effectiveness in adults only").

"If the FDA makes a request and the NDA holder satisfies that request's requirement, pediatric exclusivity provides for a six-month delay in the effective date of the pending ANDAs." Barr Labs., 238 F. Supp. 2d at 241. The effect of the grant of pediatric exclusivity depends on the type of certification included in the ANDA. If the drug is the subject of a Paragraph

4

II or Paragraph III certification, "the period during which an application may not be approved under . . . . [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the patent expires (including any patent extensions)." 21 U.S.C. § 355a(c)(2)(A). If the drug is the subject of a Paragraph IV certification "and in the patent infringement litigation resulting from the certification the court determines that the patent is valid and would be infringed, the period during which an application may not be approved under [21 U.S.C. § 355(j)(5)(B)] shall be extended by a period of six months after the date the patent expires (including any patent extensions)." 21 U.S.C. § 355a(c)(2)(B).

As an initial matter, the Court notes that AstraZeneca is entitled to a six-month period of pediatric exclusivity under 21 U.S.C. § 355a(c)(2)(B). This period of pediatric exclusivity is set to expire on October 20, 2007.

### B. The Present Case

In April 2000, Impax sent Astra notice that it had submitted an abbreviated new drug application ("ANDA") to the FDA seeking approval to engage in the commercial manufacture, use, or sale of its 10-mg and 20-mg omeprazole products, called "Omeprazole Delayed Release Capsules 10 and 20 mg," as generic versions of Astra's Prilosec® product. As part of its ANDA, Impax included a Paragraph IV Certification, as described in 21

5

U.S.C. § 355(j)(2)(A)(vii)(IV), stating that the '505 and '230
patents "[are] invalid or will not be infringed by the
manufacture, use, or sale of the new drug." (Second Am. Compl.
Against Impax (hereinafter "Second Am. Compl.") ¶¶ 12, 24.)

On May 15, 2000, Plaintiffs filed their initial Complaint
alleging that Impax committed an act of infringement under 35
U.S.C. § 271(e)(2) with respect to the '505 and '230 patents, by
filing its ANDA seeking approval from the FDA to engage in the
commercial manufacture, use, or sale of its 10- and 20-mg
Omeprazole Delayed Release Capsules, prior to the expiration of
the '505 and '230 patents. (Second Am. Compl. ¶¶ 11, 16, 28.)
On January 8, 2002, Impax sent Astra notice that it had
"submitted an amendment to ANDA 75-785, providing for the
addition of a 40mg strength" Omeprazole Delayed Release Capsule.
(Trial Ex. 1128.)

On November 8, 2002, Impax obtained final approval of its
ANDAs and in September 2004, began to market and sell its
generic products. (Impax's Mem. of Law in Supp. of its Mot. to
Dismiss Under Rule 12(b)(1) for Lack of Subject Matter
Jurisdiction (hereinafter "Def.'s Motion") at 2.) With leave of
Court, Plaintiffs filed a Second Amended Complaint on March 1,
2005, adding allegations of direct, contributory, and inducing
infringement under 35 U.S.C. § 271(a), (b), and (c),
respectively, and a demand for damages. (Second Am. Compl. ¶¶

19a-20, 31a-32.)   On February 14, 2005, Impax filed its Answer and Counterclaims to Plaintiffs' Second Amended Complaint. Impax asserted counterclaims of invalidity and non-infringement, and demanded a jury trial on Plaintiffs' infringement claims and its counterclaims.  (Impax Answer & Countercls. ¶ 235.)  In order to include Impax in the consolidated Second Wave Bench Trial,[1] Plaintiffs agreed to dismiss with prejudice their claims for damages under § 271(a)-(c).  In January 2006, the Court severed and stayed Impax's antitrust counterclaims pending the resolution of the patent infringement action, and ordered Plaintiffs to submit a voluntary dismissal of the damages claims.  (Order Denying Impax's Claim to Jury Trial, Jan. 13, 2006.)

The case was tried to the Court sitting without a jury for 42 trial days, starting April 3, 2006 and ending June 14, 2006. Post-trial findings of fact and conclusions of law were fully submitted on August 1, 2006.  The '505 and '230 patents expired on April 20, 2007, while a final decision was <u>sub judice</u>.

---

[1] The Second Wave Trial included the following defendant pharmaceutical corporations:  Mylan Laboratories Inc., Mylan Pharmaceuticals Inc., Esteve Quimica, S.A., Laboratorios Dr. Esteve, S.A., Apotex Corp., Apotex Inc., Torpharm Inc., Lek Pharmaceutical and Chemical Company D.D., Lek USA, Inc., and Impax Laboratories, Inc.

[2] In addition, the Court ordered that, upon entry of Astra's dismissal, Impax's jury demand would be struck.  (Jan. 13, 2006 Order at 9.)  On February 26, 2006, this Court denied Impax's motion for reconsideration.  On March 2, 2006, the Federal Circuit denied Impax's petition for a writ of mandamus. Impax has filed a petition for certiorari in the Supreme Court of the United States.

7

**Discussion**

On April 23, 2007, Impax filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Impax asserts that upon the expiration of the '505 and '230 patents on April 20, 2007, the Court was divested of jurisdiction over Plaintiffs' claims for patent infringement under 35 U.S.C. § 271(a)-(c) and § 271(e)(2).

**A. Legal Standard for Dismissal**

A motion to dismiss for lack of subject matter jurisdiction presents only a procedural question, and does not raise issues unique to patent law.  Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1380-81 (Fed. Cir. 2002).  Accordingly, the Court must apply regional circuit law, in this case Second Circuit law, in resolving Impax's motion to dismiss.  Id.  Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a claim when the court "lacks . . . jurisdiction over the subject matter."  F. R. Civ. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir 2000).  Plaintiffs bear the burden of establishing by a preponderance of the evidence that subject matter jurisdiction exists.  Makarova, 201 F.3d at 113; Faggionato v. Lerner, No. 06 CV 2614 2007 WL 959102, at *5 (S.D.N.Y. Mar. 30, 2007).

