# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| APOTEX INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Case No. 07-cv-01194-RMU |
|  | ) |
| FOOD AND DRUG ADMINISTRATION, *et al*., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## REPLY IN SUPPORT OF APOTEX INC.'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

William A. Rakoczy, D.C. Bar No. 489082
Amy D. Brody, D.C. Bar No. 478100
Natalie G. Mitchell
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301

Arthur Y. Tsien, D.C. Bar No. 411579
Kathryn E. Balmford, D.C. Bar No. 482279
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212

Dated:  July 9, 2007

*Counsel for Apotex Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

I.      Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its
        Claims. ..................................................................................................................... 3

        A.      FDA Had No Lawful Authority Or Basis To Revoke Or Convert Apotex's
                Longstanding Approval Because There Is No Pediatric Exclusivity
                Applicable To Apotex's ANDA. ........................................................................... 4

        B.      FDA Was Not Bound By, And Should Not Have "Simply Implemented,"
                The New York Court's Judgment. ........................................................................ 9

                1.      FDA Admits That It Has The Statutory Authority To Determine
                        Whether An NDA-Holder Has Pediatric Exclusivity. ............................. 11

                2.      FDA Cannot Shirk Its Duties By Relying Blindly On The New
                        York Court's Construction Of The Pediatric Exclusivity Statute............. 12

        C.      FDA's Slipshod Decision Is Entitled To No Deference From This Court. .......... 14

II.     The Harm To Apotex Is Substantial And Irreparable. .................................................... 16

III.    The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate
        Injunctive Relief.......................................................................................................... 19

IV.     An Injunction Would Further The Public Interest. .......................................................... 20

CONCLUSION........................................................................................................................ 21

# TABLE OF AUTHORITIES

## Federal Cases

\* *Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ................................................................. passim

\* *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989) ............................................................................. 7, 8, 18

*Bracco Diagnostics, Inc. v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) ........................................................................ 5

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) .......................................................................................... 15

*Bush-Quayle '92 Primary Comm. v. FEC*,
   104 F.3d 448 (D.C. Cir. 1997) ......................................................................... 5

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
   300 F. Supp. 2d 32 (D.D.C. 2004) .................................................................... 5

*Hill v. Norton*,
   275 F.3d 98 (D.C. Cir. 2001) .......................................................................... 15

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996 ........................................................................... 5

\* *Kearns v. Chrysler Corp.*,
   32 F.3d 1541 (Fed. Cir. 1994) ................................................................. 7, 8, 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................................... 15

*Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ................................................................. 18, 20

*Mylan Labs., Inc. v. Leavitt*,
   484 F. Supp. 2d 109 (D.D.C. 2007) ............................................................... 11

\* *Mylan Labs., Inc. v. Thompson*,
   332 F. Supp. 2d 106 (D.D.C. 2004) ......................................................... 11, 14

*Mylan Labs., Inc. v. Thompson*,
   389 F.3d 1272 (D.C. Cir. 2004) ....................................................................... 6

\* *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................................. 12, 13

*\*Authorities upon which
Apotex chiefly relies are
marked with asterisks.*

ii

*New York State Bar Ass'n v. FTC*,
    276 F. Supp. 2d 110 (D.D.C. 2003) ....................................................................... 15

\* *Teva Pharms. USA, Inc. v. FDA*,
    441 F.3d 1 (D.C. Cir. 2006) .......................................................................... 12, 13

*Teva Pharms., USA, Inc. v. FDA*,
    182 F.3d 1003 (D.C. Cir. 1999) ........................................................................ 18

*Transactive Corp. v. United States*,
    91 F.3d 232 (D.C. Cir. 1996) .............................................................................. 5

## Federal Statutes

21 U.S.C. § 355a(d) ................................................................................................... 11

21 U.S.C. § 355a(f) .................................................................................................... 11

## Other Authorities

FDA, *Guidance for Industry: Qualifying for Pediatric Exclusivity Under
    Section 505A of the Federal Food, Drug, and Cosmetic Act* (Sept. 1999) .............................. 11

Apotex respectfully submits this reply brief in support of its motion for a temporary restraining order and/or preliminary injunction.

### **INTRODUCTION**

Nothing in FDA's response (or Astra's for that matter) warrants denial of injunctive relief.[1]  Indeed, their concessions make clear that FDA's decision cannot stand under any circumstances.  FDA and Astra both concede that Apotex's ANDA was lawfully approved *years* before expiration of the relevant patents and any ruling on infringement or validity, and that such ruling occurred well after patent expiration.  ***Nor do they dispute that, as of patent expiration on April 20, 2007, there was no pediatric exclusivity blocking or otherwise delaying Apotex's approval, which remained intact and perfectly lawful.***  No one (not FDA or Astra) even attempts to explain, much less justify, how such exclusivity was somehow revived or magically reappeared based on a ruling issued months after patent expiration—and for good reason, because there is none, statutory or otherwise.  Absent such exclusivity (or, at the very least, some reasoned explanation from FDA as to why it applies here), FDA had no basis or authority to rescind or convert Apotex's lawful approval.  No more is required to set aside FDA's decision as arbitrary, capricious and contrary to law under the APA.

Rather than address the pediatric exclusivity question that underlies its decision, FDA dodges the issue entirely, arguing that it had no discretion to do so and was "obliged to carry out the New York Court's order" regardless of whether it may have a different view as to the application of pediatric exclusivity.  This head-in-the-sand approach is an unprecedented

---

[1] For the reasons set forth in Apotex's opposition to Astra's motion to intervene, filed contemporaneously herewith, Astra has no real interest in the outcome of this litigation, and therefore no basis to intervene, either as of right or permissibly.  For the Court's convenience, Apotex nonetheless addresses Astra's arguments herein, to the extent necessary to fully respond to all arguments presented.  By proceeding in this manner, Apotex in no way intends to waive any argument it has opposing Astra's proposed intervention.

abdication of the Agency's statutory obligation to determine whether pediatric exclusivity applies in the first instance, not to mention an impermissible departure from the Agency's own binding precedent in the amlodipine matter.