"Jurisdictional allegations must be shown affirmatively and may not be inferred favorably to the party asserting them." Faggianito, 2007 WL 959102 at *5. In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may refer to evidence outside the pleadings. Makarova, 201 F.3d at 113.

### B. Expiration of the '230 and '505 Patents Does Not Render Astra's Claims Moot

In support of its motion to dismiss, Impax argues that the Court lacks jurisdiction over the present controversy because "Astra has no remaining claim for relief against Impax." (See Def.'s Motion at 3.) Impax's argument can be summarized as follows  Under the Patent Act, Plaintiffs are entitled to only two remedies for infringement of the '505 and '230 patents: damages under 35 U.S.C. § 284, or an injunction under 35 U.S.C. § 283. Because Astra dismissed with prejudice all of its claims for damages, the only remedy available to Astra was an injunction under 35 U.S.C. § 283. Upon expiration of the patents Astra is no longer entitled to injunctive relief under § 283, and Astra's claims for infringement under 35 U.S.C. § 271(e)(2) "expired." Thus, Impax asserts that Astra's claims for patent infringement are now moot and the Court's subject

9

05/25/2007 08:55 FAX  212 805 6191        HONORABLE BARBARA JONES                    ☑011/027

matter jurisdiction over the claims has "dissolve[d]." (Def.'s Motion at 3).[3]

The Court disagrees. Mootness "refers to "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) [and] continue throughout [the] existence" of the litigation.[4]  U.S. Parole Comm'n v. Geraghty, 445 U.S. 385, 395-97 (1980) (quoting Henry Paul Monaghan, Constitutional Adjudication:  The Who and When, 82 Yale L.J. 1363, 1384 (1973)).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack 395 U.S. 486, 496-97 (1969) (citation omitted).

The Plaintiffs here have a legally cognizable interest, or "personal stake," in this litigation.  See U.S. Parole Comm'n v. Geraghty, 445 U.S. at 396-96.  So we are concerned only with whether the issues before the court are still "live."  The "central question . . . is whether a change in the circumstances

---

[3]  In addition, Impax contends the Pennsylvania District Court's decision in Pfizer, Inc. v. Mylan Pharm., Inc., No.02 CV 1628, 2006 WL 2990398 (W.D. Pa. Oct. 18, 2006), dictates dismissal of Astra's claims against Impax.  This Court di agrees.  Pfizer v. Mylan is not binding precedent on this Court.  Nor does it consider the detailed statutory analysis, upon which this Court relies.

[4]  "The rule that [courts] lack jurisdiction to consider the merits of a moot case is a branch of the constitutional command that the judicial power extends only to cases or controversies." Powell v. McCormack 395 U.S. 486, 497 (1969) (citing Sibron v. New York, 392 U.S. 40, 57 (1968)).  But see Honig v. Doe, 484 U.S. 305, 330 (1988) (Rehnquist, C.J., concurring) (arguing that mootness doctrine is primarily prudential and not constitutionally based), cited in Erwin Chemerinsky, Federal Jurisdiction § 2.5 (4th Ed. 2003).

that prevailed at the beginning of the litigation have
forestalled any occasion for meaningful relief." 13A Charles
Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
3533.3 (2d ed. 1984). In other words, whether the expiration of
the '505 and '230 patents has rendered Plaintiff's claims moot
depends on the availability of any judicial relief. See Earth
Island Inst. v. United States Forest Serv., 442 F.3d 1147, 1157
(9th Cir. 2006) (In deciding whether a case is moot, "[t]he
question is not whether the precise relief sought at the time of
the application for an injunction was filed is still available.
The question is whether there can be any effective relief.").

    No one disputes that if the patent holder is seeking
damages it may maintain a cause of action past the expiration
of the patents. See Clark v. Wooster, 119 U.S. 322, 325 (1886)
(expiration of the patents does not deprive the court of
jurisdiction to grant monetary relief). But if the patent
holder is seeking an injunction under § 283 "to prevent the
violation of any right secured by patent," 35 U.S.C. § 283, the
patent must still be in effect in order for the court to grant
relief because upon the expiration of the patent, the right to
exclude others from practicing the claimed invention also
expires Kearns v. Chrysler Corp., 32 F.3d 1541, 1550 (Fed.
Cir. 1994) ("Thus, when the rights secured by a patent are no
longer protectable by virtue of expiration or unenforceability,

entitlement to injunctive relief becomes moot because such relief is no longer available."); see also Sears, Roebuck & Co. v. Stiffel, Co., 376 U.S. 225, 230 (1964); Lans v. Digital Equip. Corp., 252 F.3d 1320, 1328 (Fed Cir. 2001) ("The District Court cannot enjoin the Computer Companies from infringing an expired patent."). Because the '505 and '230 patents have expired, Astra is no longer entitled to an injunction under § 283.

However, the unavailability of money damages or an injunction under § 283 does not automatically render the entire controversy before the Court "moot." For the reasons set forth below, the Court finds that because Plaintiffs are entitled to judicial relief -- either under the Court's equitable power or 35 U.S.C. § 271(e)(4)(A) -- the case is not moot, and the Court has jurisdiction over Plaintiffs' claims for patent infringement.

### 1. Equitable Relief

In Roche Prods., Inc. v. Bolar Pharm. Co. Inc., 733 F.2d 853 (1984), cert denied, 469 U.S. 856 (1984), the Federal Circuit held that the expiration of the patents did not render the case before it moot, nor did it deprive the court of the power to grant alternative forms of equitable relief. In Roche, the plaintiff requested a permanent injunction against infringement by Bolar, the defendant. Id. at 865. After the

12

motion was fully briefed, but prior to oral argument, the patent at issue expired.  Id.  The Court held that the case was not moot "because although the initially requested order [was] no longer . . . necessary, other remedies can be fashioned to give Roche relief against Bolar's past infringement," such as "an order to confiscate and destroy the data which Bolar . . . generated during its infringing activity."  Id. (citation omitted .  In accordance with Roche, the Court finds that although the expiration of the '505 and '230 patents precludes it from granting Astra an injunction under § 283, the expiration of the patents has not divested the Court of the power to issue other forms of equitable relief.[5]