FDA's attempt to spin Apotex's efforts to protect itself from further irreparable harm caused by FDA's actions as a collateral attack on another court also is meritless. Apotex does not—and indeed doesn't need to—collaterally attack the New York Court's authority or order in this proceeding. Quite the contrary, Apotex challenges the slipshod manner in which FDA blindly implemented that order without first considering whether, in fact, there is any pediatric exclusivity, just as the Agency has done in other matters and as Congress entrusted it to do. Because there is no such exclusivity here and thus no basis to rescind Apotex's approval, and because this Court owes no deference to the arbitrary and capricious manner in which FDA blindly implemented and felt itself bound by the New York Court's order, the Court must set aside FDA's decision.[2]

Apotex has established the irreparable injury necessary for immediate injunctive relief as well. In response, FDA trots out the same tired response it always does, namely, that economic harm or financial loss is not enough. But as FDA conveniently ignores, this case is not just about money. While the financial losses are certainly great and unrecoverable, FDA's decision has already caused extreme hardship to Apotex's business far beyond any monetary losses. FDA revoked the approval of an admittedly safe and effective product that has been on the market for over three years. In the process, FDA's decision has already begun to destroy

---

[2] While not formally requesting conversion of Apotex's motion, FDA casually suggests that this case may be amenable to summary judgment because the material facts are not in dispute. (*See* FDA Opp'n Mem. at 10 n.6). Apotex disagrees to the extent that it is entitled to immediate injunctive relief to remedy the irreparable injury it is already suffering by virtue of FDA's unlawful decision—which is why Apotex proceeded in an emergency fashion. That said, however, "whether or not [Apotex] has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy," including vacatur of FDA's decision. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001).

Apotex's reputation as a reliable provider of safe and effective generic drugs. This harm to Apotex's reputation has further already damaged relationships with Apotex's customers and caused enormous confusion in the marketplace. Such injury, which is not quantifiable in dollar terms, cannot be so easily disregarded.

The balance of hardships also tips decidedly in Apotex's favor. FDA concedes it has no stake in the outcome of this case. Nor does Astra because the market is already controlled by generic competitors even without Apotex. Nothing that happens here will change that or somehow give Astra meaningful pediatric exclusivity. The public interest also favors injunctive relief and fuller generic competition, not the enforcement of a pediatric exclusivity that does not exist as to Apotex (and wouldn't make a difference even if it did), and certainly not the effective extension of expired patents. The Court, therefore, should immediately set aside FDA's decision and reinstate Apotex's final approval.

## I.    Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its Claims.

As an initial matter, and contrary to FDA's repeated assertions (*see* FDA Opp'n Mem. at 2, 13-14), Apotex is not collaterally attacking or otherwise challenging the New York Court's order in this proceeding. Apotex is properly challenging the proprietary of that order before the Federal Circuit. Here, Apotex appropriately challenges FDA's decision to implement—and blindly defer to—that order (and the assumption that pediatric exclusivity applies to Apotex's ANDA) in violation of FDA's statutory obligation to engage in independent and reasoned agency decision-making on an issue that Congress delegated and entrusted solely to FDA, not the district court. Thus, FDA's attempt to blur the lines between a purported collateral attack on the New York Court (which is not the case) and Apotex's efforts to right a wrong created by FDA is disingenuous, at best.

FDA's attempt to avoid, indeed punt, the issue of pediatric exclusivity entirely on the ground that it was only following orders fares no better. The **only** possible basis for revoking or converting Apotex's longstanding approval was the purported existence of pediatric exclusivity applicable to Apotex's ANDA. FDA suggests that the revocation or conversion of Apotex's approval until October 20, 2007, had nothing to do with pediatric exclusivity, (*see* FDA Opp'n Mem. at 11-12); but this is not only disingenuous, it is absurd. The patents expired on April 20, 2007, and thus could provide no basis to rescind Apotex's approval, which admittedly leaves only Astra's purported period of pediatric exclusivity as the basis for FDA's decision. Moreover, the New York Court did not pick the October 20, 2007 date out of thin air, but rather because it thought that was the date that pediatric exclusivity expires. FDA, in turn, revoked Apotex's final approval and determined that "[f]inal approval cannot be granted earlier than October 20, 2007," the date that purported pediatric exclusivity expires. (AR[3] Tab 6 at 1). This case therefore squarely turns on whether pediatric exclusivity exists as against Apotex (it does not), and whether FDA impermissibly abdicated its responsibility to make that determination in the first place in a reasoned fashion (it clearly did). FDA cannot insulate its decision from judicial review by hiding behind the New York Court's order.

A.    **FDA Had No Lawful Authority Or Basis To Revoke Or Convert Apotex's Longstanding Approval Because There Is No Pediatric Exclusivity Applicable To Apotex's ANDA.**

In the amlodipine matter, FDA "determined that it would not apply any pediatric exclusivity against Mylan because Mylan's ANDA was already approved . . . ." (FDA Opp'n Mem. at 12). FDA reached this conclusion because "under the literal terms of the statute," pediatric exclusivity simply does not apply to a finally-approved ANDA. (AR Tab 3, Ex. 4 at 5

---

[3] References to "AR" are to the Administrative Record filed by FDA in this litigation. (*See* Dkt. Entry 7).

n.4 (citation omitted)).  Here, too, pediatric exclusivity admittedly did not apply to Apotex's

ANDA as of patent expiration on April 20, 2007, because, as FDA concedes, Apotex's ANDA

had been finally approved years before, and there was no ruling on patent infringement or

validity before patent expiration.  ***Thus, all parties agree that, as of patent expiration, there was***