    Contrary to Impax's assertion, Kearns does not dictate a different result.  In analyzing its previous decision in Roche, the Federal Circuit in Kearns found that "[t]he post-expiration relief discussed in Roche was intended to return the parties to the status quo before infringement (e.g. destruction of data obtained as a result of infringement) and was not intended to

---

[5] Having properly obtained jurisdiction over the present controversy, the Court is not automatically divested of it upon the expiration of the patents.  See John R. Kennel, Luchas Martin, et al., Corpus Juris Secundum Patents § 436 ("Where jurisdiction is once acquired, it is not ousted by the expiration of the patent during the pendency of the suit, but continues for the purpose of an accounting." (citing Rice & Adams Corp. v. Lathrop, 278 U.S. 509 (1929)); see also Rice & Adams Corp., 278 U.S. at 514-15 ("Jurisdiction of the court sitting in equity, having been rightfully invoked, was not lost . . . by the expiration of the patent pending final decree. . . . [I]f the case was one for equitable relief when the suit was instituted, the mere fact that the ground for such relief expired by the expiration of the patent, would not take away jurisdiction, and preclude the court from proceeding to grant . . . incidental relief . . . .").

prohibit future use of the invention." <u>Kearns</u>, 32 F.3d at 1550.
The court noted that "[i]mportantly, the relief was also
considered in the context of harm to a patent owner that had
been selling the patented product.  Thus, deferral of
competition by an infringer who had entered the market
prematurely, i.e., before the patent expired, was considered as
a means of equitably compensating the patent owner." <u>Id.</u>
Similarly, in this case, were the Court to find the patents
valid and infringed and issue an order pursuant to 35 U.S.C. §
27.(e)(1)(A) directing Impax's ANDA to have a delayed effective
date, such an order would have the effect of returning the
parties to the status quo before infringement -- that is before
Impax filed its ANDA with a Paragraph IV certification.  As will
be discussed in more detail below, an order directing withdrawal
of final FDA approval of Impax's ANDA and delaying the effective
date would require Impax to wait until the expiration of Astra's
six-month period of pediatric exclusivity before it could re-
enter the market to sell its generic products.  This remedy
would put the parties in the position they would have been in
had the act of infringement never occurred:  It would subject
Impax to Astra's six-month period of pediatric exclusivity, as
it would have been had it filed an ANDA with a Paragraph II or
Paragraph III certification.  Moreover, such an order would give
effect to, and is in accordance with the goal of the statutory

14

scheme enacted by Congress when it authorized the grant of
market exclusivity to patent holders who conduct pediatric
studies.  See Ass'n of Am. Physicians & Surgeons, 226 F. Supp.
2d at 206 ("[I]n an effort to encourage pediatric testing,
Congress passed the Food and Drug Administration Modernization
Act," under which "[d]rug manufacturers that agreed to conduct
these pediatric tests could receive six months of market
exclusivity for their products.").

   **2. Relief under 35 U.S.C. § 271(e)(4)(A)**

   In addition to the judicial relief available under the
Court's equitable power, 35 U.S.C. § 271(e)(4)(A) independently
provides a remedy.  Contrary to Impax's assertion the expiration
of the patents does not "eliminate[] any Section 271(e)(2) claim
that may have existed."  (See Def.'s Motion at 3.)  Section
271(e)(2) states that

> it shall be an act of infringement to submit an
> application under 505(j) of the Federal Food, Drug,
> and Cosmetic Act or described in section 505(b)(2) of
> such Act for a drug claimed in a patent or the use of
> which is claimed in a patent, if the purpose of such
> submission is to obtain approval under such Act to
> engage in the commercial, use or sale of a drug
> claimed in a patent or the use of which is claimed in
> a patent before the expiration of such patent.

35 U.S.C. § 271(e)(2).  Section 271(e)(2) creates "a new (and
somewhat artificial) act of infringement" based solely upon the
filing of an ANDA containing a Paragraph IV certification "that

is in error as to whether the commercial, manufacture, use, or sale of the new product (none of which has actually occurred) violates the relevant patent." Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 676-79 (1990).

35 U.S.C. Section 271(e)(4) sets out the remedies that are available for an act of infringement under § 271(e)(2).  In addition to injunctive relief under § 271(e)(4)(B), and damages or other monetary relief under § 271 (e)(4)(C), Section 271(e)(1)(A) provides an alternative form of relief to which Astra is still entitled.  Section 271(e)(4)(A) states that upon finding an act of infringement, "the court shall order the effective date of any approval of the drug or veterinary biological product in the infringement to be a date which is <u>not earlier than the date of expiration of the patent</u> which has been infringed."  35 U.S.C. § 271(e)(4)(A) (emphasis added).

Impax asserts that the remedy under 271(e)(4)(A) is only available prior to the expiration of the patents.  In support, Impax cites a section of legislative history from 1984, prior to the enactment of the statutory provisions authorizing the grant of pediatric exclusivity, which states that:

> If the infringing party has begun commercial marketing of the drug, damages, and other monetary relief and injunctive may be awarded for the infringement and to prevent further infringement.  In addition, the FDA would be mandated to <u>change the effective date of the approved ANDA to the expiration of the infringed patent.</u>

H.R. Rep. No. 98-857, pt. 1, at 46 (1984).  However, this is not

the language contained in the statute.  The statute states that

"the court shall order the effective date . . . to be a <u>date</u>

<u>which is not earlier than the date of the expiration of the</u>

<u>patent</u> which has been infringed." 35 U.S.C. § 271(e)(4)

(emphasis added).  Had Congress intended to limit relief under

271(e)(1)(A) to an order mandating the effective date of the

ANDA to be the date of the expiration of the patent, it could

have written the provision to say that.  But it did not.

Rather, the clear and unambiguous language of the statute sets

the date of the expiration of the patent only as the earliest

effective date a court may order.  The Court will not "accept

[Impax's] invitation to ignore [the] language which Congress saw

fit to enact" and search the legislative history for a contrary

meaning  <u>United States v. McGoff</u>, 831 F.2d 1071, 1080 & n.19

(D.C. Cir. 1987) ("Only the most extraordinary showing of

contrary intentions in the legislative history will justify

departure from the plain and unambiguous language of the

statute " (quoting <u>United States v. Albertini</u>, 472 U.S. 675, 680

(1985)) .