***no pediatric exclusivity as to Apotex.***  Neither FDA nor Astra even attempts to explain how that

pediatric exclusivity somehow reappeared months later when the New York Court issued its

order.  The fact is that such exclusivity did not and could not magically spring into existence

again based on an order entered well after patent expiration.  No one, not FDA or Astra, has cited

any authority to the contrary.  Nor has FDA provided any reasoned basis for departing from its

own binding amlodipine precedent.  *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248,

1258-59 (D.C. Cir. 1996) (stating that an agency must afford similar treatment to comparable

cases); *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 300 F. Supp. 2d 32, 42-43

(D.D.C. 2004) (finding HHS's denial of coverage was arbitrary and capricious due to agency's

inconsistent treatment of similarly situated parties); *Bracco Diagnostics, Inc. v. Shalala*, 963

F. Supp. 20, 27-28 (D.D.C. 1997) (granting injunctive relief based on FDA's disparate treatment

of one product as a device and another product as a drug).[4]

        FDA and Astra now attempt to distinguish the amlodipine matter on the ground

that FDA supposedly ***would*** have converted Mylan's approval, but for the Federal Circuit's stay

of the district court's order in that case.  (*See* FDA Opp'n Mem. at 12; Astra Opp'n Mem. at 17-

18).  What they omit, however, is that FDA was only considering such action based on an

---

[4] *See also Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (quoting *Greater Boston Tel. Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) for proposition that should an agency change its course, it "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (finding Treasury acted arbitrarily for not conforming its electronic benefits transfer policies to its existing regulations nor offering a "'reasoned analysis'" for the difference).

infringement ruling that occurred well *before* patent expiration.  There is no suggestion in the amlodipine matter, or anywhere else for that matter, that an infringement ruling issued *after* patent expiration has any bearing on pediatric exclusivity, let alone that it revives such exclusivity that, as here, has already been extinguished.  On the contrary, the amlodipine matter firmly established that an ANDA (like Apotex's ANDA here) that is finally approved as of patent expiration, before any ruling on infringement or validity, is not subject to pediatric exclusivity.

For much the same reasons, FDA's and Astra's exclusive reliance on *Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004), which involved the drug fentanyl, for their argument that FDA was authorized and obligated to revoke or convert Apotex's final approval is sorely misplaced.  (*See* FDA Opp'n Mem. at 15-18; Astra Opp'n Mem. at 14-16).  Unlike here, and as Astra grudgingly concedes, the district court's infringement ruling in the fentanyl matter occurred well *before* patent expiration, as did FDA's determination that the NDA-holder was entitled to a period of pediatric exclusivity for its fentanyl patch drug products.  *See Mylan*, 389 F.3d at 1277 (noting that the district court issued its § 271(e)(4)(a) order on March 24, 2004, some four months prior to the patent's July 23, 2004 expiration, and that FDA determined that Alza was entitled to pediatric exclusivity on June 22, 2004, more than one month prior to the patent's expiration).  While FDA simply ignores these facts altogether, Astra dismisses them without support or authority, arguing that "the date of patent expiry does not affect FDA's authority or its responsibility to respond to the patent court's order."  (Astra Opp'n Mem. at 15).  Not so.  On the contrary, that fact is dispositive here because FDA squarely concluded in the amlodipine matter that pediatric exclusivity does *not* apply to ANDAs (like Apotex's ANDA) that have final approval at the time of patent expiration.  ***Thus, unlike the***

6

*fentanyl matter, there was no pediatric exclusivity to enforce here as of April 20, 2007, when the patents expired.* At bottom, nothing in the fentanyl matter suggests, much less compels, that a final approval issued years ago can be rescinded or converted based on an order finding the patents valid and infringed issued *after those patents have expired.*

In fact, it bears emphasizing the striking and cavalier manner in which FDA and Astra simply dismiss the relevance of patent expiration here. This fact is critical, and indeed key, not only to the application of pediatric exclusivity, but to the overall effect of FDA's decision here. By rescinding Apotex's approval based on a ruling issued after patent expiration, FDA has not only revived a pediatric exclusivity that no longer exists, but also effectively extended the terms of expired patents. This is not only bad policy, but violates well-settled law that the subject matter of expired patents passes into the public domain and the free use of the public. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989) ("We have long held that after the expiration of a federal patent, the subject matter of the patent passes to the free use of the public as a matter of federal law." (citations omitted)); *id*. at 165 ("For almost 100 years it has been well established that in the case of an expired patent, the federal laws *do* create a federal right to 'copy and to use.'"); *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1550 (Fed. Cir. 1994) ("Because the rights flowing from a patent exist only for the term of the patent, there can be no infringement once the patent expires.").

Moreover, contrary to Astra's assertion, Apotex does not argue for a "sweeping policy" prohibiting the application of pediatric exclusivity to a finally approved ANDA. (*See* Astra Opp'n Mem. at 16-18).[5] Nor is Apotex ignoring the fact that it lost its patent challenge in the district court, though that ruling is on appeal, and Apotex expects it to be reversed. Such

---

[5] Astra complains that Apotex has taken language from FDA's amlodipine decision out of context. (Astra Opp'n Mem. at 17-18). That is simply not true, as Apotex has not tried to argue for the "sweeping policy" that would be supported by reading FDA's amlodipine decision literally.

exclusivity might be possible where the adverse patent ruling occurs *before* patent expiration. But it simply defies reason, as well as the statute and the prior amlodipine precedent, to apply pediatric exclusivity here where the ruling occurred well after patent expiration; well after the ANDA was finally approved; and well after pediatric exclusivity was admittedly already extinguished as to Apotex. To hold otherwise would revive the pediatric exclusivity out of thin air and, contrary to well-settled law (discussed above), effectively extend the term of expired patents. Neither Astra nor FDA has provided any rationale or authority for such an absurd result.