     The statutory language of 271(e)(4)(A) also fails to limit

the Court's power to issue a remedy to the term of the patent.

Section 271(e)(4)(A) must be read in conjunction with 21 U.S.C.

§ 355a, the statutory provision governing the grant of a six-
month period of market exclusivity to a patent holder who
completes FDA-requested pediatric studies.  21 U.S.C. § 355a
"authorizes an extra six-month 'pediatric exclusivity' period
following expiration of a drug patent for a patent holder that
has satisfactorily conducted pediatric testing of its drug upon
the FDA's request." Mylan Labs., Inc. v. Thompson, 389 F.3d
1272, 1275 (D.C. Cir. 2004) (emphasis added).  The statute
provides that if the drug is the subject of a Paragraph IV
certification "and in the patent infringement litigation
resulting from the certification the court determines that the
patent is valid and would be infringed, the period during which
an application may not be approved under [21 U.S.C. §
355(j)(5)(B)] shall be extended by a period of six months after
the date the patent expires (including any patent extensions)."
Id. at 276.  Nothing in the language of 21 U.S.C. §
355a(c)(2)(B) requires the Court to render its decision prior to
the expiration of the patents.

Imax contends that "'pediatric exclusivity' does not
rescue Astra's claims" because "pediatric exclusivity is a
reward bestowed by the FDA on pharmaceutical companies for
testing drug products on young patients[,] . . . [i]t does not,
however extend the terms of the patents."  (Def's Motion at 4.)
The Court agrees that the six-month period of pediatric

exclusivity does not extend the term of the patents, but it does grant the patent holder a period of market exclusivity, which this Court has the power to enforce.  Accordingly, the Court finds that relief under § 271(e)(4)(A) does not become moot when the patents expire but the period of pediatric exclusivity is still in effect.

Such a result is in accordance with the Federal Circuit's decision in Alza Corp. v. Mylan Labs., Inc., 391 F.3d 1365 (Fed. Cir. 2004).  In Alza, the patent was due to expire in July 2004. Id. at .368.  The Federal Circuit stated in a decision rendered on December 10, 2004 -- after the expiration of the patents -- that "following the Food and Drug Administration's approval of pediatric use of [the drug], the patent will now expire on January 23, 2005."  Id.  The parties conceded that the case would be moot after January 23, 2005.  Id. at n.3.  Although the Vermont District Court's decision in Alza was rendered prior to the expiration of the patents, the Federal Circuit did not find that the case became moot upon expiration of the patent, nor did it find that it lost jurisdiction over the appeal upon expiration of the patent.  Instead, the court asserted jurisdiction over the appeal and affirmed the district court's decision that the patents were neither anticipated nor obvious, and that the patent was not unenforceable due to inequitable conduct  Id. at 1373.

19

In support of its motion to dismiss, Impax asserts that the Court is powerless to enforce the period of pediatric exclusivity because section 355a requires a "court determi[nation] that the patent is valid and would be infringed" in order for the ANDA with a Paragraph IV certification to be subject to the period of pediatric exclusivity.  Thus Impax contends that because the patents expired while the determination of validity and infringement was <u>sub judice</u>, Astra has lost its right to its six-month period of pediatric exclusivity under 21 U.S.C. § 355a.  The Court declines to reach such an anomalous result.

Had Impax filed a Paragraph II or Paragraph III certification, it would have been automatically subject to Astra's six-month period of pediatric exclusivity prior to receiving final approval of its ANDA.  <u>See</u> 21 U.S.C. § 355a(c)(2)(B).  Instead, Impax filed a Paragraph IV certification, and while the patent litigation was pending, it obtained final approval of its ANDAs and began to manufacture and sell its generic products.  Simply because the statutory provisions do not address the specific fact pattern before us does not mean that Astra is not entitled to the six-month period of market exclusivity that it earned by conducting the requested pediatric studies.

20

In this regard <u>Ranbaxy Labs. Lim. V. United States Food &
Drug Admin.</u>, 307 F. Supp. 2d 15 (D.D.C. 2004), is instructive.
In <u>Ranbaxy</u>, the generic drug manufacturer, Ranbaxy Labs.,
received tentative approval of its ANDAs during the course of
litigation.  <u>Id.</u> at 18.  "After the summary judgment decision, .
. . the court indicated to Ranbaxy and Pfizer [the patent
holder]. that the court's schedule would not allow for a trial
until after the January 29, 2004, expiration of the '216
patent.'  <u>Id.</u> at 17.  In response the parties entered into a
stipulation of dismissal providing that because the '216 was set
to expire before the court could accommodate a trial, the
"actions would be dismissed as moot upon the . . . expiration of
the '216 patent."  <u>Id.</u> at 17.

Ranbaxy sought confirmation from the FDA that it would
receive final approval of its ANDA upon expiration of the
patent, irrespective of Pfizer's period of pediatric
exclusivity.  <u>Id.</u> at 18.  Ranbaxy argued that because it had
received tentative approval of its ANDAs, upon expiration of the
patents the ANDAs "automatically gained or were entitled to
gain, immediate effective approval . . . because the patent
litigation became moot at the very instant the patents expired."
<u>Id.</u> at 19.  In addition, Ranbaxy asserted a similar argument to
that made by Impax in support of the present motion:  Ranbaxy
argued 'that the preconditions for delaying an ANDA on the basis

cf pediatric exclusivity provided for in Section 505(a)(c)(2)(B)
[and 2] U.S.C. § 355a(b)(2)(b)] (governing Paragraph IV
submissions) could not be satisfied unless Pfizer obtained a
ruling that the [relevant] patent was valid and would be
infringed, which it was unlikely to do in view of the district
court's schedule." Id. at 18.