Astra's conclusory assertion that such a result is bad public policy because it purportedly subjects the application of pediatric exclusivity to the vagaries of patent litigation is simply not true. (*See* Astra Opp'n Mem. at 19, 25-27). First, as FDA concluded in the amlodipine matter, Congress determined that pediatric exclusivity simply does not apply to an ANDA that is approved as of patent expiration and before any infringement ruling. This makes perfect sense too, since the NDA-holder should not receive a windfall after its patents have expired, and the patented drug passes into the public domain and the free use of the public—a critical point apparently lost on Astra. Allowing for pediatric exclusivity in these circumstances would effectively result in an unwarranted extension of the patent term, a result most assuredly against public policy. *See Bonito Boats*, 489 U.S. at 152 (recognizing that "after the expiration of a federal patent, the subject matter of the patent passes to the free use of the public"); *Kearns*, 32 F.3d at 1550 (recognizing that "there can be no infringement once the patent expires"). Second, Astra will receive no meaningful pediatric exclusivity here no matter how this litigation is resolved, since the market is already fully "genericized" by other competitors even without Apotex. So there can be no serious argument—and indeed it is ludicrous to suggest—that reinstating Apotex's approval will somehow diminish the incentive to conduct pediatric studies.

And third, Astra's criticism rings especially hollow given the facts here, most notably Astra's unreasonable delays. Astra had well over three years to attempt to preclude the approval of and/or marketing by Apotex and others by seeking a preliminary injunction before patent expiration, yet admittedly Astra sat on its hands and did nothing. It should not be heard to complain now that its patents have expired.

   *The bottom line is that, as of patent expiration on April 20, 2007, there was no longer any possibility for pediatric exclusivity as to Apotex.* Absent such exclusivity, FDA had no basis or lawful authority to rescind or convert Apotex's final approval. For this reason alone, FDA's decision cannot stand.

   **B.    FDA Was Not Bound By, And Should Not Have "Simply Implemented," The New York Court's Judgment.**

   FDA admits that it blindly deferred to the New York Court when it "*simply implemented the New York Court's Order.*" (FDA Opp'n Mem. at 13 (emphasis added); *see also id.* at 16 ("Once the Federal Circuit declined to stay the New York court's order, FDA's role was limited simply to administratively implementing the binding order")). But FDA fails to provide any authority supporting its actions (or inactions as the case may be) for its baseless position that it had "no room . . . to exercise its discretion" on an issue that Congress delegated and entrusted solely to FDA. (*Id.* at 12-14). Not only did FDA have the discretion, but it was in fact obligated to engage in independent and reasoned decision-making and bring its expertise and experience to bear on the issue of whether an NDA-holder is entitled to pediatric exclusivity. By failing to do so, FDA engaged in arbitrary and capricious conduct that can only be remedied by this Court.

   To begin with, the Court can and should easily dispatch with FDA's dramatic assertions that Apotex is somehow asking the Agency to "defy, "ignore," or otherwise

"disregard" a court order. (*See* FDA Opp'n Mem. at 4, 11, 15-16, 18-19). Nothing could be further from the truth. As all parties agree, FDA was not a party to the New York action (*see id.* at 11-12, 16-17), and the New York Court did not—and indeed could not—expressly order FDA to do anything, let alone revoke Apotex's final approval.[6] Indeed, Astra has requested such injunctive relief directly against the Agency, but the New York Court has thus far not granted it. What the New York Court did do was enter an order purporting to reset the effective date of Apotex's approval to the expiration of Astra's purported pediatric exclusivity. Apotex used the term "purported to reset" because, as discussed above, there are compelling reasons why there is no pediatric exclusivity to enforce here as to Apotex, reasons that FDA apparently felt it could ignore. In its June 21, 2007 letter, Apotex merely requested that FDA address those reasons and determine in the first instance whether there is any pediatric exclusivity to enforce here, just as FDA did in the amlodipine and fentanyl matters, and just as it is obligated to do here, as discussed below. (*See* AR Tab 3). That is a far cry from asking FDA to ignore or defy a court order. The simple truth is that FDA could and should have implemented the New York Court order by determining that there is no pediatric exclusivity to enforce, and thus no reason to revoke Apotex's approval. That is not defiance, but rather reasoned agency decision-making consistent with FDA's statutory mandate.

---

[6] Indeed, for FDA even to suggest that it always follows and implements court orders no matter the circumstances, without considering and fully analyzing the underlying facts, is both disingenuous and untrue. In a prior matter involving ANDAs for the drug Taxol, FDA specifically analyzed a district court's order and rejected the court's recommendation that FDA toll the time for patent listing, on the ground that FDA was not a party to the litigation and that the court had no jurisdiction. *See Am. Bioscience*, 269 F.3d at 1081-82, 1084 n.9 ("Paradoxically, in rejecting the district court's tolling recommendation [FDA] emphasizes the California district court had no jurisdiction and the FDA was not a party."). Clearly FDA does not always blindly defer to court orders without a reasoned basis.

**1.    FDA Admits That It Has The Statutory Authority To Determine Whether An NDA-Holder Has Pediatric Exclusivity.**

FDA concedes, as it must, that it has the authority to freely "construe the pediatric exclusivity provision as it sees fit . . . ." (FDA Opp'n Mem. at 18).  In fact, FDA suggests that had it done so here, it might have reached "a different outcome than the New York court did here."[7]  (*Id.*).  This position only highlights the travesty that has occurred here and the egregiousness of FDA's conduct, and why Apotex seeks the relief it does.

Indeed, it is FDA and FDA alone that has the express authority to determine whether an NDA-holder is entitled to pediatric exclusivity.  *See Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d 106, 118 (D.D.C. 2004), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004) (holding that "issues relating to the ANDA's approval and the applicability of the pediatric exclusivity provisions" are "subject areas that have clearly been entrusted to the FDA by Congress").[8]  This is precisely the authority that FDA exercised in the amlodipine and fentanyl matters, and to which the courts deferred.  *See, e.g., id.* (deferring to FDA's determination that Mylan was barred by Alza's pediatric exclusivity for Duragesic®); *see also Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 121-22 (D.D.C. 2007) (deferring to FDA's determination that Teva was barred by Pfizer's pediatric exclusivity for Norvasc® but Apotex was not).