By letter dated January 28, 2004, "the FDA issued an
administrative decision indicating that Ranbaxy's ANDA would not
be approved until after the expiration of Pfizer's pediatric
exclusivity on July 29, 2004." Id. "The FDA concluded that an
ANDA applicant will be subject to any pediatric exclusivity that
attaches to a patent where the ANDA applicant has filed a
paragraph IV certification, was sued by the NDA holder or patent
owner within 45 days, and the litigation is unresolved on the
merits and the 30-month stay has not run when the patent
expires." Id. at 18 (citation omitted).

Although the facts of Ranbaxy differ from the case before
us, the Court finds that the FDA's reasoning is equally
applicable to the case at bar. In Ranbaxy, "the FDA concluded
that the absence of a [statutory] provision addressing
unresolved patent litigations in the Paragraph IV certification
context did not mean that Congress intended to exclude such
circumstances from the pediatric exclusivity provision."
Ranbaxy 307 F. Supp. 2d at 19. According to the FDA, Ranbaxy's

22

"alternative reading . . . would undercut the purpose of the pediatric exclusivity and invite anomalies and manipulation of the statute." Id. Similarly, the Court finds that Impax's interpretation of the statutory provisions would create an anomalous result that is at odds with Congress's goal in enacting § 355a.

Accordingly, the Court concludes that if it determines that the '505 and '230 patents are valid and infringed, it may issue an order pursuant to 35 U.S.C. § 271(e)(4)(A) recognizing Astra's six-month period of pediatric exclusivity under 21 U.S.C. § 355a(c)(2)(B), and mandating that the effective date of approval of Impax's ANDA is no earlier than the date on which the pediatric exclusivity ends -- that is October 20, 2007. Such an order does not extend the term of the patents, but instead gives effect to a period of market exclusivity which Congress has bestowed upon brand manufacturers who incur the costly task of conducting pediatric studies of pharmaceutical drugs. See S. Report No. 105-43, at 51 (1997); see also Assoc. of Am. Physicians and Surgeons, Inc. v. U.S.F.D.A., 226 F. Supp. 2d 204, 206 (D.D.C. 2002).

3. **Impax's ANDA Did Not Automatically Convert from a Paragraph IV to a Paragraph II Certification**

In support of its assertion that upon patent expiration, Astra no longer has a claim under § 271(e)(2), Impax contends

23

that upon patent expiry, its Paragraph IV certification was
automatically converted to a Paragraph II certification thereby
eliminating Astra's claim for infringement under § 271(e)(2).
Impax cites Ranbaxy in support of this proposition; however,
Ranbaxy does not mandate such a result.

In Ranabxy, the FDA determined that upon patent expiry,
Ranbaxy was required to amend its certification pursuant to 21
C.F.R. § 314.94(a)(12)(viii)(C)(1), which requires an ANDA
applicant to amend its certification "if, at any time before the
effective date of approval of the application, the applicant
learns that the submitted certification is no longer accurate."
The FDA decided that upon expiration of the patents, the
Paragraph IV certification converted to a Paragraph II
certification -- even though Ranbaxy failed to amend its
certification -- and "under a Paragraph II certification, the
statute provides for a delayed ANDA approval for six months
beyond the expiration of the patent." Ranbaxy, 374 F. Supp. 2d
at 18. Thus, Ranbaxy was subject to the six-month period of
pediatric exclusivity (even in the absence of a court order
triggering § 355a(c)(2)(B)). The District Court for the
District of Columbia affirmed this decision, finding that at the
"magic moment" the patents expired "the Paragraph IV
certification became invalid, and either converted as a matter
of law to Paragraph II certifications or became inaccurate,

24

thereby creating an obligation on Ranbaxy's part to amend its
ANDAs to reflect patent expiry and an inability on the part of
the FDA to approve the ANDAs in their inaccurate form." Id. at
21.

Ranbaxy's ANDA is distinguishable from Impax's ANDA.  In
Ranbaxy, the generic applicant had only received "tentative"
approval prior to the expiration of the patent.  In the case at
bar, Impax received final approval of its ANDA on November 8,
2002, prior to the trial on the merits and the expiration of the
patents.  Once an application is finally approved, the applicant
is no longer under an obligation to amend its patent
certification.  See 21 C.F.R. § 314.94(A)(12)(viii)(C)(i)
(requiring amendments before the effective date of approval).
Thus, the rationale behind the automatic conversion of a
Paragraph IV certification to a Paragraph II certification does
not apply.  Accordingly, the Court finds that Impax's Paragraph
IV certification did not convert to a Paragraph II certification
upon expiration of the patents, and Astra still has a viable
claim for infringement under 271(e)(2).[6]

* * *

--------------------------------------------------------------
[6] An order pursuant to § 271(e)(4)(A) would have the effect of converting
Impax's final approval to an approval with a delayed effective date, which
under the FDA's own regulations is a "tentative" approval. See Mylan v.
Thompson, 389 F.3d 1272, 1281 (D.C. Cir. 2004) (citing 21 C.F.R. §
314.105(a)). Whether such a change in the "factual and legal landscape"
would impose an obligation on Impax to amend its Paragraph IV certification
and subsequently convert the certification to a Paragraph II certification,
is not a question before us. See Mylan, 389 F.3d at 1284.  The Court
properly leaves that issue, if it arises, to be resolved by the FDA.

05/25/2007 08:57 FAX  212 805 8191          HONORABLE BARBARA JONES                    ☒027/027

The Court concludes that this is not a case in which the court is powerless to "undo the effects of conduct that was not prevented by the time of decision." Wright & Miller, supra (citing Roche and other cases).  Instead, an effective remedy is possible and within the Court's power -- either under 35 U.S.C. § 271(e)(4)(A) or the Court's general equitable powers. Accordingly, the case is not moot and the Court has jurisdiction over Astra's claim for infringement under 35 U.S.C. § 271(e)(2).

Conclusion

For the foregoing reasons, Impax's motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) is DENIED.


SO ORDERED:

_____
Barbara S. Jones
UNITED STATES DISTRICT JUDGE

New York, New York
May 25, 2007


26

# Exhibit 4

# Intentionally Omitted — Exhibit 4:

# FDA's April 18, 2007 letter to ANDA Applicants for Amlodipine Besylate Tablets

*Apotex Inc. v. Food and Drug Administration et al.*, Case No. _____ (D.D.C.)