---

[7] This makes the circumstances with which Apotex is presented here even more egregious, as FDA essentially admits that it could have prevented the harm Apotex is currently suffering, but it simply chose not to, and now tries to argue that this Court can do nothing about it.  (*See, e.g.*, FDA Opp'n Mem. at 11 (arguing that to now reverse FDA's decision, regardless of how improper it may be, essentially is a "'mandatory injunction' that must be reviewed 'with even greater circumspection'")).

[8] *See also* 21 U.S.C. § 355a(d) (granting FDA authority to determine whether pediatric studies submitted by the NDA-holder are sufficient); 21 U.S.C. § 355a(f) (requiring FDA to "publish a notice of any determination that the requirements of subsection (d) of this section have been met and that submissions and approvals under subsection (b)(2) or (j) of section 355 of this title for a drug will be subject to the provisions of this section"); *see also generally* FDA, *Guidance for Industry: Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act* (Sept. 1999) (setting forth FDA's standards for determining whether a brand manufacturer is entitled to pediatric exclusivity).

FDA simply chose not to do so here, but rather freely permitted the district court to usurp the very powers and authority delegated to it by Congress.  (*See, e.g.*, FDA Opp'n Mem. at 15-16 ("the court determined, **based upon its own reading of the relevant statutes, its authority thereunder**, and its inherent equitable power, that the appropriate remedy for infringement would be to reset the effective date of an infringing ANDA" (emphasis added)).  As such, FDA's letter ruling is arbitrary, capricious and contrary to law.

## 2. FDA Cannot Shirk Its Duties By Relying Blindly On The New York Court's Construction Of The Pediatric Exclusivity Statute.

FDA argues that the New York Court had the power to "construe the patent statute and pediatric exclusivity provision . . . ."  (FDA Opp'n Mem. at 14).  But whether a district court has the power to construe a statute or whether the court engages in a detailed analysis (which the New York Court here did not) is irrelevant.  What is relevant, and at the heart of this dispute, is that a court's statutory construction simply cannot trump that of an administrative agency.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005); *see also Teva Pharms. USA, Inc. v. FDA ("Pravastatin")*, 441 F.3d 1, 4-5 (D.C. Cir. 2006) (quoting *Brand X*).

In a mere sentence, FDA strains to dismiss *Brand X* and *Pravastatin* as inapplicable here—arguing that nothing "authorizes an agency to disregard a controlling court order."[9]  (FDA Opp'n Mem. at 18).  But this argument is, at minimum, misplaced because that order is not "controlling" on the issue of pediatric exclusivity, and otherwise entirely ignores controlling law on this issue.  Indeed, as the Supreme Court recognizes, "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference **only** if the prior court decision holds that its construction follows from the unambiguous terms of

---

[9] Significantly, Astra does not even address these authorities, much less argue that they do not apply here.

the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added); *see also Pravastatin*, 441 F.3d at 4-5 (quoting *Brand X*).  Thus, FDA had every right and indeed obligation to "choose a different construction [than the New York Court], since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." *Brand X*, 545 U.S. at 983; *see also Pravastatin*, 441 F.3d at 4 ("In a suit challenging agency action, it is not for the court to choose between competing meanings of an ambiguous statute when the agency charged with its administration has not weighed in first." (internal quotation marks and citations omitted)).

Here, of course, FDA admittedly and blindly deferred to the New York Court's order without regard to whether there was any pediatric exclusivity or not, or any other reason to rescind Apotex's approval until October 20, 2007—all on the ground that FDA was simply following orders.  This "following orders" approach does not cut the mustard under any standard of review.  FDA must have a reasoned and lawful basis for revoking the approval of a safe and effective drug that has been marketed for over three years.  Had the district court's order said that approval must be delayed indefinitely until the cows come home, no one would seriously dispute that FDA could not reasonably implement that order without inquiring into and analyzing the precise basis for withdrawing approval of a safe and effective drug product indefinitely.  The same is true here—FDA cannot simply withdraw Apotex's approval until October 20, 2007, for no reason other than it is "following orders"; rather, the Agency is obligated to determine whether in fact there is pediatric exclusivity to enforce here that would justify, and provide a reasoned basis for, the withdrawal or conversion of Apotex's approval.  FDA's admitted and intentional failure to do so is not the stuff of reasoned agency decision-making—far from it in

fact, it is the complete abdication of the Agency's statutory responsibility to administer the statute entrusted to it by Congress.

Accordingly, FDA was not even remotely bound by the New York Court's erroneous determination as it repeatedly insists. Rather, Congress clearly entrusted the issue of Astra's eligibility for pediatric exclusivity and whether Apotex's final approval status was affected in any way by that exclusivity to FDA. *See Mylan*, 332 F. Supp. 2d at 118. That FDA "simply implemented" the New York Court's order, merely for the sake of implementing a court order, violates the most basic principles of reasoned agency decision-making, and as such, FDA's letter ruling must be vacated. *See Am. Bioscience*, 269 F.3d at 1086 (vacating FDA decision to approve an ANDA due to FDA's failure to adequately explain its decision involving an Orange Book patent listing dispute).

### C.    FDA's Slipshod Decision Is Entitled To No Deference From This Court.

As articulated in Apotex's opening brief, it is an understatement to say that FDA issued the decision under review without any care or formality, much less deliberation or reasoned agency decision-making. Contrary to what the Agency has done in similar matters (most recently amlodipine), FDA admittedly did not address a single issue or argument raised by Apotex or Impax; did not solicit any comment or input from other interested parties; and issued a cursory 2-page letter with no meaningful explanation of any kind.

The matter before FDA was unprecedented. Never before has FDA had to consider whether to pull a safe and effective generic product from the market after patent expiration, much less based on a patent ruling that occurred after patent expiration and a period of purported pediatric exclusivity that admittedly did not exist as to Apotex as of patent expiration. At the very least, FDA should have addressed the issue of pediatric exclusivity, including how it was supposedly revived and applies here, as well as the Agency's admitted

14

departure from the amlodipine precedent.  FDA's failure to do so renders its cursory, slipshod decision arbitrary and capricious, and entitled to no deference from this Court.