# EXHIBIT E
# to Tsien Declaration



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

ANDA 76-048

Apotex Corp.
Attention: Tammy McIntire
2400 N. Commerce Parkway, Suite 400
Weston, FL 33326

Sent by Facsimile and U.S. Mail

Dear Ms. McIntire:

This is in reference to your abbreviated new drug application (ANDA) dated December 5, 2000, submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (Act), for Omeprazole Delayed-release Capsules, 10 mg, 20 mg, and 40 mg.[1]

Your ANDA was approved on October 6, 2003, because the 30-month period identified in section 505(j)(5)(B)(iii) of the Act, during which time FDA was precluded from approving your ANDA, had expired. The October 6, 2003 approval pertained to the 10 mg and 20 mg strengths only; the agency letter of October 6, 2003, tentatively approved the 40 mg strength. The statute anticipates that in some cases an ANDA may be approved before litigation concerning the listed patents is completed. Section 505(j)(5)(B)(iii). This leaves open the possibility that, as happened with these products, the approved drug products will later be found to infringe a listed patent.

As you know, on June 14, 2007, Judge Barbara Jones of the United States District Court for the Southern District of New York, issued a Judgment in *In re Omeprazole Patent Litigation*, M-21-81 (BSJ) that affects the status of your ANDA. The court ordered that "Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of approval for the aforementioned products and related ANDAs shall be not earlier than October 20, 2007, the date on which the six-month period of pediatric exclusivity under 21 U.S.C. § 355a(b)(2)(B) expires." See Judgment, *In re Omeprazole Patent Litigation*, M-21-81 (BSJ), at ¶ 3.

We are writing to inform you that, in light of this court order, the Agency hereby converts the final approval of ANDA 76-048 issued on October 6, 2003, to a tentative approval. Therefore, your ANDA is now tentatively approved. Final approval cannot be granted earlier than October 20, 2007.

---

[1] The reference listed drug (RLD) upon which you have based your ANDA, AstraZeneca's Prilosec Delayed-release Capsules, is subject to periods of patent protection and pediatric exclusivity. As noted in the Agency's publication titled Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book"), the pediatric exclusivity periods of U.S. Patent Nos. 4,786,505 (the '505 patent) and 4,853,230 (the '230 patent) are scheduled to expire on October 20, 2007. The other patents listed in the Orange Book for Prilosec Delayed-release Capsules were not the subjects of litigation and therefore are not relevant to the action the Agency is taking in this letter.

Because the Agency is granting a tentative approval for this ANDA, when you believe that your ANDA may be considered for final approval, you must amend your ANDA to notify the Agency regarding whether circumstances have or have not arisen that may affect the effective date of final approval. To reactivate your ANDA, please submit an amendment at least 60 days (but not more than 90 days) prior to the date your ANDA will be eligible for final approval. This amendment should identify changes, if any, in the conditions under which the product was tentatively approved, and should include updated information such as final printed labeling, chemistry, manufacturing, and controls data as appropriate. Please note that this amendment should be submitted even if none of these changes were made. The amendment should be designated clearly in your cover letter as a MINOR AMENDMENT. In addition to this amendment, the Agency may request at any time prior to the final date of approval that you submit an additional amendment containing the information described above. Any changes in the conditions outlined in this ANDA as well as changes in the status of the manufacturing and testing facilities' compliance with current good manufacturing procedures are subject to Agency review before final approval of the ANDA will be made.

The drug products that are the subject of this ANDA may not be marketed without final Agency approval under section 505 of the Act. The introduction or delivery or introduction into interstate commerce of this drug before the effective final approval date is prohibited under section 301(d) of the Act.

For further information regarding this issue, please contact Cecelia Parise, R.Ph., Regulatory Policy Advisor to the Director, Office of Generic Drugs, at (240) 276-9310.

Sincerely yours,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

cc:    Sheldon Bradshaw, Office of the Chief Counsel

------------------------------------------------------------

This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.

------------------------------------------------------------

  /s/
----------------------
Gary Buehler
6/28/2007 12:06:26 PM

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada  M9L 1T9<br><br>       Plaintiff,<br><br>      v.<br><br>FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C.  20201<br><br>      and<br><br>ANDREW VON ESCHENBACH<br>Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**APOTEX INC.'S CERTIFICATE OF COUNSEL
PURSUANT TO LOCAL CIVIL RULE 65.1(a)**

Pursuant to Local Civil Rule 65.1(a), the undersigned counsel for Apotex hereby certifies that, on June 28, 2007, counsel for Apotex informed the Federal Defendants, through counsel for FDA, of Apotex's intention to seek a temporary restraining order and/or preliminary injunction in this matter.  The Federal Defendants declined to consent to entry of the requested injunctive relief, and consultation pursuant to Local Civil Rule 7(m) has failed to narrow the areas of disagreement.  Federal Defendants have been provided with copies of Apotex's motion for

temporary restraining order and/or preliminary injunction and all supporting papers, including

the proposed order; and all other papers filed in this case.

Dated:  July 2, 2007.                    Respectfully submitted,

                                         APOTEX INC.