        The best FDA can say in response is that there are no novel issues of statutory construction or administrative practice, and no reason for FDA to weigh competing views, exercise its discretion or issue a more formal decision.  (FDA Opp'n Mem. at 19).  That is not only untrue, but that position is before this Court only by way of the *post hoc* rationalizations of litigation counsel, which are entitled to no deference and have no place in a judicial challenge to agency action.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 50 (1983) (stating that "courts may not accept . . . counsel's *post hoc* rationalizations for agency action" (citation omitted)); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (same); *see also New York State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 139 (D.D.C. 2003) (refusing to defer to agency interpretation based on rationale first adopted in litigation); *see also Hill v. Norton*, 275 F.3d 98, 105 (D.C. Cir. 2001) (finding agency action arbitrary and capricious where terms of statute were contrary to agency's decision and agency offered no more than *post hoc* rationalizations to justify its position).  FDA itself provided no explanation at all for its actual decision.  What's more, it is well settled that this Court owes no deference to FDA's reading of the New York Court's order in any event, especially where it is done through an informal adjudication with no explanation for the Agency's action.  *See Am. Bioscience*, 269 F.3d at 1084.

        For these reasons as well, FDA's decision does not withstand judicial scrutiny. At a minimum, the Court should vacate FDA's decision pending a formal and complete response from the Agency decisionmaker, not *post hoc* rationalizations from litigation counsel.

**II.    The Harm To Apotex Is Substantial And Irreparable.**

No one disputes that Apotex stands to suffer substantial economic harm due to FDA's revocation of Apotex's approval.  FDA focuses primarily on this economic harm in arguing that an injunction is not justified here.  (FDA Opp'n Mem. at 20-21; *see also* Astra Opp'n Mem. at 23).  In doing so, FDA disregards a critical point—that FDA's revocation will cause (and is causing) Apotex tremendous ***intangible*** harm to things such as its reputation and goodwill.  FDA and Astra pass off this harm as "speculative and unsupported," (FDA Opp'n Mem. at 21; *see also* Astra Opp'n Mem. at 23-24); but neither proffers any evidence—nor could they—to rebut the fact that Apotex will continue to suffer real detrimental harm (both tangible *and* intangible) from the drastic measures FDA has taken here that can only be remedied, if at all, by injunctive relief.[10]

Apotex has spent over three years building a secure position as the leading generic supplier of omeprazole products.  This role has fostered many tangible benefits for Apotex, including customer confidence, goodwill and reliance, a strong reputation as an industry leader, and access to important customers.  Now, FDA's improper revocation of Apotex's finally-approved ANDA has essentially destroyed overnight everything for which Apotex has worked so hard.  (McIntire Supp. Decl.[11] ¶ 6).

Indeed, Apotex is already suffering major blows to its reputation as a quality leader in not only the generic omeprazole market, but in the generic marketplace overall.  For

---

[10] FDA also appears to forget that, "whether or not [Apotex] has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy."  *Am. Bioscience*, 269 F.3d at 1084.  Here, of course, Apotex has made its case on the merits under the APA, and is also suffering irreparable injury.  But even without such injury, Apotex is entitled to relief, including vacatur of FDA's decision.  *See id.* ("If the appellant . . . prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order." (citations omitted)).

[11] References to "McIntire Supp. Decl." are to the Supplemental Declaration of Tammy L. McIntire submitted concurrently herewith.

instance, Apotex's competition is instilling fear in customers as to the quality and safety of Apotex's products and further directly attacking Apotex's reputation as a quality leader in order to unfairly take advantage of the market circumstances and the conversion of Apotex's approval. (McIntire Supp. Decl. ¶ 8).  This, in turn, is resulting in market confusion as to the status of Apotex's omeprazole products and further negatively impacting Apotex's reputation as a provider of safe, effective products.  (*Id.* ¶ 5).

      The harm resulting from the sudden removal of Apotex's generic omeprazole products from the market extends well past, such things as, a loss of good will and damage to reputation; this harm now includes the actual termination of certain customer relations Apotex has worked so hard to establish over the years.  (McIntire Supp. Decl. ¶ 7).  At least one of Apotex's long-standing customers has already dropped Apotex as a future supplier as a result of FDA's revocation of Apotex's longstanding approval.  (*Id.*).  Apotex fully anticipates that this type of reaction by its customers will only escalate during the next few months while Apotex is forced to wait to continue marketing and supplying its omeprazole products.  (*Id.*).  In light of the extremely competitive nature of the generic industry, these losses undoubtedly will adversely affect Apotex's sales opportunities across all of its product lines.  (McIntire Decl.[12] ¶ 17).  This harm is anything but "speculative."

      These circumstances only further support what Apotex originally feared—the conversion of Apotex's final approval will result in negative goodwill and an irreparably damaged reputation as a provider of safe and effective generic drugs, and prevent Apotex from ever returning to the strong market position it enjoyed for over three years.  (McIntire Supp.

---

[12] References to "McIntire Decl." are to the Declaration of Tammy L. McIntire, dated July 2, 2007, submitted in connection with Apotex's opening brief in support of its motion for temporary restraining order and/or preliminary injunction.  (*See* Dkt. Entry 3).