                                    By:    /s/ Arthur Y. Tsien                    
                                         Arthur Y. Tsien, D.C. Bar No. 411579
                                         Kathryn E. Balmford, D.C. Bar No. 482279
                                         OLSSON, FRANK AND WEEDA, P.C.
                                         1400 16th Street, N.W., Suite 400
                                         Washington, D.C. 20036-2220
                                         (202) 789-1212
                                         (202) 234-3550 (facsimile)

Of Counsel:
William A. Rakoczy, D.C. Bar No. 489082
Amy D. Brody, D.C. Bar No. 478100
Natalie G. Mitchell
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| APOTEX INC. | ) | |
| 150 Signet Drive | ) | |
| Weston, Ontario, Canada M9L 1T9, | ) | |
|  | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | |
|  | ) | |
| FOOD AND DRUG ADMINISTRATION | ) | |
| 5600 Fishers Lane | ) | |
| Rockville, Maryland 20857, | ) | |
|  | ) | |
| MICHAEL O. LEAVITT | ) | |
| Secretary of Health and Human Services | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20204, and | ) | |
|  | ) | |
| ANDREW C. VON ESCHENBACH, M.D. | ) | |
| Commissioner of Food and Drugs | ) | |
| 5600 Fishers Lane | ) | |
| Rockville, Maryland 20857, | ) | |
|  | ) | |
| Defendants. | ) | |

_____)

**DECLARATION OF TAMMY L. MCINTIRE**

I, TAMMY L. MCINTIRE, declare as follows:

**Introduction and Background**

1.     I am the President of Apotex Corp., which is located in Weston, Florida. Apotex Corp. is the United States marketing and sales affiliate for Apotex Inc., a Canadian-based pharmaceutical company that develops and manufactures generic drugs for sale in the United States and throughout the world. For convenience and clarity, I will refer to Apotex Inc. and Apotex Corp. collectively in this Declaration as "Apotex."

2.      I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify as to the same.

3.      I submit this Declaration in support of Apotex's motion for temporary restraining order and/or preliminary injunction.

4.      I hold a Bachelor of Science degree in Pharmacy from Ohio Northern University and a Masters of Pharmaceutical Administration from the Ohio State University.  I have been employed continuously by Apotex Corp. since December 1998.  Prior to my employment with Apotex Corp., I was Vice-President of Product Management for Cardinal Distributors, Inc., a leading wholesaler of generic drugs.  In that position, I was responsible for annual purchases of more than $1 billion (US) of generic drug products.

5.      By virtue of my present position, education, and professional experience, I am intimately familiar with the facts relating to this lawsuit, including Apotex's generic 10 mg and 20 mg omeprazole capsules, its marketing of these products and marketing plans, and the generic drug industry in general, and in particular all aspects of the marketing and promotion of generic pharmaceutical products.  It is my understanding that, on June 28, 2007, the Food and Drug Administration ("FDA") converted the final effective approval of Apotex's Abbreviated New Drug Application ("ANDA") No. 76-048 for generic 10 mg and 20 mg omeprazole capsules to a so-called tentative approval, which prohibits Apotex from further marketing this important generic medicine that Apotex has lawfully been providing to consumers since November 2003.

6.      I am well aware of the considerable disadvantages and irreparable harm that a company will suffer if its final effective approval is improperly revoked.  Such losses include, but are not limited to:  significant lost profits and sales across all product lines; an accompanying

decrease in overall market share; decreased access to important customers; loss of customer goodwill; and diminished reputation—all of which prevent a company from effectively competing in the ultra-competitive generic drug industry.

7.    Apotex is already suffering, and absent injunctive relief from this Court will continue to suffer, these harms.

### Prilosec® (Omeprazole)

8.    On December 5, 2000, Apotex submitted ANDA No. 76-048 to FDA for 10 mg, 20 mg and 40 mg generic forms of Prilosec® capsules.  On October 6, 2003, FDA granted final approval of the 10 mg and 20 mg strengths of Apotex's omeprazole products.  Apotex started selling 10 mg and 20 mg "Omeprazole Delayed Release Capsules" on November 12, 2003.

9.    As President of Apotex Corp., I am responsible for developing and implementing business plans for all activities relating to the sale and marketing of all of Apotex Inc.'s approved products in the United States.  Specifically, I am the person within Apotex Corp. who has the day-to-day responsibility for marketing and selling Apotex Inc.'s generic omeprazole products that are bioequivalent to and competitive with AstraZeneca's Prilosec® drug products.

10.    In 2001, AstraZeneca AB, Aktiebolegaet Hässle, KBI-E Inc., and AstraZeneca, LP (referred to collectively as "Astra") filed suit for patent infringement against Apotex, and, as a result, Astra enjoyed a 30-month automatic stay pursuant to the provisions of the "Hatch-Waxman" Act.  Astra never moved for a preliminary injunction against Apotex after FDA granted final approval of Apotex's ANDA No. 76-048.

11.    In the face of Astra's inaction, Apotex began selling its generic omeprazole products in the United States in November 2003.  Apotex has built up a sizable percentage of sales of its omeprazole products among the generic suppliers.  In fact, based on IMS Health data,

a recognized source of market data in the industry, Apotex is the market leader in providing generic omeprazole holding about 27.5% of the market for fiscal year 2007, with an increasing trend. Moreover, important customer relations and servicing have been established between Apotex and its customers in the more than 3 ½ years since Apotex began selling generic omeprazole.

12.     Apotex's sales of omeprazole delayed release capsules are a major component of Apotex's overall sales.   Apotex's omeprazole sales were no. 3 in Apotex's product lines in the fiscal year ending in March 2007, and these sales provided approximately 20 percent of Apotex's total U.S. sales. Apotex fully anticipated, prior to FDA revoking Apotex's final approval, that it would continue to experience strong sales of its omeprazole products in 2008.

13.     Based on IMS Health data, in the U.S. national market for omeprazole for the quarter ending in March 2007, sales of generics dominated with 98.62% of the total sales, and Astra's brand formulations amounted to only 1.38%.

14.     There were five generic suppliers (including Apotex) of omeprazole products at the quarter ending March 2007. Based on IMS Health data, the respective market shares of these suppliers for the quarter ending March 2007 were as follows:

| | |
|---|---|
| Apotex | 27.47% |
| Mylan | 24.79% |
| Kudco | 18.90% |
| Teva (Impax) | 16.17% |
| Sandoz (Lek) | 12.30% |

**Irreparable Harm to Apotex**

15.     It is my understanding that FDA has revoked Apotex's final approval, which effectively removes Apotex from, and precludes Apotex from competing in, the United States market until at least October 20, 2007.  The revocation of Apotex's approval has already caused Apotex enormous, irreparable harm, and will continue to do so.