Decl. ¶ 9).  This is all harm that rises well above economic concerns, but touches upon the very intangible factors that have permitted Apotex to develop the market stature it has.  Thus, combined, these tangible and intangible harms more than suffice to establish the irreparable nature of the injuries that Apotex would suffer absent the requested injunction.  *See Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1011 n.8 (D.C. Cir. 1999); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998).[13]

FDA and Astra also suggest that Apotex's injury is somehow self-inflicted because Apotex knew that it ran the risk of an adverse outcome in the patent case and the removal of its product from the market.  (*See* FDA Opp'n Mem. at 2, 21-22; Astra Opp'n Mem. at 3, 10, 22-23).  But both FDA and Astra both overlook a critical factor in this connection— expired patents cannot be infringed.  *See Kearns*, 32 F.3d at 1550.  Whatever risk Apotex undertook by marketing before patent expiration has absolutely nothing to do with the unprecedented harm that Apotex is suffering now by virtue of having its product removed from the market *after patent expiration*.  As already noted, it is well settled law that, after patent expiration, Apotex has the absolute right to market its product free from infringement liability. *See Bonito Boats*, 489 U.S. at 152 ("We have long held that after the expiration of a federal patent, the subject matter of the patent passes to the free use of the public as a matter of federal law."); *id*. at 165 ("For almost 100 years it has been well established that in the case of an expired patent, the federal laws *do* create a federal right to 'copy and to use.'").  Yet FDA's

---

[13] And practically speaking, this type of harm cannot be undone by simply circulating a copy of FDA's letter decision to customers, as Astra disingenuously suggests—especially a cursory 2-page letter that contains no meaningful explanation at all for FDA's abrupt action.  (Astra Opp'n Mem. at 24).  It is Apotex's sudden inability to supply product as a result of FDA's ruling that is causing the harm Apotex is suffering.  Circulating a piece of paper will not change this.  Customers need supply of this important product for the consuming public now.  Thus, unless Apotex is permitted to supply the product now, it is inevitable that it will continue to suffer all of the harm (tangible and intangible) complained of herein.

decision prevents Apotex from doing exactly that, effectively extending the terms of the expired patents.  This *post*-patent-expiration harm is not self-inflicted, but rather the direct result of FDA's unlawful decision.

### III.  The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate Injunctive Relief.

FDA concedes that it has "no commercial stake in the outcome of this litigation" and therefore can suffer no harm, much less irreparable harm.  (*See* FDA Opp'n Mem. at 22).  Yet, absent injunctive relief, Apotex stands to lose and/or has already lost, among other things, goodwill with its customers, its reputation as a reliable provider of safe and effective omeprazole products and other significant tangible and intangible benefits.  (*See, e.g.*, McIntire Decl. ¶¶ 16-20, 25; McIntire Supp. Decl. ¶¶ 5-9).

Moreover, no harm can come to Astra should the Court enter injunctive relief.  FDA argues that Astra is entitled to "the full statutory benefit it would have received but for Apotex's infringement of its patents."  (FDA Opp'n Mem. at 23*; see also* Astra Opp'n Mem. at 24 (arguing that it "has already lost one-third of the period of pediatric exclusivity it earned against Apotex")).  This argument is flawed because this exclusivity was not "earned against Apotex" and, even more importantly, there is no "benefit" left to be had in this market.  Indeed, no exclusivity of any kind exists that could affect Apotex's final approval.  This argument further makes no sense because it completely ignores that the market is already saturated by several other generics that will be able to continue marketing, regardless of the outcome of this suit.

Nor can Astra claim harm based on any purported loss of market share because Astra stands to gain no market share or sales even with Apotex off the market in any event.  (*See* McIntire Decl. ¶ 21).  Rather, because the omeprazole market is "genericized," other generic suppliers, not Astra, will gain Apotex's market share.  (*See id.*).  And FDA's and Astra's ironic

arguments that other generics "would be subject to additional competition from Apotex" fare no better.  (FDA Opp'n Mem. at 23; *see also* Astra Opp'n Mem. at 24 ("non-infringing generic manufacturers might lose sales if Apotex continues to market")).  Apotex has been marketing for over three years and in fact was (and anticipated continuing to be) the leading provider of generic omeprazole drug products in the U.S. market.  (McIntire Supp. Decl. ¶ 6).  Therefore, if Apotex were to stay on the market, other generics would continue to face the same competition they have faced for years.

Thus, in short, neither FDA nor Astra stands to gain (or lose for that matter) anything regardless of whether Apotex is on or off the market; while Apotex, on the other hand, stands to lose everything if it is forced to discontinue marketing of its products until at least October 2007.  Accordingly, the balance of harms tips decidedly in favor of granting Apotex's request for a preliminary injunction.  *See Mova*, 140 F.3d at 1066.

## IV.    An Injunction Would Further The Public Interest.

Finally, the public will only benefit from entry of injunctive relief here.  FDA and Astra both ignore an essential element in the balancing process in which the Court must engage here—the public's interest in the "'faithful application of laws.'"  *Mova*, 140 F.3d at 1066.  That interest would be best served by requiring FDA to apply the governing statute in a manner that is consistent with FDA's prior rulings and the plain statutory language.  At the very least, the public has an interest in FDA engaging in thoughtful and reasoned decision-making, not the blind deference that occurred here.  Any other result would improperly permit FDA to evade its duties as it has done here by blindly deferring to the New York Court's order on a matter that will potentially have a detrimental impact on the public.  Such circumstances only serve to discourage the public's confidence that laws will be applied faithfully.  FDA even agrees that it is charged with "implementing the statutory scheme governing the approval of generic drugs."

(FDA Opp'n Mem. at 22). Apotex only seeks to ensure that FDA in fact properly implements that scheme here.

Moreover, FDA agrees that the public benefits from having lower cost drugs available in the marketplace. (FDA Opp'n Mem. at 22). This interest is best served with increased generic competition.[14] (*See* McIntire Decl. ¶ 23). The public also has an undeniable interest in, and indeed the right to, complete and full generic competition after expiration of Astra's patents.

Astra nonetheless harps on the idea that granting the relief Apotex seeks here would essentially discourage companies from conducting pediatric studies. (Astra Opp'n Mem. at 25-27). This is nonsense. Other than conclusory allegations, Astra provides no basis to justify that these circumstances would in fact occur. But regardless, there is no pediatric exclusivity to enforce here in any case. As FDA recently held in the amlodipine matter, a finally approved ANDA (like Apotex's ANDA here) is "not blocked by [a brand manufacturer's] pediatric exclusivity . . . under the literal terms of the [pediatric exclusivity] statute." (AR Tab 3, Ex. 4 at 5 n.4). Therefore, granting the relief Apotex seeks is not in any way contrary to Congress's intent; if anything granting this relief only forces FDA to comply with Congress's intent under the plain language of the pediatric statute.