16.     Indeed, the loss of final approval has already severely impacted the customer relations that Apotex has established with pharmacy chains and distributors in the forty-four (44) months that Apotex was selling its generic omeprazole products.   Apotex also is already suffering a loss in consumer confidence.   Many members of the public may get the wrong impression that there is something medically wrong with Apotex's omeprazole formulations.  This will severely damage Apotex's reputation.

17.     Apotex further will be subject to service level penalties (failure to supply) equal to the price difference paid for Apotex's products and another generic replacement.  This will have a negative impact on Apotex's sales of other product lines to Apotex's customers for months or years in the future.

18.     Pulling Apotex off the market for up to 4 months (or until at least October 20, 2007) also will cause irreparable harm as Apotex will likely never regain the business it will lose during that time period.  In fact, Apotex's customers could be so irritated by the disruption that Apotex's other product/sales awards could be impacted.

19.     As stated above, Apotex has been (and anticipated remaining) the market leader in providing generic omeprazole.   The revocation of Apotex's final approval will result in negative goodwill and prevent Apotex from returning to the market position it enjoyed for at

least 3 years.  Apotex also will likely experience price erosion as it attempts to recapture market share.

20.    Apotex has a number of strategic agreements and tiered rebates with customers. The basis of the payout for these rebates is the customer's achievement of these tiered sales goals.  Because Apotex has been pulled from the market, Apotex will have to pay the higher rebates because customers view the issue as a market situation that was out of their control.

## No Harm to Astra

21.    The omeprazole market is made up of several generic suppliers other than Apotex.  There is minimal likelihood that any of Apotex's customers would decide to purchase Astra's brand name product at a substantially higher price when these customers previously had chosen a generic product over the brand.  Thus, it is highly unlikely that Astra will gain additional omeprazole sales even with Apotex's final approval revoked.  Rather, based on my business and marketing experience and the dynamic of the omeprazole market, it is highly likely that all of Apotex's market share will be picked up by other generic suppliers, rather than Astra, and, therefore, Astra will gain no additional market share.

22.    Moreover, as noted above, Astra did not move for a preliminary injunction against Apotex after FDA granted final approval of Apotex's ANDA No. 76-048.  Clearly, Astra must have believed that monetary damages were adequate to compensate for any alleged infringement. Thus, if Apotex regains its final approval, Astra will not suffer any harm.

## Public Interest

23.    The public will be harmed if Apotex is prohibited from continuing to supply its generic omeprazole to the United States market.  Generic competition means lower prices for

consumers.  Thus by having more choices of generic omeprazole products, consumers will undoubtedly experience lower prices as a result of the competition.

24.    Also, the profits Apotex has gained from the sale of its omeprazole products at least indirectly benefit consumers by allowing Apotex to develop and introduce new generic drugs into the market.

## Conclusion

25.    Absent immediate injunctive relief from this Court, Apotex will continue to suffer devastating and irreparable harm.  The revocation of Apotex's approval has already lead to, among other things, lost sales, lost market share for other products, decreased goodwill and access to major customers, and damage to Apotex's reputation.

26.    The foregoing facts are true and correct as I verify and believe.

Dated this 2nd day of July, 2007.

I, TAMMY L. MCINTIRE, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

_____/s/ Tammy L. McIntire_____
TAMMY L. MCINTIRE

## CERTIFICATE OF SERVICE

I, Arthur Y. Tsien, HEREBY CERTIFY that on this 2nd day of July, 2007, a true and correct copy of: (1) Apotex Inc.'s Complaint; (b) Apotex Inc.'s Disclosure Statement Under Local Rule 7.1; (c) Apotex Inc.'s Motion for Temporary Restraining Order and/or Preliminary Injunction; (d) Memorandum in Support of Apotex Inc.'s Motion for Temporary Restraining Order and/or Preliminary Injunction; (e) Proposed Order; (f) Certificate of Counsel Pursuant to Local Rule 65.1(a); (g) Declaration of Arthur Y. Tsien and all exhibits thereto; (h) Declaration of Tammy McIntire; and (i) Civil Cover Sheet, was served via hand-delivery and electronic mail upon the following:

> Eugene Thirolf
> (Eugene.thirolf@usdoj.gov;
> 202-307-3009)
> Drake Cutini
> (drake.cutini@usdoj.gov;
> 202-307-0044)
> U.S. Department of Justice
> Office of Consumer Litigation
> Room 950 North
> 1331 Pennsylvania Ave., NW
> Washington, D.C.  20004

>                   /s/ Arthur Y. Tsien
>                 Arthur Y. Tsien
>                 *Counsel for Apotex Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada  M9L 1T9<br><br>       Plaintiff,<br><br>       v.<br><br>FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C.  20201<br><br>       and<br><br>ANDREW VON ESCHENBACH<br>Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>       Defendants. | Case No. _____ |

## [PROPOSED] ORDER

The Court having considered Plaintiff Apotex Inc.'s ("Apotex") Motion for Temporary Restraining Order and/or Preliminary Injunction, Apotex's supporting Memorandum of Law, the Declaration of Tammy L. McIntire, and the Declaration of Arthur Y. Tsien (and related exhibits), and all other papers filed in support of and in opposition to Apotex's Motion, and counsel for the Plaintiff and Defendants having been heard on the Motion,

The Court finds that Plaintiff has shown that it will be immediately and irreparably harmed absent injunctive relief; it is therefore

**ORDERED THAT** the Motion be, and hereby is, **GRANTED**.  Defendants the Food and Drug Administration; Michael O. Leavitt, Secretary of Health and Human Services; and Andrew von Eschenbach, Commissioner of Food and Drugs, shall:

(a)     immediately set aside their June 28, 2007 administrative decision converting final approval of Apotex's Abbreviated New Drug Application ("ANDA") No. 76-048 for omeprazole capsules 10 mg and 20 mg to a tentative approval;

(b)     immediately reinstate final approval of Apotex's ANDA No. 76-048 for omeprazole capsules 10 mg and 20 mg; and

(c)     refrain from rescinding or otherwise converting final approval of Apotex's ANDA No. 76-048 for omeprazole capsules 10 mg and 20 mg to a tentative approval.

**SO ORDERED**

Date: _____

_____
United States District Judge