Thus, the public interest favors entry of an injunction here.

## CONCLUSION

Apotex has made the requisite showing for immediate injunctive relief. Simply put, FDA cannot ignore its own binding precedent holding that pediatric exclusivity does not

---

[14] As a general matter, based on decades of experience, generic prices almost always go down as the number of generic competitors goes up. (McIntire Supp. Decl. ¶ 10). Thus, contrary to Astra's contention (Astra Opp'n Mem. at 27 n.11), permitting Apotex to continue marketing would provide for fuller generic competition, which ultimately provides incentive for lower prices.

apply to an ANDA—like Apotex's omeprazole ANDA here—that is finally approved before patent expiration and any ruling on infringement or validity.  Nor can FDA blindly follow the New York Court's order and abandon its statutory obligation to independently engage in reasoned agency decision-making on the question of whether Astra is entitled to such exclusivity in the first place.  Because Astra is not entitled to such exclusivity under FDA's own precedent, FDA had no lawful basis to revoke Apotex's final approval, and its decision must be set aside as arbitrary, capricious and contrary to law.  Because Apotex has already suffered devastating and irreparable harm, and because neither FDA nor any other interested party will suffer in the least, the Court should enter an order setting aside FDA's decision and requiring FDA to immediately reinstate Apotex's final approval and refrain from further revoking and/or converting that approval.

In the event the Court denies such relief, Apotex respectfully moves for an injunction allowing Apotex to maintain its final approval pending an appeal of this matter to the D.C. Circuit, in order to prevent further devastating and irreparable harm to Apotex.

Dated:  July 9, 2007.                         Respectfully submitted,

APOTEX INC.

By:    /s/ Arthur Y. Tsien
         Arthur Y. Tsien, D.C. Bar No. 411579
         Kathryn E. Balmford, D.C. Bar No. 482279
         OLSSON, FRANK AND WEEDA, P.C.
         1400 16th Street, N.W., Suite 400
         Washington, D.C. 20036-2220
         (202) 789-1212
         (202) 234-3550 (facsimile)

<u>Of Counsel</u>:
William A. Rakoczy, D.C. Bar No. 489082
Amy D. Brody, D.C. Bar No. 478100
Natalie G. Mitchell
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| APOTEX INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-01194-RMU |
| v. | ) | |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## SUPPLEMENTAL DECLARATION OF TAMMY L. MCINTIRE

I, TAMMY L. MCINTIRE, declare as follows:

### Introduction and Background

1.      I am the President of Apotex Corp., which is located in Weston, Florida.  Apotex Corp. is the exclusive marketing and sales company in the United States for Apotex Inc., a Canadian-based pharmaceutical company that develops and manufactures generic drugs for sale in the United States and throughout the world.   For convenience and clarity, I will refer to Apotex Inc. and Apotex Corp. collectively in this Supplemental Declaration as "Apotex."

2.      I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify as to the same.

3.      I submit this Supplemental Declaration in support of Apotex's motion for temporary restraining order and/or preliminary injunction, and more specifically in connection with Apotex's reply in support of its motion for temporary restraining order and/or preliminary injunction.

**Irreparable Harm to Apotex**

4.      Upon receiving notice of FDA's June 28, 2007 letter ruling, Apotex immediately stopped marketing and selling its omeprazole products in the United States.  Before that time, however, Apotex had lawfully supplied safe and effective generic omeprazole products to the U.S. market for over three years under what was Apotex's finally-approved omeprazole ANDA.

5.      FDA's revocation of Apotex's final approval is not only negatively impacting Apotex's business in terms of sales, but just as critically is tremendously damaging Apotex's reputation as the leading provider of safe and effective generic omeprazole, and also causing enormous confusion concerning the status of this drug product.

6.      In the more than three years during which Apotex was marketing its generic omeprazole products, Apotex gained a reputation as a reliable provider of safe and effective omeprazole products, and indeed the market leader for this product.  In fact, Apotex was (and anticipated continuing to be) the leading provider of generic omeprazole drug products in the U.S. market.  This reputation and market status that Apotex worked so hard to gain and maintain essentially has diminished overnight in light of FDA's improper revocation of Apotex's finally-approved ANDA.

7.      Indeed, at least one of Apotex's long-time customers has already dropped Apotex as a supplier.  I anticipate that this immediate loss in customer confidence that occurred just days after FDA's revocation of Apotex's ANDA will only escalate during the next few months as Apotex is forced to wait to continue marketing and supplying its omeprazole products.  While Apotex may never be able to undo all of the harm it has already suffered, by granting the relief Apotex seeks herein, the Court can give Apotex an opportunity to salvage what relationships and goodwill remain.

8.      Moreover, on information and belief, Apotex's competition is instilling fear in customers as to the quality and safety of Apotex's products and attacking Apotex's reputation as a quality leader not only in the generic omeprazole market, but in the generic marketplace overall, in order to unfairly take advantage of the market circumstances and the revocation of Apotex's approval.

9.      These circumstances only further support what Apotex originally feared—the revocation of Apotex's final approval will result in negative goodwill and an irreparably damaged reputation as a provider of safe and effective generic drugs, and prevent Apotex from ever returning to the strong market position it enjoyed for over 3 years.

## Effect of Generic Competition on Pricing

10.      Based on my experience, generic prices generally decrease as the number of generic competitors increases in the market.

11.      The foregoing facts are true and correct as I verify and believe.

Dated this 9th day of July, 2007.

I, TAMMY L. MCINTIRE, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.


_____/s/ Tammy L. McIntire_____
TAMMY L. MCINTIRE